**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| MUNA AL-SUYID, individually and on behalf of the estates of her family members ABDEL SALAM AL-SUYID, IBRAHIM AL-SUYID, KHALID AL-SUYID and MUSTAFA AL-SUYID, and ABDALLA AL-KRSHINY, AHMAD AL-KRSHINY, MAHMUD AL-KRSHINY, and IBRAHIM AL-KRSHINY, individually and on behalf of his family member ALI AL-KRSHINY and MUSTAFA AL-KRSHINY, : : : : : : : : : : : | |
| : | Civil Action No. _____ |
| Plaintiffs, : | |
| : | **JURY TRIAL** |
| v. : | **DEMANDED** |
| : | |
| KHALIFA HIFTER, KHALID HIFTER, and SADDAM HIFTER : : | February 18, 2020 |
| : | |
| Defendants. : | |

## COMPLAINT

Plaintiff Muna al-Suyid (individually and on behalf of the estates of her father Abdel Salam al-Suyid, and her brothers Ibrahim al-Suyid, Khalid al-Suyid, and Mustafa al-Suyid), Plaintiffs Abdalla al-Krshiny, Ahmad al-Krshiny, Mahmud al-Krshiny, and Plaintiff Ibrahim al-Krshiny (individually and on behalf of the estates of his brothers Ali al-Krshiny and Mustafa al-Krshiny) complain and allege as follows:

### INTRODUCTION

1.       More than thirty years ago, a U.S. Court of Appeals voiced "the universal abhorrence with which torture is viewed" and held that "deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights."

1

*Filartiga v. Pena-Irala*, 630 F.2d 876, 884, 878 (2d Cir. 1980). At the time, the court characterized its decision as one "small but important step in the fulfillment of the ageless dream to free all people from [the] brutal violence" of torture. *Id.* at 890.

2.      In the years since *Filartiga* was decided, both the international community and the United States have taken significant steps to end torture and extrajudicial killings. Internationally, 144 nations, including the United States, committed to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture"). Domestically, the United States criminalized complicity in torture by enacting the Torture Act, 18 U.S.C. § 2340 *et seq.*, and provided civil remedies for victims of torture or extrajudicial killings with the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note.

3.      Individuals who commit these universally reviled acts deserve no immunity and indeed have none under U.S. law. Defendants therefore cannot invoke the doctrines of foreign-official immunity, derivative sovereign immunity, or any other conduct- or status-based immunity.

4.      In 2011, Defendant Khalifa Hifter, an American citizen, left his home in Northern Virginia and went to Libya, taking leadership of the Libyan National Army ("LNA"). His sons Khalid and Saddam Hifter, also American citizens, also became leaders of the LNA under their father's command.

5.      Since they took over the LNA, Defendants have waged an indiscriminate war against the Libyan people. Their forces tortured and killed hundreds of Libyans without any judicial process whatsoever. They displayed a complete disregard for civilian safety and international humanitarian law by carrying out dishonorable, disproportionate, indiscriminate, and unnecessary attacks on densely populated residential neighborhoods, causing devastating consequences. And they have tried to purge the country of so-called extremists, by attacking the

family homes of certain ethnicities, suspected dissidents, and those who simply disagree with Defendants.

6.      Over a two-day period in October 2014, two families were among those in Defendants' crosshairs. Defendants' forces attacked the family homes of the al-Suyids and the al-Krshinys as part of this offensive. Men, women, and children lived in those homes.

7.      The LNA forces nonetheless opened fire, killing many of the men without any semblance of judicial process. Those men who survived the initial assaults were imprisoned, beaten, electrocuted, or shot by Defendants' forces.

8.      Plaintiffs cannot seek justice in Libya, which is largely controlled by the Defendants and their cohorts. Therefore, lacking any chance to seek justice in Libya, Plaintiffs ask this Court to hold these *hostis humani generis* accountable for these atrocities.

## PARTIES

9.      Plaintiff Muna al-Suyid, a citizen and resident of Libya, brings this action in her individual capacity and on behalf of her late father, Abdel Salam al-Suyid, and her late brothers Ibrahim, Khalid, and Mustafa al-Suyid. Pursuant to Libyan law and custom, Muna is the personal representative of Abdel Salam's, Ibrahim's, Khalid's, and Mustafa's estates.

