# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | | |
|---|---|---|
| MUNA AL-SUYID, individually and on behalf of the estates of her family members ABDEL SALAM AL-SUYID, IBRAHIM AL-SUYID, KHALID AL-SUYID and MUSTAFA AL-SUYID, and IBRAHIM AL-KRSHINY, individually and on behalf of the estates of his family members ABDALLA | : : : : : : : | |
| | : : | Civil Action No. 1:20-cv-00170-LMB-JFA |
| AL-KRSHINY, AHMAD AL-KRSHINY, ALI AL-KRSHINY, MAHMUD AL-KRSHINY, and MUSTAFA AL-KRSHINY, | : : : : | |
| Plaintiffs, | : : | **JURY TRIAL** |
| v. | : : | **DEMANDED** |
| KHALIFA HIFTER, KHALID HIFTER, and SADDAM HIFTER | : : | MAY 22, 2020 |
| Defendants. | : : : | |

## <u>MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT</u>

Plaintiffs ask this Court to enter default judgment under Fed. R. Civ. P. 55(b), against Defendants Khalifa Hifter, Khalid Hifter, and Saddam Hifter. As explained below, in February 2020, Plaintiffs filed their complaint alleging that Defendants violated the TVPA. Defendants have not appeared, answered the complaint, or filed a responsive pleading. This Court has subject matter and personal jurisdiction, Plaintiffs have alleged facts establishing a violation of the Torture Victim Protection Act of 1991 ("TVPA"), and Plaintiffs are entitled to damages. Default judgment is therefore appropriate.

1

# BACKGROUND

## I.     Factual Background

Before Defendants came to power in Libya, the al-Suyids and al-Krshinys were two large families from Benghazi, Libya. Compl. ¶¶ 9-13. Multiple generations lived together in the family homes, and both families were civilians who had full Libyan citizenship. *Id.* That all changed in October 2014, when troops under the command of Khalifa Hifter and his sons (Khalid and Saddam Hifter) stormed the families' houses, killed several of the male members, and beat, tortured, and/or killed the rest. Compl. ¶¶ 26-46. There was no trial. There was no due process. Hifter targeted these families as "dissidents" and had his troops attack, capture, and torture the male family members. *Id.* These grave crimes against humanity are detailed below. But first, it is important to understand the role Khalifa Hifter and his sons played in these atrocities.

### A.  The Hifters

Khalifa Hifter and his sons are United States citizens who are residents of the Eastern District of Virginia and own significant assets here. Compl. ¶¶ 17-18. Many years ago, Khalifa Hifter helped infamous Libyan dictator Muamar Qadafi overthrow the country's monarchy. After helping lead the revolt, Khalifa served in Libya's military campaign in Chad. Amnesty International accused him of committing war crimes when he was there. *Id.* at ¶ 21.

Khalifa Hifter then turned against Qadafi and reportedly became a source for the United States Central Intelligence Agency. During that time, he obtained United States citizenship, and resided in the Commonwealth of Virginia. *Id.* at ¶ 22. When they came to America, Khalifa Hifter and his sons established deep contacts with this District. Khalifa Hifter owns a home in Falls Church. His sons bought (with cash) seventeen properties in Virginia between 2014 and 2017, worth at least eight million dollars. These include homes in Falls Church and Vienna, and

property in Keysville. Upon information and belief, the Hifters bought those homes with the intent to reside there indefinitely and resided there. *Id.* at ¶ 23.

Khalifa Hifter journeyed to Libya in 2014, where the Libyan House of Representatives appointed him field marshal and head of the Libyan National Army ("LNA"). *Id.* at ¶ 24. Khalifa made his sons—Khalid Hifter and Saddam Hifter—high-ranking LNA officers who led forces fighting in Benghazi in 2014. Saddam Hifter also represented the LNA internationally and helped obtain financing for the LNA. *Id.* at ¶ 25.

### B. "Operation Dignity"

In October 2014, the LNA launched "Operation Dignity" to root out and kill opposition in the city of Benghazi. Compl. ¶ 26. An LNA official issued a video announcement starting Operating Dignity, stating that the LNA was "in the process of preparing a plan to divide the city of Benghazi into squares," that they "had lists of names of all those who worked for the Libya Shield and Ansar al-Sharia," that they marked the location of those individuals' homes, and finally that "on each map, there was an accurate description of the house of such-and-such and that they will all be liquidated." *Id.* at ¶ 27. The LNA official then issued a religious ruling to that end, specifying that the LNA would kill any prisoners. *Id.* And they did. As one leading human rights organization reported, "Serious human rights abuses and violations of international humanitarian law" were then "perpetrated in Benghazi" by forces loyal to retired General Khalifa Hifter. *Id.* at ¶ 28.

