IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MUNA AL-SUYID, *et al.*,    )
                            )
            Plaintiffs,     )
                            )
    v.                      )     Civil Action No. 1:20cv170 (LMB/JFA)
                            )
KHALIFA HIFTER, *et al.*,   )
                            )
            Defendants.     )
_____)

## PROPOSED FINDINGS OF FACT AND RECOMMENDATIONS

This matter is before the court on plaintiffs Muna al-Suyid, Abdalla al-Krshiny, Ahmad

al-Krshiny, Mahmud al-Krshiny, and Ibrahim al-Krshiny's (collectively "plaintiffs") motion for

default judgment against defendants Khalifa Hifter, Khalid Hifter, and Saddam Hifter

(collectively "defendants"). (Docket no. 27). Pursuant to 28 U.S.C. § 636(b)(1)(C), the

undersigned magistrate judge is filing with the court his proposed findings of fact and

recommendations, a copy of which will be provided to all interested parties.

### Procedural Background

On February 18, 2020, plaintiffs filed a complaint against defendants alleging violation of

the Torture Victim Protection Act of 1991, civil conspiracy, wrongful death, battery, assault,

false imprisonment, and intentional infliction of emotional distress. (Docket no. 1). Summonses

were issued for service on defendants on February 24, 2020. (Docket no. 10). The summonses

were returned unexecuted as to each defendant on March 9, 2020. (Docket nos. 13–15). Alias

summonses were issued for service on defendants on March 10, 2020. (Docket no. 19). On

March 20, 2020, plaintiff filed returns of service indicating that the alias summonses and

complaint was served on each defendant on March 14, 2020. (Docket nos. 20–22). In

accordance with Federal Rule of Civil Procedure 12(a), defendants' responsive pleadings were

due on April 6, 2020, twenty-one (21) days after each defendant was served with an alias

summons and complaint. No defendant has filed a responsive pleading and the time for doing so

has expired.

On April 23, 2020, the District Judge ordered plaintiffs to obtain entry of default as to

defendants, after which, they were to file a motion for default judgment, an accompanying

memorandum in support, and a notice of hearing. (Docket no. 23). Plaintiffs requested an entry

of default as to defendants on May 1, 2020. (Docket no. 24). The Clerk of Court entered default

as to defendants on May 5, 2020. (Docket no. 25). On May 22, 2020, plaintiffs filed a motion

for default judgment, an accompanying memorandum in support, and a notice of hearing for June

12, 2020. (Docket nos. 27, 28). [1] On June 12, 2020, this matter was called in open court and

plaintiffs' counsel appeared telephonically before the undersigned, but no one appeared on

behalf of any defendant.

## Factual Background

The following facts are established by the complaint (Docket no. 1) ("Compl") and

plaintiffs' memorandum in support of their motion for default judgment. (Docket no. 27-1).

Plaintiff Muna al-Suyid is a citizen and resident of Libya and brings this action in her individual

capacity and on behalf of her late father and brothers: Abdel Salam al-Suyid, Ibrahim al-Suyid,

Khalid al-Suyid, and Mustafa al-Suyid. (Compl. ¶ 9). Plaintiff Ibrahim al-Krshiny is also a

citizen and resident of Libya and brings this action in his individual capacity and on behalf of his

---

[1] Plaintiffs have provided a certificate of service and a declaration indicating that a copy
of the motion for default judgment, the memorandum in support of the motion, and the notice of
hearing were sent to each of the defendants at the Seminary Road address in accordance with the
District Judge's order dated August 23, 2020. (Docket no. 30).

late brothers: Ali al-Krshiny and Mustafa al-Krshiny. (*Id.* ¶ 10). Plaintiffs Abdalla al-Krshiny,
Ahmad al-Krshiny, and Mahmud al-Krshiny are all citizens and residents of Libya who bring
this action in their individual capacities. (*Id.* ¶ 11).

Defendant Khalifa Hifter is a dual U.S. and Libyan citizen who lived in Virginia for years
and owns property in Virginia. (*Id.* ¶ 12). Defendants Khalid and Saddam Hifter are U.S.
citizens who also lived in Virginia for years and own property in Virginia. (*Id.* ¶ 13). In 2011,[2]
defendant Khalifa Hifter traveled to Libya and was appointed field marshal and head of the
Libyan National Army ("LNA"). (*Id.* ¶ 24). He made his sons, defendants Khalid Hifter and
Saddam Hifter, LNA officers. (*Id.* ¶ 25). Defendant Saddam Hifter also represented the LNA
internationally, helping to obtain financing for the LNA. (*Id.*). In October 2014, acting on the
authority of the Libyan House of Representatives,[3] defendant Khalifa Hifter and the LNA
launched "Operation Dignity" against those who opposed the LNA, especially in the city of
Benghazi. (*Id.* ¶ 26). On October 15, 2014, the first day of Operation Dignity, LNA units under
defendant Khalifa Hifter's command surrounded the al-Suyid family home in Benghazi. (*Id.* ¶
29). A gunfight ensued during which Mustafa and Khalid al-Suyid defended the home. (*Id.* ¶
30). Abdel Salam and Ibrahim al-Suyid were kidnapped on their way back to the family home
and taken to a nearby school where they were beaten. (*Id.*). Plaintiff Muna al-Suyid then
received a phone call demanding that if she wished to see her father and brother alive again—
Abdel Salam and Ibrahim al-Suyid—she was to surrender her other brothers—Mustafa and