10.      Plaintiff Ibrahim al-Krshiny, a citizen and resident of Libya, brings this action in his individual capacity and on behalf of his late brothers, Ali and Mustafa, Ibrahim is the personal representative of Ali and Mustafa's estates.

11.      Plaintiffs Abdalla al-Krshiny, Ahmad al-Krshiny, and Mahmud al-Krshiny are citizens and residents of Libya and bring this action in their individual capacities.

12.      Defendant Khalifa Hifter is a dual U.S. and Libyan citizen and the current leader of the LNA. He lived in Virginia for years, and owns property in Virginia including in this District.

13.     Defendants Khalid and Saddam Hifter are U.S. citizens and LNA members who lived in Virginia for years, and own property in this District.

## JURISDICTION

A.     <u>Subject Matter Jurisdiction</u>

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332(a)(2), and 1350. This case arises under a law of the United States, the Torture Victim Protection Act of 1991 (the "TVPA"), Pub.L. No 102-256, 106 Stat. 73 (1992), *codified at* 28 U.S.C. § 1350 note.

15.     There is also diversity jurisdiction under 28 U.S.C. § 1332, because there is a diversity of citizenship between Plaintiffs, who are Libyan citizens, and the Hifter Defendants, who are United States citizens. The amount in controversy exceeds $75,000 excluding costs.

16.     This Court may also exercise supplemental jurisdiction over the non-federal claims that are inextricably intertwined with the TVPA claim, pursuant to 28 U.S.C. § 1367(a).

B.     <u>Personal Jurisdiction</u>

17.     Defendant Khalifa Hifter is a United States citizen who is a resident of this District and owns significant assets here.

18.     Defendants Khalid and Saddam Hifter are also U.S. citizens and residents of this District and they also own assets here.

## VENUE

19.     Venue in this jurisdiction is proper under 28 U.S.C. §1391(b)(1)-(3).

## FACTUAL ALLEGATIONS

20.     After a decades' long absence, Khalifa Hifter traveled to Libya in 2011 to fight in Libya's civil war and eventually seized control of the LNA. Once in command, he started a savage

4

and suppressive campaign against ethnic and political minorities in and around Benghazi, Libya. In October 2014, Plaintiffs Muna, Abdel Salam, Ibrahim, Khalid and Mustafa al-Suyid and Ibrahim, Abdalla, Ahmad, Ali, and Mahmud al-Krshiny were civilians living in Benghazi. With his sons, Defendant Khalifa Hifter commanded forces who hunted, tortured, and killed the men of the al-Suyid and al-Krshiny families.

A.      Khalifa Hifter

21.     Many years ago, Defendant Khalifa Hifter helped infamous Libyan dictator Muamar Qadafi overthrow the country's monarchy. After helping lead the revolt, Khalifa served in Libya's military campaign in Chad. Amnesty International accused him of committing war crimes during that campaign, including the extrajudicial killing and torture of prisoners.

22.     Defendant Khalifa Hifter then turned against Qadafi and reportedly became a source for the United States Central Intelligence Agency. During that time, he obtained United States citizenship, and resided in the Commonwealth of Virginia.

23.     When they came to America, the Hifter Defendants established deep contacts with this District. Khalifa Hifter owns a home in Falls Church. His sons purchased (with cash) seventeen properties in Virginia between 2014 and 2017, worth at least eight million dollars. These include homes in Falls Church and Vienna, within the Eastern District of Virginia, and property in Keysville in the Western District of Virginia. Upon information and belief, Defendant Khalifa Hifter purchased those homes with the intent to reside there indefinitely, and he did indeed reside there.

24.     Defendant Khalifa Hifter returned to Libya upon the outbreak of civil war in 2011. He was appointed as a field marshal, and head of the Libyan National Army.

B.    Khalid and Saddam Hifter

25.    Khalifa made his sons, Defendants Khalid Hifter and Saddam Hifter, LNA officers who led forces fighting in Benghazi in 2014. Saddam Hifter also represented the LNA internationally and helped obtain financing for the LNA. Khalid and Saddam aided and abetted their father's crimes, which are described below. All three Hifter Defendants are jointly and severally liable.

B.    "Operation Dignity"

26.    In October 2014 Defendant Khalifa Hifter's LNA, acting on the authority of the government of Libya, launched what they inaptly called "Operation Dignity" against those suspected to oppose the LNA, especially in the city of Benghazi. During Operation Dignity the LNA, under the Hifter Defendants' command, violated *jus cogens* norms in its treatment of civilians and detainees through extrajudicial killing and torture.