Among those targeted during Operation Dignity were members of the al-Suyid family. On the first day of Operation Dignity, LNA units of "Neighborhood Youths" (including child-soldiers) under Defendant Khalifa Hifter's command responsibility, surrounded the al-Suyids'

family home in Benghazi. The al-Suyid home housed men and women, and seven children as young as six months old. *Id.* at ¶ 29.

The LNA units opened fire on the home. *Id.* at ¶ 30. The LNA kidnapped Abdel Salam al-Suyid and his son Ibrahim al-Suyid, took them to a nearby school, and beat them. *Id.* Abdel Salam's daughter, Muna, received a call from the LNA demanding that she surrender her brothers if she wanted to see Adbel Salam and Ibrahim again. *Id.* at ¶ 31. She refused. The LNA later shot and killed her brother Mustafa al-Suyid. Her brother Khalid al-Suyid was wounded in the attack, and later discovered dead. *Id.* The next day, Muna learned that the LNA had dumped the badly beaten bodies of Abdel Salam and Ibrahim in an industrial area near the al-Suyid home. As one of the few remaining al-Suyid adults, Muna identified the bodies at the city morgue. *Id.* at ¶¶ 32-33. All told, the LNA killed or tortured four al-Suyid men—Abdel Salam, Ibrahim, Mustafa, and Khalid.

 The LNA also targeted the al-Krshiny family. Two days after the massacre of the al-Suyid family, LNA units attacked the al-Krshiny family home in Benghazi. The al-Krshiny home housed men, women (one of whom was pregnant), and fourteen children. *Id.* at ¶ 34. The LNA apparently targeted the al-Krshiny family because they hailed from the city of Misrata, Libya. An LNA propagandist had called for the expulsion of Misratans from Benghazi and named the al-Krshinys as one of those families. *Id.* at ¶ 35.

The LNA opened fire on the al-Krshiny family home and a gunfight ensued. *Id.* at ¶ 36. Ibrahim al-Krshiny was wounded in the eye by shrapnel. The LNA took Ibrahim and his five surviving brothers as prisoners. *Id.* The LNA transported the al-Krishnys to the village of Bersis, where they beat them. LNA guards falsely accused the al-Krshiny brothers of being members of the Islamic State, and demanded that the brothers confess. The LNA guards also demanded that

the brothers return to Turkey. *Id.* at ¶ 37. The LNA then detained two al-Krishny brothers—
Ibrahim and Mustafa—at LNA barracks co-located with Defendant Khalifa Hifter's headquarters
in ar-Rajma, Libya. *Id.* at ¶ 38.

Within earshot of Hifter's headquarters, the LNA tortured Ibrahim. They stripped, bound,
and beat him with fists, pipes, and cables. *Id.* at ¶ 39. They later again stripped, bound,
blindfolded, and beat him with a cable, broom handle, and plastic hose, again also on his face. *Id.*
at ¶ 40. Next, the LNA forced Ibrahim to stand in water and electrocuted him for five minutes at
a time. *Id.* at ¶ 41. This lasted about seven and a half hours. *Id.* at ¶ 41. Finally, the LNA
blindfolded Ibrahim, and drove him out to a forest where they told him to walk forward and not
look back until he reached a road in the distance. He reasonably feared, under the circumstances,
that the LNA would imminently execute him with a gunshot to his back. *Id.* at ¶ 42. Ibrahim
received an obvious wound to his eye just before his capture. He also suffered permanent injuries
to his legs and shoulders from his torture. Yet he received no medical attention while in custody
for any of his injuries. Ibrahim's eye wound, aggravated by beatings, became infected. As a
result of this neglect and abuse, Ibrahim lost his eye after his release. *Id.* at ¶ 43.

Mustafa al-Krshiny's body was found on the side of a deserted road, along with several
other victims. All victims had their hands tied behind their backs while in custody, had clearly
been tortured, and had execution-style bullet wounds to their heads and chests. The al-Krshiny
family retrieved the body of Mustafa from a morgue in the public hospital of al-Marj, a town far
from where he was captured, located one-hundred kilometers northeast of Benghazi. *Id.* at ¶ 44.

The LNA detained the other male al-Krishinys—Abdalla, Ahmad, Ali, and Mahmud—

and brought them in a truck to an LNA camp in Benghazi. When the truck arrived at the camp, LNA troops opened fire, killing Ali while in custody and wounding Abdalla, Ahmad, and Mahmud. The LNA released the surviving al-Krshinys on November 21, 2014. *Id.* at ¶ 45.

Less than a year later, Defendant Khalifa Hifter released a video confirming what he had already done—he demanded that the LNA's opponents be shown "[n]o mercy … Never mind the consideration of bringing a prisoner here. There is no prison here. The field is the field, end of the story." *Id.* at ¶ 46.  Hifter thus admitted extrajudicuial murders and endorsed the unlawful practice.