---

[2] Plaintiffs' memorandum in support of their motion for default judgment suggests that
defendant Khalifa Hifter traveled to Libya in 2014, so there is a slight discrepancy in the dates.
(Docket no. 27-1 at 3).
[3] Plaintiffs' complaint asserts defendant Khalifa Hifter acted on the authority of the
"Libyan Government," but, as further detailed below, the Libyan Civil War has resulted in
several factions, two of whom—the Libyan House of Representatives and the Government of
National Accord—compete as two rival centers of power. (*See* Docket no. 27-1 at 12–14).

Khalid al-Suyid. (*Id.* ¶ 31). She refused. (*Id.*). Subsequently, Mustafa al-Suyid was shot and killed in the fighting and Khalid al-Suyid was wounded and later discovered dead, although the exact circumstances of his death are unknown. (*Id.*). On October 16, 2014, plaintiff Muna al-Suyid learned that Abdel Salam and Ibrahim al-Suyid's bodies were discovered in a nearby industrial area; visible injuries indicated that both had been subject to torture. (*Id.* ¶¶ 32–33).

On October 17, 2014, LNA units acting under defendant Khalifa Hifter's command attacked the al-Krshiny family home in Benghazi. (*Id.* ¶ 34). Plaintiff Ibrahim al-Krshiny was wounded in the eye by shrapnel resulting from the gunfight that ensued and he, along with his five brothers, were taken prisoner. (*Id.* ¶ 36). Plaintiffs Ibrahim and Mustafa al-Krshiny were taken to the village of Bersis where they were beaten by an LNA member. (*Id.* ¶ 37). They were then detained at an LNA barracks co-located with defendant Khalifa Hifter's headquarters in ar-Rajma, Libya. (*Id.* ¶ 38). Plaintiff Ibrahim al-Krshiny was stripped, bound, and beaten on his face and body with fists, pipes, cables, a broom handle, and a plastic hose. (*Id.* ¶¶ 39–40). He was also electrocuted at five minute intervals for approximately seven and a half hours. (*Id.* ¶ 41). Eventually, he was blindfolded, driven into a forest, told to walk forward and not look back. (*Id.* ¶ 42). Due to being in custody, beaten, and receiving no medical attention, plaintiff Ibrahim al-Krshiny's eye wound became infected and his eye had to be removed after he was released. (*Id.* ¶ 43). Mustafa al-Krshiny's body was found on the side of a deserted road, alongside others, on November 5, 2014. (*Id.* ¶ 44). His hands were tied behind his back, he had been tortured, and he had execution-style bullet wounds in his head and chest. (*Id.*). Plaintiff Ibrahim al-Krshiny's remaining brothers—Abdalla, Ahmad, Ali, and Mahmud—were detained and brought to an LNA camp. (*Id.* ¶ 45). LNA members opened fire on the truck killing Ali al-Krshiny and wounding

Abdalla, Ahmad, and Mahmud al-Krshiny. (*Id.*)  Eventually, the remaining three al-Krshiny brothers were released on November 21, 2014. (*Id.*).

## Proposed Findings and Recommendations

Rule 55 of the Federal Rules of Civil Procedure provides for the entry of a default judgment when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a).  Based on the defendants' failure to file their responsive pleadings in a timely manner, the Clerk of Court has entered a default against defendants. (Docket no. 25).

A defendant in default admits the factual allegations in the complaint. *See* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount in damages—is admitted if a responsive pleading is required and the allegation is not denied."); *see also GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003) ("Upon default, facts alleged in the complaint are deemed admitted and the appropriate inquiry is whether the facts as alleged state a claim.").  Rule 55(b)(2) of the Federal Rules of Civil Procedure provides that a court may conduct a hearing to determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter.

## Jurisdiction and Venue

A court must have both subject matter and personal jurisdiction over a defaulting party before it can render a default judgment.  Plaintiffs assert that they cannot obtain civil relief in Libya since their case seeks personal damages against the LNA field marshal who controls the government in many parts of Libya including plaintiffs' home jurisdiction. (Compl. ¶ 51).[4]

---

[4] Plaintiffs cite to Amnesty International which has found that Libya has a "highly dysfunctional" domestic judicial system that cannot provide recourse for victims of human rights

5

Plaintiffs thus allege that this matter is properly before the court pursuant to 28 U.S.C. § 1331 as their claims arise under the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350.[5]  (*Id.* ¶ 14). Given that these allegations are uncontested, this court appears to have jurisdiction pursuant to 28 U.S.C. § 1331.