27.    For example, Ashraf al-Mayar, an LNA official under the command responsibility of Defendant Khalifa Hifter, issued a video announcement commencing Operating Dignity. In it, al-Mayar stated that the LNA was "in the process of preparing a plan to divide the city of Benghazi into squares," that they "had lists of names of all those who worked for the Libya Shield and Ansar al-Sharia," that they marked the location of those individuals' homes, and finally that "on each map, there was an accurate description of the house of such-and-such and that they will all be liquidated." Al-Mayar issued a religious ruling to that end, specifying that the LNA would kill any prisoners.

28.     As noted by a leading human rights organization, "Serious human rights abuses and violations of international humanitarian law" were then "perpetrated in Benghazi" by forces loyal to retired General Khalifa Hifter."[1]

(i)     *The al-Suyid plaintiffs*

29.     On or about October 15, 2014, the first day of Operation Dignity, LNA units of "Neighborhood Youths" (including child-soldiers) led by Major General Abdulrazaq al-Naduri and co-conspirator Wanis Bukamada, both under Defendant Khalifa Hifter's command responsibility, surrounded the family home of the al-Suyids in Benghazi. The al-Suyid home housed men and women, and seven children as young as six months old.

30.     The al-Suyid family home was taken under fire by Defendants' LNA. A gunfight ensued, during which Muna al-Suyid's brothers Mustafa and Khalid defended the family home. Her father Abdel Salam and brother Ibrahim were kidnapped on their way home to rescue the family. As noted during a father-daughter telephone call, these two men were taken—alive—as prisoners to a nearby school where they were beaten.

31.     Muna then received a phone call demanding that she surrender her other brothers Mustafa and Khalid, if she wanted to see her father and brother Ibrahim alive again. Muna refused. Her brother Mustafa was subsequently shot and killed in the fighting. Her brother Khalid was wounded in the fighting, and later discovered dead; the exact circumstances of his death are unknown.

---

[1] Amnesty International, *Libya: Rule of the Gun*, (2014), at 1,
https://reliefweb.int/sites/reliefweb.int/files/resources/rule_of_the_gun.pdf.

32.     On or about October 16, 2014, the day after they were seized, and absent any intervening judicial process, Muna learned that Abdel Salam and Ibrahim's bodies were discovered in a nearby industrial area. She identified her relatives in a local morgue.

33.     The two men, taken alive by Defendants' LNA, were victims of extrajudicial killings while in LNA custody. There is no evidence that any judicial process took place, and as only a day passed between the men's capture and execution, there was not enough time to conduct any trial with due process. Visible injuries to their bodies indicated to Muna that her father and brother suffered torture before their deaths.

(ii)     *The al-Krshiny plaintiffs*

34.     Two days later, on or about October 17, 2014, the LNA was still executing Operation Dignity. LNA units led by co-conspirators Major General Jamal al-Zahawi and Colonel Almadi al-Bargathi, both under Defendant Khalifa Hifter's command responsibility, attacked the al-Krshiny family home in Benghazi. The al-Krshiny home housed men, women (one of whom was pregnant), and fourteen children.

35.     The LNA apparently targeted the al-Krshiny family because they hailed from the city of Misrata, Libya. LNA propagandist Khalid Bulagheeb had called for the expulsion of Misratans from Benghazi and named the al-Krshinys as one of those families.

36.     The al-Krshiny family home was taken under fire by the LNA, and a gunfight ensued. Two members of the extended al-Krshiny family were killed in the attack. Ibrahim al-Krshiny was wounded in the eye by shrapnel. He and his five surviving brothers were taken prisoner by Colonel Bargathi's LNA unit.

37.     Ibrahim and his brother Mustafa were taken in custody to the village of Bersis, where they were beaten by an LNA member. While in custody, LNA guards falsely accused the

al-Krshiny brothers of being members of the Islamic State, and demanded that the brothers confess, falsely, to such membership. The LNA guards further demanded that the brothers return to Turkey.

38.     Ibrahim and Mustafa were subsequently detained at an LNA barracks co-located with Defendant Khalifa Hifter's headquarters in ar-Rajma, Libya.

39.     Ibrahim was stripped, bound, and beaten, both on his body and his face, by his captors with fists, pipes and cables.