## II.    Procedural Background

Under the Federal Rules of Civil Procedure, obtaining default judgment against a party is a two-step process. Under Fed. R. Civ. P. 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown affidavit or otherwise, the clerk must enter the party's default." Once the clerk has entered the party's default, the party seeking default judgment must apply, under Fed. R. Civ. P. 55(b)(2), to the court for a default judgment. The Clerk has already entered default against Defendants. Entry of a default judgment is now appropriate.

## LEGAL STANDARD

Rule 55 of the Federal Rules of Civil Procedure provides for the entry of default judgment when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Defendant judgment is appropriate when the court has subject-matter jurisdiction over the claims, has personal jurisdiction over the defendants, and the plaintiffs served the Defendants with process. See, e.g., *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008); *F.D.I.C. v. Schaffer*, 731 F.2d 1134, 1135 (4th Cir. 1984).

When considering a motion for default judgment, the Court views all well-pleaded factual allegations in the complaint as true for purposes of liability. After all, Fed. R. Civ. P. 8(b)(6) provides that "[a]n allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied." And the Fourth Circuit has confirmed that "[t]he defendant, by his default, admits the plaintiff's well-pleaded allegations of fact." *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (internal citation omitted). In assessing damages, "a district court entering a default judgment may award damages ascertainable from the pleadings." *Anderson v. Found, for Advancement. Educ. & Emp't of Am. Indians*, 155 F.3d 500, 507 (4th Cir. 1998).

## ARGUMENT

Default judgment is appropriate because (1) this Court has jurisdiction over Defendants, (3) Plaintiffs alleged facts supporting their claims, and (4) Plaintiffs are entitled to damages.

### I.     This Court has jurisdiction.

#### A.  This Court has subject matter jurisdiction.

This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C.S. § 1350 note. This Court has subject matter jurisdiction for Plaintiff's' state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy and share a common nucleus of operative fact with the TVPA claims.

#### B.  This Court has personal jurisdiction over Defendants.

This Court has personal jurisdiction over Defendants because they are citizens of the United States with substantial ties to the forum. Plaintiffs properly served Defendants under the Federal Rules of Civil Procedure and Virginia law.

1.   **Defendants are United States citizens who own property within the State of Virginia.**

This Court has personal jurisdiction over Defendants because they are citizens of the United States and Virginia, and own property in this District. Defendant Khalifa Hifter obtained his United States citizenship in the 1990s, living in northern Virginia. Compl. ¶ 12-13. He bought property in Falls Church, Virginia in 1995. *Id.* Hifter bought that home with the intent to reside there indefinitely and has never foresworn that intent. Compl. ¶ 23. Defendant has lived at this property for around two decades with his sons Khalid and Saddam Hifter. Compl ¶¶ 12-13, 23. The Hifters bought seventeen other properties in the District, worth at least $8 million. *Id.*

Given their substantial connections to the forum, Defendants should reasonably expect to be called into court in the Eastern District of Virginia. They received the rights and liberties of United States and Virginia citizens, and used the safety of this forum to build their power in the Libyan government. The Eastern District of Virginia has every right to exercise dominion over Hifter and enter judgment assessing damages for his wrongful acts that killed thousands of people, including Plaintiffs and their family members.

ii.   **Defendant Hifter was served properly in accordance with Fed. Rule Civ. Pro. R. 4(e)(1).**

Federal Rule of Civil Procedure 4(e)(1) provides that "an individual . . . may be served in a judicial district of the United States by: (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located." Instead of personal service, the state of Virginia allows "substitute service" as described below:

2. By substituted service in the following manner:

a. If the party to be served is not found at his usual place of abode, by delivering a copy of such process and giving information of its purport to any person found there, who is a member of his family, other than a temporary sojourner or guest, and who is of the age of 16 years or older; or

b. If such service cannot be effected under subdivision 2 a, then by posting a copy of such process at the front door or at such other door as appears to be the main entrance of such place of abode, provided that not less than 10 days before judgment by default may be entered, the party causing service or his attorney or agent mails to the party served a copy of such process and thereafter files in the office of the clerk of the court a certificate of such mailing . . .

Va. Code § 8.01-296(2).