The court also appears to have personal jurisdiction over defendants.  As alleged in the complaint, each defendant is a United States citizen and a resident of Virginia who owns property in this District. (Compl. ¶¶ 17–18, Docket no. 27-1 at 7–8).  Defendant Khalifa Hifter has property in Falls Church, Virginia, and has lived there with his sons, defendants Khalid and Saddam Hifter, for approximately twenty years. (Docket no. 27-1 at 8).  Defendants also own substantial other property in the District; defendants Khalid and Saddam Hifter purchased seventeen properties in Virginia between 2014 and 2017. (Compl. ¶ 23).  Venue is also proper in this court pursuant to 28 U.S.C. § 1391 as all defendants allegedly reside in this judicial district. (Compl. ¶¶ 17–19).

For these reasons, the undersigned magistrate judge recommends a finding that this court has subject matter jurisdiction over this action, that this court has personal jurisdiction over defendants, and that venue is proper in this court.

### Service

Pursuant to Federal Rule of Civil Procedure 4(e)(1), an individual within a judicial district of the United States may be served pursuant to state law for serving a summons in the state where the district court is located or where service is made.  An individual may also be

---

violations, thereby leaving those responsible to "continue to operate with absolute impunity without fear of accountability." (Compl. ¶ 50).

[5] "The district court shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

served by delivering a copy of the summons and complaint to the individual personally.  Fed. R.

Civ. P. 4(e)(2).  Under Virginia law, if an individual cannot be personally served and a copy of

the process cannot be left with a family member other than a "temporary sojourner or guest" 16

years or older, a party may post a copy of the process on the main entrance of the individual's

place of abode.  Va. Code Ann. § 8.01-296(2)(b) (2018).  The party posting the process,

however, must mail a copy of the process to the individual served by posting at least ten days

before default judgment is entered and file a certificate of mailing with the Clerk of Court.  *Id.*

On February 24, 2020, summonses were issued for each defendant.  (Docket no. 10).  The

summonses were returned unexecuted on March 9, 2020.  (Docket nos. 13–15).  On March 10,

2020, alias summonses were issued for each defendant.  (Docket no. 19).  Following three

unsuccessful attempts on March 11, 12, and 13, on March 14, 2020, Abel Emiru, a private

process server, posted the alias summons and complaint at 5505 Seminary Road, Unit 2310N in

Falls Church, Virginia and mailed a copy of the alias summons and complaint to each defendant.

(Docket nos. 20–22).  Plaintiffs state in their memorandum in support that the Seminary Road

address was defendants' usual place of abode.  (Docket no. 27-1 at 9).  Plaintiffs filed affidavits

of service for each defendant with the Clerk of Court on March 20, 2020.  (Docket nos. 20–22).[6]

Based on the foregoing, the undersigned recommends a finding that defendants were properly

served with the alias summons and complaint and are deemed to have notice of this action.

---

[6] The affidavits of service merely state "Post & Mail" for each defendant at the Seminary
Road address.  (Docket nos. 20–22).  During the hearing on June 12, 2020, plaintiffs' counsel
indicated that the alias summons and complaint were posted on the main entrance of the abode
and mailed to each defendant.

## Grounds for Default Judgment

In accordance with Federal Rule of Civil Procedure 12(a), defendants were required to file a responsive pleading by April 6, 2020, twenty-one (21) days after they were served with a copy of the alias summons and complaint. No responsive pleadings have been filed by any defendant and the time for doing so has expired. On May 1, 2020, plaintiffs filed a request for entry of default against defendants pursuant to Federal Rule of Civil Procedure 55(a). (Docket no. 24). The Clerk of Court entered default against defendants on May 5, 2020. (Docket no. 25).

For the reasons stated above, the undersigned magistrate judge recommends a finding that the Clerk of Court properly entered a default as to defendants.

## Liability

According to Federal Rule of Civil Procedure 54(c), a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Given that a default has been entered, the factual allegations in the complaint are deemed admitted. *See* Fed. R. Civ. P. 8(b)(6).

**Torture Victim Protection Act (Count 1)[7]**

Count I of plaintiffs' complaint asserts that defendants, by their actions, violated the Torture Victim Protection Act ("TVPA"). (Compl. ¶¶ 55–71). The TVPA provides for a civil cause of action where:

---

[7] Plaintiffs' complaint includes several other counts in addition to the Torture Victim Protection Act claim; namely, civil conspiracy (count two), wrongful death (count three), battery (count four), assault (count five), false imprisonment (count six), and intentional infliction of emotional distress (count seven). (*See* Compl. ¶¶ 72–96). The default judgment focuses only on the TVPA claim which, plaintiffs assert, "affords complete relief" on its own. (Docket no. 27-1 at 9–10). During the hearing on June 12, 2020, plaintiffs' counsel indicated that they were pursuing only the TVPA claim. Given that plaintiffs' move for default judgment on the TVPA claim only and the statement that they are not pursuing the other claims, this Proposed Findings of Fact and Recommendations limits its discussion to the TVPA count.

8

> An individual who, under actual or apparent authority, or color of law, of any
> foreign nation—
> (1) subjects an individual to torture shall, in a civil action, be liable for damages
> to that individual; or
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable
> for damages to the individual's legal representative, or to any person who may be
> a claimant in an action for wrongful death.