40.     Next, Ibrahim was again stripped, bound, blindfolded and beaten with a cable, broom handle and plastic hose, again also on his face.

41.     Next, Ibrahim was forced to stand in water and be painfully electrocuted, for five minutes at a time, for approximately seven and a half hours.

42.     Finally, Ibrahim was blindfolded, driven into a forest, and told to walk forward and not look back until he reached a road in the distance. He reasonably feared, under the circumstances, that he would be imminently executed with a gunshot to his back.

43.     Ibrahim received an obvious wound to his eye immediately prior to his capture. He also suffered permanent injuries to his legs and shoulders from his torture. Yet he received no medical attention while in custody for any of his injuries. Instead Ibrahim's eye wound, aggravated by beatings, became infected. As a result of this neglect and abuse, Ibrahim's eye had to be removed after his release.

44.     On November 5, 2014, Mustafa's body was found on the side of a deserted road, along with several other victims. All victims had their hands tied behind their backs while in custody, had clearly been tortured, and had execution-style bullet wounds to their heads and chests. The al-Krshiny family retrieved the body of Mustafa from a morgue in the public hospital of al-

Marj, a town far from where he was captured, located one-hundred kilometers northeast of Benghazi.

45.     Ibrahim's brothers Abdalla, Ahmad, Ali, and Mahmud were detained and brought in a truck to an LNA camp in Benghazi under the command of Defendant Khalifa Hifter's subordinate, Major General Jamal al-Zahawi. Upon the truck's arrival, LNA members opened fire on the truck— obviously without any judicial process—killing Ali while in custody and wounding Abdalla, Ahmad, and Mahmud. The LNA released the remaining al-Krshiny brothers on November 21, 2014.

46.     Less than a year later, Defendant Khalifa Hifter released a video announcing that the LNA's opponents should be shown "[n]o mercy … Never mind the consideration of bringing a prisoner here. There is no prison here. The field is the field, end of the story." This admission demonstrates his pattern and practice of extrajudicial killing less than a year earlier, during his assault on Benghazi.

C.     Command Responsibility and Joint and Several Liability

47.     As commander of the LNA, Defendant Khalifa Hifter bears responsibility for war crimes that he knew, or should have known, were committed by his subordinates. These war crimes took place under the common plan, design, and scheme of the LNA. Field Marshal Hifter's crimes were aided and abetted by his sons and other officers and officials. The Hifters, father and sons, and their subordinates are jointly and severally liable for each other's misconduct.

D.    Lack of Remedies in Libya

48.    Plaintiffs cannot obtain civil relief in Libya. According to a 2019 travel advisory issued by the U.S. Department of State, which remains in place, Libya is beset by "crime, terrorism, civil unrest, kidnapping, and armed conflict" and the "threat of kidnapping for ransom."[2]

49.    The capital of Tripoli, and at least eight other cities including Plaintiffs' hometown of Benghazi, are fraught with "fighting among armed groups, as well as terrorist attacks … Even demonstrations intended to be peaceful can turn confrontational and escalate into violence." Furthermore, militia groups detain persons "for arbitrary reasons, do not grant detainees access to a lawyer or legal process, and do not allow detainees to inform others of their status."[3]

50.    Libya, according to Amnesty International, has a "domestic judicial system [that] is highly dysfunctional and is unable to provide recourse for victims of human rights violations or bring those responsible for these abuses to justice. Perpetrators of serious human rights abuses continue to operate with absolute impunity without fear of accountability."[4]

51.    This is not an environment in which Plaintiffs may practically or safely pursue justice in a Libyan court, seeking personal damages against the field marshal of the LNA who controls the government in much of Libya, including Plaintiffs' home jurisdiction. Their relief can come only in U.S. federal courts.

---

[2] Libya Travel Advisory, (Apr. 9, 2019),
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/libya-travel-advisory.html.

[3] *Id*.

[4] *Statement for the United Nations Human Rights Council's Interactive Dialogue on the High Commissioner's Report on Libya*, AMNESTY INTERNATIONAL (Feb. 20, 2018), available at
https://www.refworld.org/pdfid/5b55c0fb4.pdf.

E.     Defendants' Lack of Immunity

52.     Defendants have no right to any conduct-based or foreign-official immunity because no nation endorses extrajudicial killing or torture, which violate international human rights *jus cogens* norms. Extrajudicial killing and torture also violate U.S. law.