Defendants were served on March 14, 2020, by a private process server through post and mail as shown in the Affidavits of Service. Defendants had attempted but failed to effect in-person service at Defendants' usual place of abode in Falls Church, Virginia, on March 11, 12, and 13, 2020. ECF Nos. 20, 21, 22. No one answered the door, and thus service under Va. Code § 8.01-296(2)(a) could not occur. *Id.* The process server therefore posted the summons, complaint, and civil cover sheet and sent it by mail, as permitted under Va. Code. § 8.01-296(2)(b). *Id.*

## II.    Plaintiffs alleged facts establishing a violation of the TVPA.

The TVPA imposes civil liability on any "individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture ... or ... to extrajudicial killing." Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. 102-256 (enacted March 12, 1992) (codified as Note to 28 U.S.C. § 1350). The statute "establish[es] an unambiguous basis for a cause of action that has been successfully maintained under [the ATCA,] ... which permits Federal district courts to hear claims by aliens for torts committed 'in violation of the law of nations.'" S. Rep. No. 102–249, at 4 (1991). *Id.* at 4. As set forth below, Defendants violated the TVPA.

Plaintiffs also brought common law tort claims, including civil conspiracy, battery, assault, false imprisonment, and intentional infliction of emotional distress. While Plaintiffs sufficiently pleaded facts to support those claims under either Virginia or Libyan law, the TVPA

on its own affords complete relief. For that reason, to conserve judicial resources and simplify

this motion, Plaintiffs now move for default judgment on the TVPA claim. But Plaintiffs are

prepared to address the other claims if need be.

### A. Defendants acted with authority from a foreign nation.

To begin with, Defendants committed custodial, extrajudicial killings and torture under

the authority of a "foreign nation"—the de facto government of Eastern Libya. As discussed

below, courts interpret the "foreign nation" requirement liberally, and do not require

international recognition of the government. Instead, the court determines whether an entity has

de facto control over a given territory and populace. Hifter committed his acts as head of the

LNA and under the authority of the Libyan House of Representatives, the de facto government of

Eastern Libya at that time. Those entities together controlled the territory, provided a police

force, and controlled the populace. Defendants' forces tortured and killed Plaintiffs and their

families under the auspices of that government in 2014.

### B. The state action requirement

An individual is liable under the TVPA when he commits torture or extrajudicial killings

while acting under the authority of a "foreign nation." *In re Terrorists Attacks on Sept. 11, 2001*,

740 F. Supp. 2d 494, 514 (S.D.N.Y. 2010), *aff'd, sub nom.*, 714 F.3d 118 (2d Cir. 2013). The

"foreign nation" is any "'entity that has a defined territory and a permanent population, under the

control of its own government, and that engages in, or has the capacity to engage in, formal

relations with other such entities.'" *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995) (quoting

Restatement (Third) of Foreign Relations Law § 201). It doesn't have to be a nation recognized

by the U.S. State Department, but can be "'any government, however violent and wrongful in its

origin," as long as "it was in the full and actual exercise of sovereignty over a territory and

people large enough for a nation.'" *Id.* (quoting *Ford v. Surget,* 97 U.S. (7 Otto) 594, 620 (1878) (Clifford, J., concurring)). Indeed, courts often give effect to "de facto" governments without official recognition from the U.S. State Department. *See, e.g., id.*; *United States v. Insurance Cos.*, 89 U.S. (22 Wall.) 99, 101–03, 22 L.Ed. 816 (1875) (seceding states in Civil War); *Thorington v. Smith*, 75 U.S. (8 Wall.) 1, 9–12 (1868) (same); *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 699 (2d Cir.1970) (post-World War II East Germany). In other words, the TVPA does not distinguish "between recognized and unrecognized states." *Karadzic,* 70 F.3d at 245.

Several courts have applied the TVPA when a defendant is acting on behalf of someone other than a traditional nation-state. For example, in *Karadzic*, the two groups of victims from Bosnia-Herzegovina brought actions against the self-proclaimed president of an unrecognized Bosnian-Serb entity under, among other things, the TVPA. *Karadzic,* 70 F.3d at 245. The district court held that an unrecognized Bosnian-Serb entity of "Srpska" was not a "state" and therefore the defendant did not act under color of law under the TVPA. *Id.* The Second Circuit reversed.

The court reasoned that Srpska allegedly controlled the defined territory, controlled the populations within its power, entered agreements with other governments, and had a president, legislature, and its own currency. *Id.* at 245. The court continued, "Moreover, it is likely that the state action concept, where applicable for some violations like 'official' torture, requires merely the semblance of official authority. The inquiry, after all, is whether a person purporting to wield official power has exceeded internationally recognized standards of civilized conduct, not whether statehood in all its formal aspects exists." *Id.*

Similarly, in *Doe v. Islamic Salvation Front (FIS)*, 993 F. Supp. 3 (D.D.C. 1998), the court found state action where an Algerian political group allegedly tortured women in Algeria. Even though the Algerian political group was not an official government, the court held that

> Certain private groups may constitute a de facto state, in which case they will be held liable under the TVPA. The de facto state doctrine recognizes that the TVPA does not concern the legitimacy of a particular organization but its power. According to international law, "a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with such other entities."