Pub. L. No. 102-256, § 2(a), 106 Stat. 73 (1993) (codified at 28 U.S.C. § 1350 note). To bring a

claim under the TVPA, a claimant has to have exhausted all adequate and available remedies "in

the place in which the conduct giving rise to the claim occurred." *Id.* § 2(b). Furthermore, the

statute contains a ten-year statute of limitations. *Id.* § 2(c).[8]

### *Exhaustion*

As noted above, the court must decline to hear a claim brought under the TVPA if the

claimant has not exhausted his remedies. However, this requirement "is an affirmative defense,

requiring the defendant to bear the burden of proof," a burden which is considered "substantial."

*Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005). "In most instances, initiation of litigation

under the TVPA 'will be virtually prima facie evidence that the claimant has exhausted his or her

remedies in the jurisdiction in which the torture occurred.'" *Boniface v. Viliena*, 338 F. Supp. 3d

50, 65 (D. Mass 2018) (citing *Jean*, 431 F.3d at 781–82). To the extent there is any doubt

surrounding this issue, "both Congress and international tribunals have mandated that such

doubts be resolved in favor of the plaintiffs." *Id.* (citing *Enahoro v. Abubakar*, 408 F.3d 877,

892 (7th Cir. 2005)).

Here, defendants have not met their substantial burden to show that plaintiffs failed to

exhaust their administrative remedies in Libya given defendants are in default. Plaintiffs'

---

[8] As plaintiffs' complaint notes, their claims under the TVPA are timely in that the events
giving rise to them took place less than ten years ago, in 2014 respectively. (Compl. ¶ 70).

complaint and motion for default judgment contain detailed allegations concerning the

dysfunction of the Libyan justice system. (*See* Compl. ¶¶ 48–51, Docket no. 27-1 at 17–19).

They categorically assert that they cannot obtain civil relief in Libya, most significantly in part

due to the fact that "the men who perpetrated their heinous crimes run most of the country and

dominate the court systems." (Docket no. 27-1 at 18). Plaintiffs also cite to a U.S. Department

of State travel advisory, issued in 2019, which warns that militia groups in Libya detain persons

for arbitrary reasons, refuse to grant those detained access to a lawyer or the legal process more

broadly, and do not allow detainees to inform others of their status. (*Id.*) Further, plaintiffs point

to a report by Amnesty International which describes Libya's judicial system as "highly

dysfunctional" and unable to provide a means of recourse for those subject to human rights

violations; rather, the "perpetrators of serious human rights abuses continue to operate with

absolute impunity without fear of accountability." (*Id.*) Courts have found allegations that a

country's judicial system is corrupt sufficient to show that a claimant lacks "effective domestic

legal remedies." *Boniface*, 338 F. Supp. 3d at 66–67 (citing *Enahoro*, 408 F.3d at 892; *In re*

*Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 190 F. Supp. 3d 1100,

1115 (S.D. Fla. 2016); *Doe v. Drummond Co.*, No. 7:09cv1041, 2009 WL 9056091, at *17 (N.D.

Ala. Nov. 9, 2009)). Given defendants are in default, thereby admitting the factual allegations in

the complaint as true, and plaintiffs allege the unavailability of justice in the Libyan court

system, the undersigned recommends a finding that plaintiffs have exhausted their administrative

remedies.

### *Acting with Authority from a "Foreign Nation"*

To bring a civil cause of action under the TVPA, a claimant must show that the liable

individual was acting under the authority of a "foreign nation." Pub. L. No. 102-256, § 2(a), 106

Stat. 73 (1993). The claimant must establish that there was "some governmental involvement in

the torture or killing to prove a claim" as the TVPA "does not attempt to deal with torture or

killing by purely private groups." *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995) (citing

H.R. Rep. No. 367, at 5 (1991)). This state action requirement, however, "does not require that a

particular government be officially recognized . . . [c]ertain private groups may constitute a de

facto state, in which case they will be held liable under the TVPA." *Doe v. Islamic Salvation*

*Front (FIS)*, 993 F. Supp. 3, 9 (D.D.C. 1998) (citing *Karadzic*, 70 F.3d at 244). "The de facto

state doctrine recognizes that the TVPA does not concern the legitimacy of a particular

organization but its power." *Id.* A state is considered, according to international law, as "an

entity that has a defined territory and a permanent population, under the control of its own

government, and that engages in, or has the capacity to engage in, formal relations with such

other entities." *Id.* (quoting Restatement (Third) § 201).

Plaintiffs assert that defendants here were acting with the authority granted by a de facto

foreign nation. (Docket no. 27-1 at 12). In support of their assertion, plaintiffs detail two

different factions in the Libyan Civil War that encompass the two rival centers of power that

emerged following the fall of Muammar Gaddafi: that of the Government of National Accord

("GNA"), the officially recognized government led by Prime Minister Fayez al-Sarraj, and that

of the Libyan House of Representatives, which appointed defendant Khalifa Hifter as

commander-in-chief of the LNA. (*Id.*). Plaintiffs explain that the GNA, based in the capital city

of Tripoli and established after failed military coups and the relocation of the Libyan House of

Representatives, has "little power," controlling only a "small fraction" of Libya and exerting no

control over Eastern Libya, the location of the events at the heart of this action. (*Id.* at 12–13).