53.     Defendant Khalifa Hifter is not Libya's head of state. He is not recognized as such by either Libya's government, or the U.S. Department of State. Khalifa Hifter is subordinate to both Libya's legislature and head of state.

F.     Fourth Geneva Convention

54.     Upon information and belief, the LNA's grave breaches of the Geneva Convention are notorious and ongoing. They include but are not limited to willful killing, torture, and inhuman treatment, causing great suffering and serious injuries to body or health, and unlawful confinement of protected persons without the rights of fair and regular trials.[5]

**CAUSES OF ACTION**

**Count One: Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note**

55.     Plaintiffs incorporate their allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

56.     The *Geneva Convention Relative to the Treatment of Prisoners of War* (Aug. 12, 1949), U.S.T. 3316, 75 U.N.T.S. 135, which the U.S. signed and ratified, states, in pertinent part:

> Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed *hors de combat* by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely … the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons: (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture …

---

[5] Article 4, *Protection of civilian persons in time of war*, available at
https://www.un.org/en/genocideprevention/documents/atrocity-crimes/Doc.33_GC-IV-EN.pdf.

(c) outrages upon personal dignity, in particular humiliating and degrading treatment; (d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples … The wounded and sick shall be collected and cared for."[6]

57.     The TVPA provides for civil liability for any individual who, under actual or apparent authority or color of law of a foreign nation, commits torture or extrajudicial killings.

58.     The TVPA defines extrajudicial killing as a deliberate killing unauthorized by a previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

59.     The TVPA defines torture as any act directed against an individual in the offenders' custody, by which severe physical or mental pain or suffering is intentionally inflicted, for example, to punish an individual for an act he/she or a third person is suspected of committing, or intimidating or coercing him/her, for any discriminatory reason.

60.     The TVPA defines mental pain as including prolonged mental harm caused by the intentional or threatened infliction of severe physical pain, the threat of imminent death, or the threat that another individual will imminently be subjected to death.

61.     Here Defendants, acting under the authority of the government of Libya, wrongfully subjected al-Suyid and al-Krshiny family members to extrajudicial killing and torture in violation of the TVPA.

62.     Defendants killed prisoners Abdel Salam and Ibrahim al-Suyid and Ali and Mustafa al-Krshiny deliberately and while in custody, absent any authorization by previous judgments

---

[6] Article 3, *Conflicts not of an international character*, available at https://www.un.org/en/genocideprevention/documents/atrocity-crimes/Doc.32_GC-III-EN.pdf.

pronounced by regularly constituted Libyan courts affording them judicial guarantees, or lawful authority recognized by international law.

63.    Defendants also killed Khalid and Mustafa al-Suyid deliberately, absent any authorization by previous judgements pronounced by regularly constituted Libyan courts affording them judicial guarantees, or lawful authority recognized by international law.

64.    These extrajudicial killings violated international agreements to which the United States is a party, such as the Third Geneva Convention, and therefore violated U.S. federal law.

65.    Defendants tortured members of the al-Suyid and al-Krshiny families. While Abdel Salam and Ibrahim al-Suyid and Ibrahim and Mahmud al-Krshiny were in the LNA's physical control, Defendants unlawfully directed that they be beaten, that Ibrahim al-Krshiny be slowly electrocuted and forced to face what he reasonably believed to be imminent execution. Abdel Salam and Ibrahim al-Suyid faced torture that left marks on their remains. Abdalla and Ahmad al-Krshiny were gratuitously shot and wounded while defenseless and compliant in Defendants' custody.

66.    This torture violated the Geneva Convention and therefore U.S. federal law.

67.    Defendants intentionally caused these men prolonged and severe mental and physical pain and suffering, in order to punish them for their presumed resistance to Khalifa Hifter's LNA, to intimidate and coerce them on the basis of their wrongly assumed membership in the Islamic State, to obtain false confessions from them of Islamic State membership, and discriminate against them for their residency in Benghazi and the al-Krshiny's Turkish ethnicity.

68.    Defendant Khalifa Hifter possessed power by dint of his command of the LNA. The extrajudicial killings and torture of Plaintiffs resulted from Defendants' exercise of LNA-derived power. War crimes took place under the common plan, design, and scheme of the LNA.

Defendant Khalifa Hifter tolerated and knowingly ignored or implicitly directed the commission of these torts, and he is liable for them; and his sons Khalid and Saddam and other LNA subordinates and officials are jointly and severally liable for them.