*Id.* (quoting Restatement (Third) Foreign Relations Law § 201). The court reasoned that the political group was a "foreign nation" because the political group (1) controlled most of Algeria, (2) governed its population by issuing laws and assessing taxes, (3) conducted trials and imposed sentences, and (4) engaged in international diplomatic relations.

### C. Plaintiffs have met the state action requirement

While the Libyan Civil War is no doubt complex, Defendants were acting with authority granted by a de facto "foreign nation" when they committed the TVPA violations. There are several factions in the Libyan Civil War. The Libyan House of Representatives, elected in 2014, is in the Eastern Libyan city of Tobruk, and in 2015 appointed Defendant Khalifa Hifter as commander-in-chief of the Libyan National Army ("LNA") with the mission of restoring its sovereignty over the whole of Libyan territory. The Government of National Accord ("GNA"), led by Prime Minister Fayez al-Sarraj, is based in the capital Tripoli and established after failed military coups and the relocation of the Libyan House of Representatives. Even though the GNA is the officially recognized government of Libya, there is little question that the Hifter-supported government qualifies as a "foreign nation" under the TVPA.

To begin with, the GNA has little power and controls only a small fraction of Libya. Hifter's forces have conducted a ten-month siege of the GNA's capital. And, importantly, the

GNA has no control over Eastern Libya, where Hifter's forces committed the torture and extrajudicial killings of the al-Suyids and al-Krshinys.[1]

Moreover, the United Nations has recognized the Libyan House of Representatives. After the fall of Gadhafi, two rival centers of power emerged in Libya—Tripoli and eastern Libya. In 2015, the U.N. reached a compromise to promote peace in the region and balance power. *See* United Nations, Security Council Resolution 2259 (2015).[2] The agreement established an official executive branch in Tripoli but acknowledged the Libyan House of Representatives as the country's official legislature. *Id.* The U.N. reiterated that the Libyan House of Representatives should be an official part of the Libyan government in 2020, when a special envoy to the "Berlin process"—an international conference seeking peace in Libya—wrote a letter encouraging the Security Council to call for "establishment of a functioning Presidency Council and the formation of a single, unified, inclusive and effective Libyan government approved by the [Libyan] House of Representatives."[3] Although the transition to the unified government never happened and the two factions still remain divided, the U.N. Security Council recognizes the House of Representative's power to negotiation for Libyan peace on both the national and international level.[4]

Finally, and most importantly, the LNA and the Libyan House of Representatives has de facto control over Eastern Libya and has established a government there. The LNA (operating under authority from the Libyan House of Representatives) controls Eastern and Central Libya

---

[1] See map available at https://www.bbc.com/news/world-africa-51082365 (last visited May 18, 2020).

[2] The 2015 Resolution is available at https://undocs.org/en/S/RES/2259%20(2015) (last visited May 18, 2020).

[3] Letter dated 22 January 2020 from the Permanent Representative of Germany to the United Nations addressed to the President of the Security Council ("Berlin Letter"), available at https://undocs.org/en/S/2020/63.
[4] See map available at https://www.bbc.com/news/world-africa-51082365 (last visited May 18, 2020).

and is laying siege to Tripoli. It governs the population of that area through laws and taxes, conducts trials and imposes death sentences, and engages in international diplomacy about peace in Libya.

The New York Times recently verified these allegations in a report on life inside the Hifter-controlled zone of Libya, describing an authoritarian regime replete with security forces, a government, and infrastructure. David D. Kirkpatrick, "A Police State with an Islamic Twist: Inside Hifter's Libya," (updated April 14, 2020).[5] While Hifter's government is worthy of international condemnation, it is a government and has more stability and control than the "foreign nations" in *Karadzic* and *Islamic Salvation Front*. Plaintiffs have thus established that Hifter and his sons were acting with authority from a de facto "foreign nation" under the TVPA.[6]

### D.  Plaintiffs alleged that Defendants committed custodial, extrajudicial killings.

Plaintiffs have shown that Defendants are liable for the custodial, extrajudicial killings of four members of the al-Suyid family (Abdel Salam, Ibrahim, Khalid, and Mustafa) and members of the al-Krshiny family (Mustafa and Ali). "[T]he term 'extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is

---

[5] The article is available at https://www.nytimes.com/2020/02/20/world/middleeast/libya-hifter-benghazi.html.