By way of contrast, the Libyan House of Representatives has de facto control of Eastern Libya

11

and has established a government there. (*Id.* at 13). The LNA, operating under the authority of the Libyan House of Representatives, controls both Central and Eastern Libya through laws, taxes, trials, and the imposition of death sentences, and has, for many months, attempted to lay siege to Tripoli. (*Id.* at 13–14). Further, the LNA has engaged in international diplomacy concerning peace in Libya. (*Id.* at 14). Plaintiffs also draw attention to the recognition of the Libyan House of Representatives by the United Nations. (*Id.* at 13). In a compromise designed to promote peace and balance power, the agreement between the United Nations and the two rival seats of power recognized an official executive branch in Tripoli and the Libyan House of Representatives as the official legislature. (*Id.*).

Plaintiffs' allegations, admitted as true given the defendants' default, demonstrate that defendants were acting under the authority of a foreign government. In *Karadzic*, the Second Circuit found that the appellants had alleged sufficient facts for them to prove that defendant's regime satisfied the criteria for a state as considered in the context of international law. *Karadzic*, 70 F.3d at 245. There, "Srpska" was alleged to "control defined territory, control populations within its power, and to have entered into agreements with other governments . . . [i]t has a president, a legislature, and its own currency." *Id.* The Second Circuit continued by reframing the inquiry, noting that the concept of a state, where required for violations such as "official" torture, "requires merely the semblance of official authority . . . not whether statehood in all its formal aspects exists." *Id.* Here, plaintiffs have alleged that the Libyan House of Representatives, through the LNA, controlled defined territory, in this case Central and Eastern Libya, and controlled the populations within those areas through the imposition of laws, taxes, trials, and death sentences. (Docket no. 27-1 at 13–14). Further, plaintiffs allege that the United Nations has recognized the Libyan House of Representatives (Docket no. 27-1 at 13) and

defendant Saddam Hifter represented the LNA internationally in order to obtain financing (Compl. ¶ 25).  Accordingly, the undersigned recommends a finding that plaintiffs assertion that the LNA acted under the authority of the Libyan House of Representatives, a de facto government, is sufficient to meet the "foreign nation" requirement of the TVPA.

### *Extrajudicial Killings*

The TVPA defines the term "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1993).  It does not include "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." *Id.*

Plaintiffs' complaint asserts that defendants committed the extrajudicial killings of Abdel Salam, Ibrahim, Khalid, and Mustafa al-Suyid and Mustafa and Ali al-Krshiny.  (Compl. ¶¶ 61–64).  Specifically, plaintiffs point to the deaths of Adbel Salam and Ibrahim al-Suyid who were kidnapped on their way home and their bodies found the next day in a nearby industrial area. (*Id.* ¶¶ 29–33).  Plaintiffs assert that no evidence exists that any judicial process took place and that there was certainly not enough time to conduct a trial with any form of due process.  (Docket no. 27-1 at 15).  Khalid and Mustafa al-Suyid were killed outside their home; plaintiffs again contend that the "gunning down" of these individuals was "with no semblance of judicial process." (*Id.*).  Mustafa al-Krshiny was detained in an LNA barracks co-located with defendant Khalifa Hifter's headquarters and his body found two weeks later with "execution-style bullet wounds to his head and chest." (*Id.*).  Ali al-Krshiny was killed when LNA members opened fire on a truck he was in while being bought to an LNA camp. (*Id.*).  Mustafa and Ali al-Krshiny's deaths, plaintiffs contend, were without judicial process. (*Id.*).  These killings were deliberate,

without authorization by previous judgments from a Libyan court or any lawful authority recognized by international law.  (Compl. ¶ 62).

      Plaintiffs acknowledge that defendants did not directly "pull the trigger," but assert that defendants are still liable under the doctrine of "command responsibility" and cite to *Hilao v. Estate of Marcos* in support of this theory of liability.  (Docket no. 27-1 at 15).  The Ninth Circuit in *Hilao* described the principle of "command responsibility" as that which "holds a superior responsible for the actions of subordinates" and found the United States had moved toward recognizing the applicability of the principle for torture occurring during peacetime, not just during wartime. *Hilao v. Estate of Marcos*, 103 F.3d 767, 777 (9th Cir. 1996).  Further, as the court cited, the legislative history of the TVPA evidenced this move, explaining that under international law "responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts—anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them." *Id.* (citing S. Rep. No. 249, at 9 (1991)).  More recently, the Supreme Court has affirmed that "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012).  Plaintiffs assert that defendants, as LNA commanders, bear responsibility for the deaths of Abdel Salam, Ibrahim, Khalid, and Mustafa al-Suyid and Mustafa and Ali al-Krshiny. (Docket no. 27-1 at 16).  They "authorized, tolerated, or knowingly ignored these killings" and defendant Khalifa Hifter's "Operation Dignity" showed a "prepared" plan to determine whom to "liquidate"; namely, those suspected to oppose the LNA, especially in Benghazi. (*Id.*).  It, therefore, was no surprise that defendant Khalifa Hifter's troops followed his orders. (*Id.*).  Plaintiffs contend that defendants' actions were a part of a "common plan, design, and scheme of the LNA" and that defendant