69.     Civil remedies are unavailable to Plaintiffs in the failed state of Libya.

70.     Plaintiffs' claims are timely, as the facts giving rise to them took place less than ten years ago.

71.     Plaintiffs are entitled to recover actual compensatory, and exemplary and punitive, damages, under 28 U.S.C. § 1350 note.

## Count Two: Civil Conspiracy

72.     Plaintiffs incorporate their allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

73.     In Virginia, at common law, a conspiracy is a combination of two or more persons who, by concerted action, seek to accomplish some criminal purpose, or to accomplish any purpose by unlawful means.

74.     To be liable for civil conspiracy, defendants must be liable for the underlying misconduct, have participated with others in a series of unlawful acts, and each have performed an overt act pursuant to and in furtherance of the common scheme, knowing that their participation in the conspiracy would cause grave and foreseeable damages to plaintiffs.

75.     Here, Defendants are liable for war crimes during Operation Dignity. Defendants participated with each other in supervising a series of overt acts—extrajudicial killings and acts of torture—in furtherance of their common scheme to punish perceived LNA opponents, causing grave and foreseeable damages to the al-Suyid and al-Krshiny Plaintiffs.

## Count Three: Wrongful Death
### (Virginia Code § 8.01-50, *et seq.*)

76.    Plaintiffs incorporate their allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

77.    Virginia Code § 8.01-50, *et seq.* provides that whenever the death of a person is caused by the intentional and wrongful act of a person or corporation, the person or corporation responsible shall be liable for damages including the decedent's survivors' deprivation of the decedent's aid, comfort and financial support.

78.    Defendants' intentional and wrongful actions are the direct and proximate cause of Plaintiffs' family members, Abdel Salam, Ibrahim, Khalid and Mustafa al-Suyid's and Ali and Mustafa al-Krshiny's deaths. Defendants denied Plaintiff Muna al-Suyid of her deceased relatives' future financial support, aid and comfort.

79.    Defendant Khalifa Hifter led the LNA; Khalid and Saddam Hifter were LNA officers fighting in Benghazi in 2014; and Saddam Hifter also obtained financing for and represented the LNA abroad. These wrongful deaths took place under the common plan, design, and scheme of the LNA. Defendants at least tolerated and knowingly ignored or directed implicitly these wrongful deaths, and are jointly and severally liable for them.

## Count Four: Battery

80.    Plaintiffs incorporate their allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

81.    In Virginia, at common law, battery includes the intentional, nonconsensual, and unlawful infliction of immediate injury upon another through harmful contact, and the aiding and abetting of the same.

16

82.     Defendants unlawfully intended to and did inflict immediate injury upon Plaintiffs' family members, Abdel Salam, Ibrahim, Khalid, and Mustafa al-Suyid, and Abdalla, Ahmad, Ali, Ibrahim, Mahmud, and Mustafa al-Krshiny, by aiding and abetting their nonconsensual battery. Defendant Khalifa Hifter led the LNA; Khalid and Saddam Hifter were LNA officers fighting in Benghazi in 2014; and Saddam Hifter also obtained financing for and represented the LNA abroad. The battery of Plaintiffs' family members took place under the common plan, design, and scheme of the LNA. Defendants at least tolerated and knowingly ignored or implicitly directed these batteries, and are jointly and severally liable for them.

### Count Five: Assault

83.      Plaintiffs incorporate their allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

84.     In Virginia, at common law, assault is a nonconsensual act intended to cause the reasonable apprehension of an imminent battery.

85.     Defendants unlawfully intended to and did inflict such an injury upon Ibrahim al-Krshiny, when after being tortured he was blindfolded, driven into a forest, and told to walk forward and not look back until he reached a road in the distance. He reasonably feared, under the circumstances, that he was imminently to be executed by being shot in the back.

86.     Similarly, Defendants unlawfully intended to and did inflict such an injury upon Abdalla and Ahmad al-Krshiny, when they were fired upon while held in custody in the back of a truck located on an LNA compound. The gunfire killed their brother and fellow prisoner, Ali al-Krshiny, before their eyes, and led them to reasonably fear threatened that they, too, were imminently to be executed. Abdel Salam, Ibrahim, Khalid, and Mustafa al-Suyid and Ali al-Krshiny were similarly assaulted immediately before they were wrongfully killed. Defendants

intentionally aided and abetted the assaults on Abdalla, Abdel Salam, Ibrahim, and Mustafa al-Suyid and Ali and Ahmad al-Krshiny.