[6] The Libyan House of Representatives continue to support Hifter's control of the LNA and his attempt to control Libyan. The head of the Libyan House of Representatives expressed public support for the Libyan National Army and announced that Hifter's troops would continue to advance on the capital of Tripoli, despite international calls for a halt in an offensive that risked causing many civilian casualties. *See, e.g.*, "U.S. remains committed to Libyan political agreement: State Department." REUTERS (December 1, 2017), https://www.reuters.com/article/us-usa-libya/u-s-remains-committed-to-libyan-political-agreement-statedepartment-idUSKBN1DV5P3; "UAE calls on all Libyan parties to commit to political process, renews support to Haftar." REUTERS (April 30, 2020), https://www.reuters.com/article/us-libya-security-emirates-turkey/uae-callson-all-libyan-parties-commit-to-political-process-renews-support-to-haftar-idUSKBN22C1JO.

lawfully carried out under the authority of a foreign nation." TVPA § 3(a); 28 U.S.C. § 1350 note. Defendants' forces committed extrajudicial killings within that definition.

LNA forces kidnapped Abdel Salam and Ibrahim al-Suyid, who were on their way home to protect their families during Hifter's "Operation Dignity." *Id.* at ¶¶ 29-33. Abdel Salam's and Ibrahim's bodies were found the next day in a nearby industrial area. *Id.* at ¶¶ 29-33. There is no evidence that a judicial process took place, and there was not enough time to conduct any trial with due process. *Id.* at ¶ 33. And they killed Khalid and Mustafa al-Suyid outside their homes, gunning them down with no semblance of judicial process. *Id.* at ¶ 31.

The evidence is equally strong for the al-Krshinys. LNA forces captured Mustafa al-Krshiny and detained him in LNA barracks that were co-located with Defendant Khalifa Hifter's headquarters. *Id.* at ¶¶ 34-38. Mustafa's body was found two weeks later, dumped on the side of a deserted road, along with several other victims. *Id.* at ¶ 44. His hands were tied behind his back and he had execution-style bullet wounds to his head and chest. *Id.* Ali al-Krshiny was detained and brought in a truck to an LNA camp in Benghazi. *Id.* at ¶ 45. Upon the truck's arrival, LNA members opened fire on the truck— with no judicial process—killing Ali. *Id.*

Even though they might not have pulled the trigger, Defendants are liable for these extrajudicial killings because they commanded troops that committed these acts. Under the doctrine of "command responsibility," a higher-level official need not have personally performed or ordered the alleged abuses to be liable. *Hilao v. Estate of Marcos*, 103 F.3d 767, (9th Cir. 1996). Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person who commits the acts, and includes anyone with higher authority who authorized, tolerated, or knowingly ignored those acts. *Id.*

Defendants as commanders of the LNA bear responsibility for crimes that he knew, or should have known, were committed by his subordinates. Compl. ¶ 47. Indeed, Hifter and his sons authorized, tolerated, or knowingly ignored these killings. Hifter launched "Operation Dignity" against those suspected to oppose the LNA, especially in the city of Benghazi. *Id.* at ¶ 26. During that operation, Hifter's LNA prepared "a plan to divide the city of Benghazi into squares" and used a "list of names" to determine which people to "liquidate[ ]," specifically ordering the LNA to kill any prisoners. *Id.* at ¶ 26. It should have come as no surprise that Hifter's troops followed those orders, with the al-Suyids and al-Krshinys among the victims. These were not enemy combatants. These were not acts of war. These were civilians who the LNA rounded up because of suspected political affiliations and summarily executed. The TVPA holds Hifter and his sons liable for that.  Rank hath its privileges *and* its responsibilities.

### E.  Plaintiffs alleged that Defendants committed torture.

Defendants are liable for the torture of Abdel Salam al-Suyid, Ibrahim al-Suyid, Ibrahim al-Krshiny, Mahmud al-Krshiny, Abdalla al-Krshiny, and Ahmad al-Krshiny. The TVPA defines "torture" as:

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

TVPA § 3(b); 28 U.S.C. § 1350 note.

What the LNA did to Plaintiffs was torture. As noted above, the LNA unlawfully beat Abdel Salam al-Suyid, Ibrahim al-Suyid, Ibrahim al-Krshiny, and Mahmud al-Krshiny while they were in custody. Compl. ¶ 65. The LNA electrocuted Ibrahim al-Krshiny, which he believed

16

was the precursor to his imminent execution. *Id.* Abdel Salam al-Suyid and Ibrahim al-Suyid

faced torture that left marks on their remains. *Id.* And the LNA gratuitously shot Abdalla and

Ahmad al-Krshiny while they were defenseless and in the LNA's custody. *Id.* That is torture.

Defendants are liable under the doctrine of command responsibility for these acts. Indeed, many

of these acts occurred within eyesight and earshot of Defendant Khalifa Hifter's headquarters.

He is responsible for those acts.