14

Khalifa Hifter was aided and abetted by his sons. (Compl. ¶ 47). As noted, courts have found

liability under a theory of command responsibility. *See, e.g.*, *Karadzic*, 70 F.3d at 232;

*Chiminya Tachiona v. Mugabe*, 216 F. Supp. 2d 262 (S.D.N.Y. 2002) (finding that members of

Zimbabwe's ruling party were liable under the TVPA for "organiz[ing] targeted violence against

political opponents and their families and supporters, assassinations and assassination attempts,

kidnappings, tortures, rapes, beatings, mass destruction of property, and mob riots in a consistent

and focused campaign of terror designed to crush political opposition to ZANU-PF"). 

Accordingly, the undersigned recommends a finding that defendants' actions amount to

extrajudicial killings as defined by the TVPA.

### *Torture*

The TVPA defines the term torture as:

> [A]ny act, directed against an individual in the offender's custody or physical
> control, by which severe pain or suffering (other than pain or suffering arising
> only from or inherent in, or incidental to, lawful sanctions), whether physical or
> mental, is intentionally inflicted on that individual for such purposes as obtaining
> from that individual or a third person information or a confession, punishing that
> individual for an act that individual or a third person has committed or is
> suspected of having committed, intimidating or coercing that individual or a third
> person, or for any reason based on discrimination of any kind[.]

Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73 (1993). The definition also encompasses "mental

pain or suffering" which "refers to prolonged mental harm" caused by, or as a result of:

> (A) the intentional infliction or threatened infliction of severe physical pain or
> suffering;
> (B) the administration or application, or threatened administration or application,
> of mind altering substances or other procedures calculated to disrupt profoundly
> the senses or the personality;
> (C) the threat of imminent death; or
> (D) the threat that another individual will imminently be subjected to death,
> severe physical pain or suffering, or the administration or application of mind
> altering substances or other procedures calculated to disrupt profoundly the senses
> or personality.

*Id.* § 3(b)(2). Plaintiffs allege that defendants are liable for the torture of Abdel Salam and

Ibrahim al-Suyid and Ibrahim, Mahmud, Abdalla, and Ahmad al-Krshiny when they were in the

custody of the LNA.[9] (Docket no. 27-1 at 16). Specifically, plaintiffs refer to the LNA's

direction that Ibrahim al-Krshiny be beaten, electrocuted, and "forced to face what he reasonably

believed to be imminent execution," the "gratuitous[]" shooting of Adballa and Ahmad al-

Krshiny, both of whom were defenseless at the time, and the marks left on the bodies of Abdel

Salam and Ibrahim al-Suyid indicative of pain and suffering. (*Id.* at 16–17; Compl. ¶ 65).

Plaintiffs also assert that defendants intentionally caused these individuals prolonged and severe

physical and mental pain to punish them "for their presumed resistance to [the] LNA, to

intimidate and coerce them on the basis of their wrongly assumed membership in the Islamic

State, to obtain false confessions from them of Islamic State membership, and discriminate

against them for their residency in Benghazi and the al-Krshiny's Turkish ethnicity." (Compl. ¶

67). Plaintiffs' theory of liability is again based on the principle of "command responsibility,"

---

[9] Plaintiffs' have indicated that plaintiff Muna al-Suyid also has a claim for torture under the TVPA relying on the second part of the definition in which "mental pain or suffering" is discussed. Plaintiffs' complaint, specifically count seven, alleges that Muna al-Suyid suffered intentional infliction of emotional distress as a result of defendants' actions. (Compl. ¶ 95). However, as previously noted, plaintiffs' motion for default judgment proceeds only on the TVPA count and does not include the remaining counts of the complaint. (*See* Docket no. 27-1 at 9–10). Further, reading the plain language of the TVPA statute and reviewing case law, for a claim of torture, the individual must be in the "offender's custody or physical control." Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73 (1993). Muna al-Suyid received a phone call in which defendants' demanded she surrender her brothers Mustafa and Khalid al-Suyid if she wished to see her father and brother, Abdel Salam and Ibrahim al-Suyid, alive again. (Compl. ¶ 31). Although Muna al-Suyid's experience is incredibly distressing, she was not physically in the control of defendants thus it appears she was not "tortured" as defined by the TVPA. A review of the specific allegations in count one of the complaint (Compl. ¶¶ 56–71) reveals no mention of Muna al-Suyid and states that defendants "intentionally caused these men prolonged and severe mental and physical pain and suffering" (Compl. ¶ 67).

pointing out that the acts above occurred both "within eyesight and earshot of defendant Khalifa Hifter's headquarters," thus making him responsible. (Docket no. 27-1 at 16–17).