87.     Defendant Khalifa Hifter led the LNA: Khalid and Saddam Hifter were LNA officers fighting in Benghazi in 2014: and Saddam Hifter also obtained financing for and represented the LNA abroad. These assaults took place under the common plan, design, and scheme of the LNA. Defendants at least tolerated and knowingly ignored or implicitly directed these assaults, and are jointly and severally liable for them.

### Count Six: False Imprisonment

88.     Plaintiffs incorporate their allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

89.     In Virginia, at common law, false imprisonment includes the restraint of a person's liberty without sufficient cause or lawful process.

90.     Defendants' actions were such that Plaintiffs and their family members were afraid to ignore Defendants' demand to enter LNA custody; Plaintiffs and their family members justifiably believed that Defendants were capable of and intended to falsely imprison them by force, that Plaintiffs and their family members had to submit to the LNA, that failure to do so would result in bodily harm, and that Plaintiffs and their family members had no means of escape.

91.     Abdalla, Ahmad, Ali, and Mahmud al-Krshiny and Abdel Salam and Ibrahim al-Suyid were falsely imprisoned by the LNA. Defendants Khalifa Hifter led the LNA; Khalid and Saddam Hifter were LNA officers fighting in Benghazi in 2014; and Saddam Hifter also obtained financing for and represented the LNA abroad. Plaintiffs' false imprisonments took place under the common plan, design, and scheme of the LNA. Defendants at least tolerated and knowingly

ignored or implicitly directed these false imprisonments, and are jointly and severally liable for them.

**<u>Count Seven: Intentional Infliction of Emotional Distress</u>**

92.     Plaintiffs incorporate their allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

93.     In Virginia, at common law, the intentional infliction of emotional distress includes intentional, extreme, outrageous, and wrongful conduct that causes severe emotional distress.

94.     Defendants knew that their direction, setting the conditions of, and facilitating of intentional, extreme, outrageous, and unlawful conduct would at least indirectly cause Plaintiffs and their family members grave, foreseeable, permanent, and severe psychological damage, causing Plaintiffs' bereavement by killing their family member in front of them.

95.     Abdel Salam, Ibrahim, and Muna al-Suyid and Abdalla, Ahmad, Ali, Ibrahim, Mustafa and Mahmud al-Krshiny all suffered the intentional infliction of emotional distress at the hands of the LNA during Operation Dignity.

96.     Defendant Khalifa Hifter led the LNA; Khalid and Saddam Hifter were LNA officers fighting in Benghazi in 2014; and Saddam Hifter also obtained financing for and represented the LNA abroad. The intentional infliction of emotional distress on Plaintiffs and their family members took place under the common plan, design, and scheme of the LNA. Defendants at least tolerated and knowingly ignored or implicitly directed the intentional infliction of emotional distress on Plaintiffs and their family members, and are jointly and severally liable for it.

**JURY DEMAND**

97.     Per Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all

issues so triable.

**PRAYER FOR RELIEF**

*Wherefore*, Plaintiffs request:

> Actual compensatory damages suffered by Plaintiffs, in an amount to be
> determined, but in excess of $75,000;
>
> Exemplary and punitive damages, in an amount to be determined;
>
> Pre-judgment and post-judgment interest; and
>
> Such other and further relief as the Court deems just and equitable.

[*Signature page follows*]

By:

_____/s/_____

William B. Cummings
VA Bar No. 06469
William B. Cummings, P.C.
Counsel for Plaintiffs
111 S Fairfax Street
Alexandria, VA 22314
wbcpclaw@aol.com
Phone: 703-836-7997
Facsimile: 703-836-0238

Kevin T. Carroll
Wiggin and Dana LLP
800 17th Street, NW, Suite 520
Washington, DC 20006
kcarroll@wiggin.com
Phone: 202-800-2475
Facsimile: 212-551-2888

Joseph G. Grasso
Wiggin and Dana LLP
Two Liberty Place
50 South 16th Street, Suite 2925
Philadelphia, Pennsylvania 19102
jgrasso@wiggin.com
Phone: 215-988-8312
Facsimile: 215-988-8344

28418\1\4825-1550-2005.v1