### F.  Exhaustion is excused because there are no available remedies in Libya.

To bring a claim under the TVPA, a claimant must have "exhausted [any] adequate and

available remedies in the place in which the conduct giving rise to the claim occurred." TVPA §

2(b); 28 U.S.C. § 1350 note. "[T]he exhaustion requirement pursuant to the TVPA is an

affirmative defense, requiring the defendant to bear the burden of proof." *Jean*, 431 F.3d 776,

781 (11th Cir. 2005). But the Senate Report makes clear that exhaustion can be excused for

futility, and that bringing a TVPA claim in the first place is prima facie evidence that exhaustion

should be excused:

> [T]he committee recognizes that in most instances the initiation of litigation under
> this legislation will be virtually prima facie evidence that the claimant has
> exhausted his or her remedies in the jurisdiction in which the torture occurred.
> The committee believes that courts should approach cases brought under the
> proposed legislation with this assumption ...
>
> More specifically, ... [the exhaustion requirement] should be informed by general
> principles of international law. The procedural practice of international human
> rights tribunals generally holds that the respondent has the burden of raising the
> nonexhaustion of remedies as an affirmative defense and must show that domestic
> remedies exist that the claimant did not use. Once the defendant makes a showing
> of remedies abroad which have not been exhausted, the burden shifts to the
> plaintiff to rebut by showing that the local remedies were ineffective,
> unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate
> burden of proof and persuasion on the issue of exhaustion of remedies, however,
> lies with the defendant.

S.Rep. No. 102–249, at 9–10.

"[T]o the extent that there is any doubt ... both Congress and international tribunals have mandated that ... doubts [concerning the TVPA and exhaustion are to] be resolved in favor of the plaintiffs." *Enahoro v. Abubakar,* 408 F.3d 877, 892 (7th Cir.2005).

Plaintiffs cannot obtain civil relief in Libya. According to a 2019 travel advisory issued by the U.S. Department of State, which remains in place, Libya is beset by "crime, terrorism, civil unrest, kidnapping, and armed conflict" and the "threat of kidnapping for ransom."[7] The capital of Tripoli, and at least eight other cities including Plaintiffs' hometown of Benghazi, are fraught with "fighting among armed groups, as well as terrorist attacks … Even demonstrations intended to be peaceful can turn confrontational and escalate into violence." Militia groups detain persons "for arbitrary reasons, do not grant detainees access to a lawyer or legal process, and do not allow detainees to inform others of their status." *Id.* Libya, according to Amnesty International, has a "domestic judicial system [that] is highly dysfunctional and is unable to provide recourse for victims of human rights violations or bring those responsible for these abuses to justice. Perpetrators of serious human rights abuses continue to operate with absolute impunity without fear of accountability."[8]

And most importantly, the men who perpetrated these heinous crimes run most of the country and dominate the court systems. In *Chiminya Tachiona v. Mugabe*, 216 F. Supp. 2d 262 (S.D. N.Y. 2002), the court faced a similar situation and excused exhaustion where opposing party members faced severe pain and suffering at the hands of the ruling party before being brutally murdered. The court held that the plaintiffs showed that the defendants controlled the

---

[7] Libya Travel Advisory, (Apr. 9, 2019),
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/libya-travel-advisory.html.
[8] Statement for the United Nations Human Rights Council's Interactive Dialogue on the High Commissioner's Report on Libya, AMNESTY INTERNATIONAL (Feb. 20, 2018), available at
https://www.refworld.org/pdfid/5b55c0fb4.pdf.

Zimbabwean judicial system, making it inaccessible to the plaintiffs. Likewise, the al-Suyids and al-Krshinys cannot get relief in Libyan. Hifter and his sons control most of Libya and might soon overrun Tripoli itself. They dominate the court system in the remainder of Libya, which has no semblance of justice.

The New York Times recently reported that opposition members disappear without warning and reported "If you are with Hifter then you are under his umbrella and you can do whatever you want," he said. "If you aren't, you are an enemy and you may be jailed, killed or exiled." *See* Kirkpatrick, "A Police State with an Islamic Twist," at 2. There is no justice system for Hifter and his sons, and anyone who tries to bring them to court will suffer the same fate as Plaintiffs and their families.

### III.     Plaintiffs are entitled to compensatory and punitive damages.

The Torture Victim Protection Act makes clear that an individual found to have committed torture or extrajudicial killings "shall, in a civil action, be liable for damages." TVPA § 2(a), 28 U.S.C. § 1350 note. This includes compensatory and punitive damages. *Cabello v. Fernández-Larios*, 402 F.3d 1148, 1151 (11th Cir. 2005).