Plaintiffs have met the standard for torture under the TVPA as to Abdel Salam and Ibrahim al-Suyid and Ibrahim, Mahmud, Abdalla, and Ahmad al-Krshiny. These individuals were subject to severe pain and suffering at the hands of defendants before two of them were killed. *See Chiminya Tachiona*, 216 F. Supp. 2d at 275 (finding that plaintiffs there had been tortured before being "brutally murdered"). Further, case law indicates that under the TVPA, electrocution, or electric shocks, are considered means of torture. *See Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 52 (2d Cir. 2014) (citing *Jean-Pierre v. U.S. Attorney Gen.*, 500 F.3d 1315, 1324 n.6 (11th Cir. 2007); *Cherichel v. Holder*, 591 F.3d 1002, 1009 n.11 (8th Cir. 2010); *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 448 (4th Cir. 2007); *Lhanzom v. Gonzales*, 430 F.3d 833, 848 (7th Cir. 2005); *United States v. Webster*, 392 F.3d 787, 794 (5th Cir. 2004); *Zubeda v. Ashcroft*, 333 F.3d 463, 472 (3d Cir. 2003); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002)). Accordingly, the undersigned recommends a finding that defendants' actions amount to torture as defined by the TVPA.

## Relief

Plaintiffs' complaint seeks (1) actual compensatory damages in an amount to be determined, but in excess of $75,000; (2) exemplary and punitive damages in an amount to be determined; and (3) pre- and post-judgment interest. (Compl. at 20). Plaintiffs' motion for default judgment seeks an award of $10 million for each decedent and $5 million for each survivor. (Docket no. 27-1 at 21).

**Damages**

The TVPA provides that, in a civil action, an individual found to subject another to torture or extrajudicial killing can be held liable for damages. Pub. L. No. 102-256, § 2(a), 106 Stat. 73 (1993). Plaintiffs assert that the court should enter a substantial award of compensatory and punitive damages in this case, citing to several cases where such an award was made and noting the six factors which the courts took into account: "(i) [the] brutality of the act; (ii) [the] egregiousness of defendant's conduct; (iii) [the] unavailability of criminal remedy; (iv) [the] international condemnation of act; (v) [the] deterrence of others from committing similar acts; and (vi) [the] provision of redress to plaintiff, country[,] and world." *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1158–59 (E.D. Cal. 2004) (collecting cases). Plaintiffs assert that defendants commanded troops to commit brutal acts; they commanded troops to "target[], hunt[] down, [torture], and kill[] plaintiffs and plaintiffs' families"; they will never face criminal liability in Libya; and their actions have been condemned by the international community. (Docket no. 27-1 at 21).

As an initial matter, plaintiffs contend they have standing to recover damages on behalf of themselves and on behalf of the decedents. (*Id.* at 19). To obtain relief pursuant to the TVPA, a claimant must be "(1) a legal representative or any person who may be a claimant in an action for wrongful death; (2) of a victim of an extrajudicial killing; (3) committed by an individual acting 'under actual or apparent authority, or color of law, of any foreign nation.'" *Baloco ex rel. Tapia v. Drummond Co., Inc.*, 640 F.3d 1338, 1346 (11th Cir. 2011). Plaintiffs assert that "there can be no question" that those plaintiffs who suffered torture at the hands of defendants can recover in their own name; that plaintiff Muna al-Suyid can bring the claims of Abdel Salam, Ibrahim, Khalid, and Mustafa al-Suyid as their legal representative; and that plaintiff Ibrahim al-

Krshiny can bring his own claims as well as the claims of his brothers Ali and Mustafa al-Krshiny as their legal representative. (Docket no. 27-1 at 19–20). Plaintiffs' complaint alleges that plaintiff Muna al-Suyid is the personal representative of the estates of plaintiffs Abdel Salam, Ibrahim, Khalid, and Mustafa al-Suyid "pursuant to Libyan law and custom." (Compl. ¶ 9). Similarly, plaintiff Ibrahim al-Krshiny is the personal representative of the estates of his brothers, Ali and Mustafa al-Krshiny. (*Id.* ¶ 10). Plaintiffs Abdalla, Ahmad, and Mahmud al-Krshiny bring this action in their individual capacities. (*Id.* ¶11). From these allegations, plaintiffs meet the standing requirement of the TVPA: they are either legal representatives of persons who were victims of extrajudicial killings or were subject to torture as defined by the TVPA themselves. As further detailed above, defendants acted with the authority of a "foreign nation."

Although the language of the TVPA provides no methodology by which a court should determine the amount or type of damages, courts have appropriately relied on federal common law to do so and have found successful plaintiffs entitled to seek both compensatory and punitive damages. *See Chiminya Tachiona*, 216 F. Supp. 2d at 275; *Xuncas v. Gramajo*, 886 F. Supp. 162, 198 (D. Mass. 1995). Generally, courts have awarded significant damages for extrajudicial killings under the TVPA. *See Rafael Saravia*, 348 F. Supp. 2d at 1158 (citing *Chiminya Tachiona*, 216 F. Supp. 2d at 267–68; *Mushikiwabo v. Barayagwiza*, No. 94 CIV. 3627, 1996 WL 164496, at \*3 (S.D.N.Y. Apr. 9, 1996; *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1358–60 (N.D. Ga. 2002)). Plaintiffs cite to five cases in support of their request, two of which present a somewhat similar procedural posture to the case at hand.