To begin with, Plaintiffs have standing to recover damages on their own behalf on and on behalf of the decedents. There can be no question that those Plaintiffs who suffered torture can recover damages in their own name. Moreover, Muna al-Suyid and Ibrahim al-Krshiny can recover damages for the extrajudicial killings of the decedents. To obtain relief for extrajudicial killing pursuant to Torture Victim Protection Act (TVPA), plaintiff must be (1) legal representative or any person who may be claimant in action for wrongful death, (2) of victim of extrajudicial killing, (3) committed by an individual acting under actual or apparent authority, or color of law, of any foreign nation; plaintiff who satisfies these elements possesses cause of action under TVPA. 28 U.S.C.A. § 1350 note. Muna al-Suyid has standing to bring her own

claims as well as the claims of her father Abdel Salam al-Suyid, and her brothers Ibrahim al-Suyid, Khalid al-Suyid, and Mustafa al-Suyid as their legal representative. Compl. ¶ 9. Ibrahim al-Suyid has standing to bring his own claims as well as the claims of his late brothers, Ali and Mustafa as their legal representative. Compl. ¶ 10.  As a result, the court can award damages for the torts committed against every person and decedent listed in the complaint.

And those damages are significant. Courts have awarded significant compensatory and punitive damages for torture and extrajudicial killings under the TVPA:

- In *Jane Doe I v. Karadzic*, 2001 WL 986545 (S.D.N.Y. 2001), a jury awarded around $4.5 billion in compensatory and punitive damages to 22 Muslim citizens of Bosnia–Herzegovina for acts of genocide that included murder, rape, and torture, committed in Bosnia–Herzegovina by individuals under the command and control of the defendant.

- In *Doe v. Saravia*, 2004 WL 2913256 (E.D. Cal. 2004), the court entered default judgment and awarded damages of $5 million compensatory plus $5 million punitive against the former chief of security for the organizer of El Salvadoran paramilitary groups, under the Torture Victim Protection Act (TVPA). The defendant was found liable for the 1980 assassination of the archbishop, and the award reflected the national and international stature of victim, his importance to any effort to avoid war, and the violence that followed his death.

- In *Chiminya Tachiona v. Mugabe*, 216 F. Supp. 2d 262 (S.D. N.Y. 2002), the plaintiffs alleged that members of the opposition party faced severe pain and suffering at the hands of the ruling party before being brutally murdered. The court awarded $2.5 million in compensatory damages and $5 million in punitive damages for the murder of members of the opposing political party, noting the grief suffered by the victims' relatives because of the killings. The court concluded that an award of $1 million in compensatory and $5 million in punitive damages for each of the Zimbabwean citizens who were tortured before their deaths was proper, citing declarations from people who witnessed the kinds of torture inflicted by the ruling political party before their deaths.

- In *Mushikiwabo v. Barayagwiza,* No. 94 Civ. 3627, 1996 WL 164496, at *3 (S.D.N.Y. Apr.9, 1996), the court awarded compensatory damages including $500,000 in pain and suffering and awarding $1 million in punitive damages to each relative of a victim and $5 million to each victim for torture and murder under the TVPA and ATCA.

- In *Mehinovic v. Vuckovic,* 198 F. Supp. 2d 1322 (N.D. Ga. 2002), the court awarded $10 million in compensatory and $25 million in punitive damages to each victim for

torture, cruel, and inhumane treatment, arbitrary detention, violations of the law of war and crimes against humanity under both the TVPA and ATCA and assault and battery, false imprisonment, intentional infliction of emotional distress and conspiracy under Georgia law.

The Court should enter a substantial award of compensatory and punitive damages in this case. The above decisions appear to rely on six factors: "(i) Brutality of the act; (ii) egregiousness of defendant's conduct; (iii) Unavailability of criminal remedy; (iv) International condemnation of act; (v) Deterrence of others from committing similar acts; and (vi) Provision of redress to plaintiff, country[,] and world." *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1159 (E.D. Cal. 2004) (collecting cases).

For all the reasons discussed above, these factors support the award of substantial damages here. Defendants commanded troops that committed acts of outright brutality during the ironically named Operation Dignity. The troops targeted, hunted down, tortured, and killed Plaintiffs and their families. In many cases, the troops shot men in front of their families. In others, the troops summarily executed the men. And in others, Defendants' troops bound and tortured the men through electrocution, gratuitous shootings, and frequent beatings. Hifter and his sons will never face criminal justice in Libya, and the international community has condemned their acts. Plaintiffs' only source of justice is the courts of the United States. And entering a large compensatory and punitive award will send a message to the strongmen of the world that they do not have free rein to commit these atrocities. Plaintiffs therefore ask the Court to award $10 million for each decedent and $5 million for each survivor.

## CONCLUSION

For these reasons, Plaintiffs ask the Court to enter default judgment against all Defendants.

Dated: May 22, 2020

/s/ Kevin T. Carroll

Kevin T. Carroll (VSB#95292)
Wiggin and Dana LLP
800 17th Street, NW, Suite 520
Washington, DC 20006
kcarroll@wiggin.com
Phone: 202-800-2475
Facsimile: 212-551-2888