In *Chiminya Tachiona*, the plaintiffs alleged that the Zimbabwe National Union-Patriotic Front ("ZANU-PF") carried out a campaign of violence against them in an effort to suppress

political opposition. 216 F. Supp. 2d at 265. Acting in concert with Robert Mugabe and other high-ranking government officials, ZANU-PF's campaign of violence included extra-judicial killing, the seizure of property, torture, and terrorization. *Id.* The district court dismissed the claims asserted against Mugabe and other officials but found plaintiffs had properly effected service on defendant ZANU-PF. *Id.* at 264. Defendant ZANU-PF failed to appear in the case and a default judgment was entered. *Id.* The court referred the action to a magistrate judge for a hearing on damages. *Id.* at 264–69. Regarding plaintiffs' claims of extrajudicial killing and torture, the magistrate judge relied on several cases where compensatory and punitive damages were awarded and ultimately recommended the adopting of plaintiffs' request for an award of $2,500,000 in compensatory damages and $5,000,000 in punitive damages for the murder of three individuals and $1,000,000 in compensatory damages and $5,000,000 in punitive damages for the torture of two other individuals. *Id.* at 279–280. The District Judge indicated that he was inclined to adopt those recommended amounts. *Id.* at 268.

In *Rafael Saravia*, the plaintiff brought suit against a former chief of security for paramilitary organizations (also known as "death squads") organized by the political party Alianza Republicana Nacionalista ("ARENA") in El Salvador. 348 F. Supp. 2d at 1117. The defendant was alleged to have been complicit in the assassination of Archbishop Romero. *Id.* Plaintiff alleged violations of the Aliens Tort Act and the TVPA. *Id.* at 1142. Although defendant was properly served, he failed to appear, and plaintiff subsequently requested a default judgment. *Id.* at 1143. The district court found defendant liable under the TVPA for extrajudicial killing and proceeded to determine damages. *Id.* at 1148–53. Again, relying on several cases as guidance to determine the award of damages, the court found that six factors were considered to include, as detailed above, the brutality of the act, the unavailability of a

20

criminal remedy, and the deterrence of others from committing similar acts. *Id.* at 1158–59.
Taking into account the national and international stature of the victim, the court awarded
plaintiff $5,000,000 in compensatory damages and $5,000,000 in punitive damages. *Id.* at 1159.

Here, plaintiffs seek an award of $5,000,000 in compensatory and punitive damages for
each survivor and $10,000,000 in compensatory and punitive damages for each decedent.
(Docket no. 27-1 at 21). As discussed with plaintiffs' counsel during the hearing, very little
information was provided to the court concerning the background of the survivors and the
decedents that would normally be considered in determining a compensatory damages award.
Counsel indicated that the main focus of the damages claim relied upon the six factor analysis in
*Rafael Saravia* and not the specific background or earning capacity of each plaintiff.

Taking into consideration the six factors discussed above and in particular the brutality of
the acts, the egregious nature of defendants' conduct, the unavailability of a criminal remedy,
and the deterrence of others for committing similar acts, the amounts requested by plaintiffs
seem appropriate. Given that defendants have not challenged the requested amounts, the
undersigned recommends that the court award $5,000,000 to each survivor and $10,000,000 for
each decedent.

## Conclusion

For these reasons, the undersigned recommends that default judgment be entered in favor
of plaintiff Muna al-Suyid as the personal representative of the estates of Abdel Salam, Ibrahim,
Khalid, and Mustafa al-Suyid in the amount of $40,000,000 ($10,000,000 for each decedent);
plaintiffs Abdalla, Ahmad, Mahmud, and Ibrahim al-Krshiny as survivors of torture in the
$5,000,000 for each plaintiff; and plaintiff Ibrahim-al-Krshiny as the personal representative of
the estates of Ali and Mustafa al-Krshiny in the amount of $20,000,000 ($10,000,000 for each

decedent) against defendants Khalifa Hifter, Khalid Hifter, and Saddam Hifter for a total amount of $80,000,000.

## Notice

By means of the court's electronic filing system and by mailing a copy of this proposed findings of fact and recommendations to defendants Khalifa Hifter, Khalid Hifter, and Saddam Hifter, 5505 Seminary Road, Unit 2310N, Falls Church, VA 22041, and 3409 Wilson Boulevard, Apt. 213, Arlington, VA 22201, the parties are notified that objections to this proposed findings of fact and recommendations must be filed within fourteen (14) days of service of this proposed findings of fact and recommendations and a failure to file timely objections waives appellate review of the substance of the proposed findings of fact and recommendations and waives appellate review of any judgment or decision based on this proposed findings of fact and recommendations.

ENTERED this 17th day of June, 2020.

/s/

John F. Anderson
United States Magistrate Judge
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

22