**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

_____

MUNA AL-SUYID, individually and on behalf of the        :
estates of her family members ABDEL SALAM               :
AL-SUYID, IBRAHIM AL-SUYID, KHALID                      :
AL-SUYID and MUSTAFA AL-SUYID, and                      :
IBRAHIM AL-KRSHINY, individually and on behalf of       :
the estates of his family members ABDALLA               :
AL-KRSHINY, AHMAD AL-KRSHINY, ALI                       :
AL-KRSHINY, MAHMUD AL-KRSHINY, and                      :
MUSTAFA AL-KRSHINY,                                     :
                                                        :
                                    Plaintiffs,         :
                                                        :        Civil Action No.
v.                                                      :        1:20-cv-170-LMB-JFA
                                                        :        September 10, 2020
KHALIFA HIFTER, KHALID HIFTER, and SADDAM               :
HIFTER,                                                 :
                                                        :
                                    Defendants.         :
_____


**<u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    I.     Factual Background ......................................................................................... 2

    II.    Procedural Background.................................................................................... 3

LEGAL STANDARDS ................................................................................................... 3

ARGUMENT ................................................................................................................. 5

    I.     Plaintiffs' allegations do not present a political question. ............................. 5

    II.    Field Marshal Hifter is not entitled to head-of-state immunity. ................... 10

    III.   Plaintiffs adequately pleaded their TVPA claims ......................................... 12

         a.  Due process in Libya is unavailable ......................................................... 12

         b.  Field Marshal Hifter is responsible for the war crimes that form the basis of Plaintiffs' claims ................................................................................... 15

            1.  Field Marshal Hifter is responsible for the conduct of troops that attacked and tortured Plaintiffs ..................................................... 16

            2.  Field Marshal Hifter failed to address the torture and extrajudicial killings ... 18

            3.  The killings were both "extrajudicial" and "deliberate".................... 19

    IV.   Defendants were properly served, and had actual notice of this suit........................... 22

         a.  Defendants were properly served.......................................................... 22

         b.  Defendants had actual notice of this suit .............................................. 24

CONCLUSION.............................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Airlines Reporting Corp. v. Cartagena Travel & Tours*,
   2012 U.S. Dist. LEXIS 202661 (E.D. Va. Aug. 3, 2012) .......................................................26

*Al Shimari v. CACI Premier Tech.*,
   300 F. Supp. 3d 758 (E.D.Va. 2018) .......................................................................................4

*Amazon Web Servs. v. Global Equity Mgmt., S.A.*,
2017 U.S. Dist. LEXIS 148477 (E.D. Va. 2017)...................................................................24

*Aziz v. Alcolac, Inc.*,
   658 F.3d 388 (4th Cir. 2011) .................................................................................................27

*Chiminya Tachiona v. Mugabe*,
   216 F. Supp. 2d 262 (S.D.N.Y. 2002)......................................................................................3

*Corrie v. Caterpillar, Inc.*,
   403 F. Supp. 2d 1019 (W.D. Wash. 2005)............................................................................8, 9

*Earle v. McVeigh*,
   91 U.S. 503 (1875).................................................................................................................23

*Enahoro v. Abubakar*,
   408 F.3d 877 (7th Cir.2005) ..................................................................................................13

*Filartiga v. Pena-Irala*,
   630 F.2d 876 (2d Cir. 1980).....................................................................................................5

*In re Grand Jury Proceedings, Doe No. 700*,
   817 F.2d 1108 (4th Cir. 1987) ...............................................................................................10

*Hilao v. Estate of Marcos*,
   103 F.3d 767 (9th Cir. 1996) .................................................................................................16

*Jean v. Lump Sum Cap., LLC*,
   431 F.3d 776 (11th Cir. 2005) ...............................................................................................12

*Kadic v. Karadzic*,
   70 F.3d 232 (2d Cir. 1995).......................................................................................................9

*Kerns v. United* States,
   585 F.3d 187 (4th Cir. 2009) ...................................................................................................4

*Lafontant v. Aristide*,
844 F. Supp. 128 (E.D.N.Y. 1994) ........................................................................10

*Leutwyler v. Office of Her Majesty Queen Rania al-Abdullah*,
184 F.Supp.2d 277 (S.D.N.Y. 2001).....................................................................10

*Malibu Media, LLC v. Bondoc*,
No. 1:18-cv-052, 2018 WL 6683937 (E.D. Va. Nov. 14, 2018) .............................23

*Mamani v. Berzain*,
654 F.3d 1148 (11th Cir. 2011) .......................................................................7, 21, 22

*Matar v. Ditcher*,
563 F.3d 9 (2d Cir. 2009).........................................................................................7

*Matta v. Lynch*,
579 U.S. 143 (2015)..................................................................................................6

*Mohamad v. Palestinian Auth.*,
132 S. Ct. 1702, 182 L. Ed. 2d 720 (2012) .....................................................26, 27

*Mohamad v. Palestinian Auth.*,
566 U.S. 449 (2012).................................................................................................6

*Painter v. Blue Ridge Reg'l Jail Auth.*,
No. 6:17-cv-00034, 2019 WL 302509 (W.D. Va. Jan. 23, 2019)............................23

*The Prosecutor v. Mahmoud Mustafa Busayf Al-Werfalli*, ICC-01/11-01/17 ..............................19

*Schneider v. Kissinger*,
412 F.3d 190 (D.C. Cir. 2005) ..............................................................................7, 8

*Tawfik v. al-Sabah*,
No. 11 Civ. 6455(ALC)(JCF), 2012 WL 3542209 (S.D.N.Y. Aug. 16, 2012) .....................10

*United States v. Williams*,
8 M.J. 506 (A.F.C.M.R. 1979)...............................................................................16

*Warfaa v. Ali*,
33 F. Supp. 3d 653 (E.D.Va. 2014), *aff'd*, 811 F.3d 653 (4th Cir.)..........................4, 9, 15, 26

*Ye v. Zemin*,
383 F.3d 620 (7th Cir.2004) .................................................................................10

*Yousuf v. Samantar*,
552 F.3d 371 (4th Cir. 2009), *aff'd*, 560 U.S. 305 (2010) ........................................9

*Yousuf v. Samantar*, 1:04-CV-1360 (LMB/JFA), 2012 U.S. Dist. LEXIS 122403
(E.D. Va. Aug. 28, 2012) .......................................................................................15

iii

*Yousuf v. Samantar*,
No. 1:04cv1360, 2011 WL 7445583 (E.D. Va. Feb. 15, 2011) ..............................................10

**Statutes**

Torture Victims Protection Act, Pub. L. No. 102-256, 28 U.S.C. § 1350 note .................... *passim*

Va. Code Ann.§ 8.01-288 ...........................................................................................................26

Va. Code Ann.§ 8.0l-296 .......................................................................................................5, 22

**Articles**

D. Kilpatrick, *A Police State With an Islamic Twist*, NEW YORK TIMES (Apr. 14,
2020), https://www.nytimes.com/2020/02/20/world/middleeast/libya-hifter-
benghazi.html ..........................................................................................................................14

*Head of State Immunity As Sole Executive Lawmaking*, 44 Vand. J. Transnat'l L.
911 (2011). ..............................................................................................................................10

I. deBre, *US court hears torture case against top Libyan commander*,
WASHINGTON POST (Jun. 12, 2020) .........................................................................................11

International Committee of the Red Cross Unit for Relations with Armed and
Security Forces, *The Law of Armed Conflict: Command responsibility* (Jun.
2002) ........................................................................................................................................16

J. Abdalla, *Two families file complaint against Khalifa Haftar in US lawsuit*, AL-
JAZEERA (Feb. 25, 2020) ..........................................................................................................11

J. Anderson, *The Unravelling*, THE NEW YORKER (Feb. 16, 2015) ............................................24

J. Barnes, *Ex-C.I.A. Asset, Now a Libyan Strongman, Faces Torture Accusations*,
NEW YORK TIMES (Feb. 18, 2020) ...........................................................................................11

K. Williams, *Trump Officials Meet with Libyan Politician Aligned with
Opposition 'Strongman' in Potential Policy Shift*, Defense One (Nov. 21,
2019), https://www.defenseone.com/policy/2019/11/trump-officials-meet-
libyan-politician-aligned-opposition-strongman-potential-policy-shift/161479/ ...................25

*Libya: Abducted Politician Missing 4 Weeks*, Human Rights Watch (Aug. 16,
2019), https://www.hrw.org/news/2019/08/16/libya-abducted-politician-
missing-4-weeks ......................................................................................................................14

*Libya: Abducted politician's fate remains unknown a year on, amid ongoing
disappearances*, Amnesty International (Jul. 17, 2020) ..........................................................14

Libya Travel Advisory (Apr. 9, 2019),
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/libya
-travel-advisory.html ..............................................................................................13

*Libyan National Army*, MIDDLE EAST EYE (July 9, 2019),
https://www.middleeasteye.net/news/libyas-haftar-promotes-accused-war-
criminal-wanted-international-court ........................................................................19

M. Hernandez & V. Dogantekin, *Questions Loom over Haftar's Legal Defense in
US Court*: *Renegade Libyan general seeks immunity as head of state, even
though US government recognizes opposing government*, ANDALOU AGENCY
(Aug. 28, 2020), https://www.aa.com.tr/en/africa/questions-loom-over-haftar-
s-legal-defense-in-us-court/1954628 ......................................................................11

## Other Authorities

Fed. R. Civ. P. 4 ....................................................................................................4, 22, 26

Fed. R. Civ. P. 12 ................................................................................................................4

H.R. Rep. No. 102-367 (1991) ............................................................................................7

Rome Statute of the International Criminal Court, 8 J. Int'l L. & Prac. 227, 232
(1999) .........................................................................................................................21

S. Rep. No. 102-249 (1991) ..................................................................................5, 8, 13, 20

Statement for the United Nations Human Rights Council's Interactive Dialogue on
the High Commissioner's Report on Libya, Amnesty International (Feb. 20,
2018), available at https://www.refworld.org/pdfid/5b55c0fb4.pdf ........................13

## INTRODUCTION

Congress passed the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note, to give a forum for civil claims against individuals who act under color of law to commit torture or extrajudicial killings. Under the TVPA, victims of those crimes have access to federal courts to carry out the United States' obligations under the "[United Nations'] charter and other international agreements pertaining to the protection of human rights." *Id.*

This case presents war crimes that are the paradigm of what Congress designed the TVPA for the federal courts to adjudicate. The Defendants are U.S. citizens who became warlords in Libya, commanding troops during "Operation Dignity" to torture and/or kill Plaintiffs and their family members solely because of their ethnicity. Defendants and their subordinates specifically targeted Plaintiffs and their families for extermination, making a public announcement and listing their names beforehand. They attacked the families' homes, slaughtered many, and abducted and tortured others. It does not matter if the head of an army personally committed the crimes—a commander is responsible for his troops' actions. The TVPA gives Plaintiffs the right to seek redress for these violations of international law in U.S. courts.

Defendants now seek to shirk responsibility for their actions, claiming among other things that torture and extrajudicial killings are lawful acts of war (they are not), that they did not know what the troops under their command were doing (they did), that the killings and torture were not "deliberate" (they were), or that Plaintiffs should have sought to exhaust remedies from the very men who tortured or killed their family members (they should not have had to, nor are there any such procedures available to exhaust). None of Defendants' arguments have merit. Plaintiffs deserve their day in court.

# BACKGROUND

## I.     Factual background

Plaintiffs, the Suyids and Krshinys, are two families in Benghazi, Libya. Compl. ¶¶ 9–13. In October 2014, troops under orders from Defendants Khalifa, Khalid, and Saddam Hifter stormed these families' homes, killed several of their men, and tortured and/or executed the survivors without trial. *Id*. ¶¶ 26–46.

Defendants are United States citizens, residents of the Eastern District of Virginia, and owners of significant assets in this District. *Id*. ¶¶ 17–18. Since 2014, Defendant Khalifa Hifter has served as a field marshal in the Libyan National Army ("LNA"), with his sons Khalid and Saddam as key subordinates. *Id.* ¶¶ 24–25.

In October 2014, the LNA launched an operation to kill named opponents in Benghazi, including members of Plaintiffs' families. Defendants' spokesperson and propagandist called for them to be "liquidated" and ordered that no prisoners be taken. *Id*. ¶¶ 26–27.

The LNA kidnapped Abdel Salam and Ibrahim al-Suyid. Forces under the command of Defendant Khalifa Hifter's immediate subordinates tortured and executed these men while in custody, and killed Mustafa and Khalid al-Suyid as well. *Id*. ¶ 31.

Similarly the LNA targeted—by name in a public announcement—the Krshiny family; they killed two brothers in the family, and took five prisoners from the family. Two of the prisoners were taken to Defendant Khalifa Hifter's headquarters and beaten. One of them, Ibrahim, was tortured, including by electrocution, mutilated (losing an eye), and mock executed. The other, Mustafa, was found dumped on a roadside, tortured and shot dead, execution-style, with his hands tied behind his back. Four other al-Krshiny brothers—Abdalla, Ahmad, Ali, and Mahmud—were captured, placed in a truck, and shot while in custody in that vehicle. Ali was killed in the fusillade. *Id.* ¶¶ 34–45.

Defendant Khalifa Hifter bragged about what did done. He stated publicly that the LNA's opponents are shown no mercy: "Never mind the consideration of bringing a prisoner here. There is no prison here. The field is the field, end of the story." *Id.* ¶ 46. Defendant thereby admitted and endorsed his notorious practice of extrajudicial killings.

## II.  <u>Procedural Background</u>

Plaintiffs sued under the Torture Victims Protection Act ("TVPA"), Pub. L. No. 102-256, 28 U.S.C. § 1350 note (the "TVPA"). Under the TVPA any individual who, pursuant to actual or apparent authority or color of law of a foreign nation, commits torture or extrajudicial killings, may be civilly liable.

Plaintiffs filed their TVPA Complaint on February 18, 2020. Dkt. 1. Summonses and alias summonses issued on February 24 and March 10, the latter being returned executed on March 20. Dkt. 20–22. The Clerk of this Court entered a default on May 5. Dkt. 25. A hearing took place on Plaintiffs' motion for default judgment before United States Magistrate Judge Anderson on June 12, Plaintiffs' moving papers having been served on Defendants on May 26. Dkt. 29–30.

Magistrate Judge Anderson issued his Report and Recommendation on June 17, recommending that default judgment be entered on behalf of Plaintiffs and that damages were eighty million dollars. *See* Dkt. 31 ("Report & Recommendation").

Defendants' counsel first entered limited appearances on July 31. Dkt. 36. This Court set aside the Clerk's order of default on August 6, and Defendants' motion to dismiss followed on August 20. Dkt. 37-39. Plaintiffs oppose Defendants' motion for the following reasons.

## LEGAL STANDARDS

The Federal Rules of Civil Procedure provide that a defendant may move to dismiss a complaint for, among other things, lack of subject matter jurisdiction, insufficiency of service of

process, and failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12 (b)(1), (5), and (6).

Under Rule 12(b)(1), the "facts alleged in the complaint are taken as true and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United* States, 585 F.3d 187, 192 (4th Cir. 2009) (vacating and remanding Rule 12(b)(1) dismissal). The Court may also "consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Al Shimari v. CACI Premier Tech.*, 300 F. Supp. 3d 758, 777 (E.D.Va. 2018) (denying motion to dismiss a TVPA case).

A civil action should be dismissed for failure to state a claim pursuant to Rule 12(b)(6) *only* if the complaint lacks sufficient facts to state a claim plausible on its face. The Court must assume that well-pleaded allegations are true, and must view the complaint in the light most favorable to the plaintiff. *See id*. at 777; *Warfaa v. Ali*, 33 F. Supp. 3d 653, 658 (E.D.Va. 2014) (Brinkema, D.J.) (denying motion to dismiss for failure to state a TVPA claim, holding that courts must draw all reasonable inferences in plaintiffs' favor, and only dismiss complaints if, while construing facts in a light favorable to plaintiffs, they do not rise above speculation to state any cognizable, facially plausible claim for relief), *aff'd*, 811 F.3d 653 (4th Cir.).

With respect to sufficiency of service under 12(b)(5), as explained in the Report & Recommendation of Magistrate Judge Anderson, under Rule 4(e)(l),

> an individual within a judicial district of the United States may be served pursuant to state law for serving a summons in the state where the district court is located or where service is made … . Under Virginia law, if an individual cannot be personally served and a copy of the process cannot be left with a family member other than a "temporary sojourner or guest" 16 years or older, a party may post a copy of the process on the main entrance of the individual's place of abode. The party posting the process, however, must mail a copy of the process to the individual served by posting at least ten days before default judgment is entered and file a certificate of mailing with the Clerk of Court.

Report & Recommendation at 6–7 (citing Va. Code Ann.§ 8.0l-296(2)(b) (2018)).

## ARGUMENT

"Official torture and summary execution violate standards accepted by virtually every nation." S. Rep. No. 102-249, at § IV(D) (1991) ("TVPA Sen. Rep."). As the Second Circuit held, "official torture is now prohibited by the law of nations." *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir. 1980). "There are few actions so dehumanizing as torture. Victims bear the physical and psychological scars of their experience for life. Its use is designed to terrorize and oppress entire populations. The prohibition against summary executions has acquired a similar status." TVPA Sen. Rep., at § II (internal quotation marks omitted).

But before the TVPA was enacted, these universal principles provided little comfort "to the thousands of victims of torture and summary executions around the world. Despite universal condemnation of these abuses, many of the world's governments still engage in or tolerate torture of their citizens, and state authorities have employed extrajudicial killings to execute many people." *Id.* Therefore, Congress passed the TVPA "to provide a Federal cause of action against any individual who, under actual or apparent authority or under color of law of any foreign nation, subjects any individual to torture or extrajudicial killing." *Id.*

Plaintiffs seek damages under the TVPA and related state law claims because Defendants tortured, employed extrajudicial killings, and left a trail of dehumanization. Defendants seek to avoid responsibility for their actions on five bases: (1) the political question doctrine, (2) head-of-state immunity, (3) failure to state a claim under the TVPA, (4) state-law statute of limitations, and (5) insufficient service of process. None of these defenses have merit.

## I.    Plaintiffs' allegations do not present a political question.

Defendants assert that the entire lawsuit should be dismissed because it presents a political question or poses separation of powers concerns. Defendants' primary argument is that

hearing these claims would create a conflict with the government that employs Field Marshal Hifter because these were "official act[s]" of a member of a foreign government. Def. Mem. at 6–7. That argument fails for several reasons.

To begin with, Defendants' argument would make the TVPA superfluous. Every TVPA case necessarily involves a foreign official who commits torture or extrajudicial killings under "actual or apparent authority, or color of law." 28 U.S.C. § 1350 note. Indeed, the Supreme Court has made clear that the TVPA "does not impose liability on perpetrators who act without authority or color of law of a foreign state." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 459 (2012). In other words, every TVPA claim will be against a foreign official committing acts purportedly on behalf of his government.

Congress decided that U.S. courts must hear those claims, and U.S. courts cannot duck that express responsibility just because a TVPA claim may involve military, foreign affairs or political issues. After all, the Supreme Court recently emphasized that where a duly enacted statute creates a cause of action and grants federal courts with jurisdiction, the courts do not have discretion to punt:  "when a federal court has jurisdiction, it also has a 'virtually unflagging obligation ... to exercise' that authority." *Matta v. Lynch*, 579 U.S. 143, 153 (2015). This Court should not read an exception into a statute that contemplates that the Court should hear the claim.

Moreover, torture and extrajudicial killings can *never* be an "official act" of a foreign government and therefore there is no risk of offending Marshal Hifter's government. The Senate Report to the TVPA explained that "no state commits torture as a matter of public policy" and therefore doctrines relying on "official" or "public" acts "cannot shield former officials from liability under this legislation." TVPA Sen. Rep., at § IV(D) (discussing the act of state defense). It is presumed that Marshal Hifter's government (as opposed to Hifter himself) does not condone

torture or extrajudicial killings, and that it could not claim offense if a person guilty of such crimes is brought to justice.

That is why Congress had no problem vesting in courts the responsibility to address and resolve the legality of torture and extra-judicial killings occurring in foreign countries, pursuant to the TVPA.[1] And the Executive Branch would not object on political question grounds because it is the United States' official policy to oppose those crimes. *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (ratified by U.S. Senate on October 27, 1990).

Congress, in its wisdom, did not intend in passing the TVPA to override the common law doctrines of diplomatic and head-of-state immunity (which do not apply here), H.R. Rep. No. 102-367, at 5 (1991), but "the TVPA will apply to any individual official whom the Executive Branch declines to immunize." *Matar v. Ditcher*, 563 F.3d 9, 15 (2d Cir. 2009). Indeed, the Executive Branch could have filed a statement in this case effectively immunizing Defendants. It did not. And since these claims require the court to evaluate the lawfulness of the conduct of specific persons towards the victims, not to decide the legitimacy of the United States' Executive Branch's foreign policy decisions, the political question doctrine does not bar these claims. *See, e.g., Mamani v. Berzain*, 654 F.3d 1148 (11th Cir. 2011) (rejecting the political question doctrine on the same grounds in an Alien Tort Statute case).

Defendants cite many cases, but none support their position. To begin with, they rely on *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), but that is not a TVPA case. There, plaintiffs asserted common law tort claims against former U.S. officials (some deceased), in their

---

[1] Indeed, Congress asked U.S. courts to wade into the particulars of whether a killing is justified, providing that the TVPA "does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." *Id.* Congress expected U.S. courts to cast judgment upon the merits of the killings or torture, and did not think it would be a nonjusticiable political question.

personal capacities, over violent acts during the 1970 U.S.-backed coup d'état that toppled Chile's president. The United States moved, successfully, to substitute itself as the defendant. *See id.* at 192–93.

The Court of Appeals upheld the dismissal of the suit under the political question doctrine:

> [T]he subject matter of the instant case involves the foreign policy decisions of the United States. In 1970, at the height of the Cold War, officials of the executive branch, performing their delegated functions concerning national security and foreign relations, determined that it was in the best interest of the United States to take such steps as they deemed necessary to prevent the establishment of a government in a Western Hemisphere nation that in the view of those officials could lead to the establishment or spread of communism as a governing force in the Americas … that decision was classically within the province of the political branches, not the courts.

*Id.* at 195.

Here, neither the United States nor any American official is the defendant. Thus, the risks faced by the *Kissinger* court—of the judiciary passing judgment on the wisdom of a past U.S. presidential administration's national security policies, or the personal legal culpability of its former Cabinet officers—do not apply. The issue here is not whether the U.S. government should support Defendant Khalifa Haftar. Rather, it is whether Defendants violated a federal statute by committing extrajudicial killings and torture, as Plaintiffs allege.

Defendants cite *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1032 (W.D. Wash. 2005), for the proposition that actions that challenge the "official acts of an existing government in a region where diplomacy is delicate and U.S. interests are great" are political questions and thus barred from judicial adjudication. While *Corrie* is a TVPA case, it involved claims against an American manufacturer for selling bulldozers to the Israeli government, which were used to destroy Palestinians' homes.

The passage Defendants cite from that case is better understood in in the broader context the *Corrie* court intended: that court prefaced the quoted statement by reasoning that, as neither the Executive nor the Legislature had restrained U.S. trade with Israel, for that court to preclude sales of Caterpillar products to Israel would "impinge directly upon the prerogatives of the executive branch of government," and thereby "invade the foreign policy prerogatives of the political branches of government." *Id*. at 1032. Plaintiffs ask this Court to do nothing remotely analogous. They instead seek to invoke the jurisdiction of this Court to pursue claims against foreign officials, for the very offenses at the heart of what Congress anticipated the TVPA be deployed to redress when it passed the Act.

Finally, Defendants cite *Yousuf v. Samantar*, 552 F.3d 371 (4th Cir. 2009), *aff'd*, 560 U.S. 305 (2010), which is also distinguishable. *Samantar* involved claims under both the TVPA and the broader Alien Tort Statute, 28 U.S.C. § 1350. But the Court of Appeals' decision in that case specifically noted that its decision and opinion did not pertain to plaintiff-appellants' TVPA claims. *See* 552 F.3d at 384.

The opinion most closely on point is this Court's decision in *Warfaa*, 33 F. Supp. 3d at 653. There, this Court stated that the plaintiff's TVPA claims presented purely legal issues, not implicating decisions made by coordinate branches of government, as "it is well established that the resolution of claims brought under the TVPA has been constitutionally committed to the Judiciary." *Id*. at 660 (relying on *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995)). As in *Warfaa*, here the Executive Branch has not, to Plaintiffs' knowledge, informed this Court of any potential adverse impact on U.S. foreign affairs from Plaintiffs' statutorily based suit.

As this Court noted in *Warfaa*, potentially sensitive cases involving uncertain political situations should not be confused as nonjusticiable ones. *See id*. at 661. The former are common

in this jurisdiction, while cases that invoke political questions are not. Plaintiffs' TVPA suit falls well within that first category.

## II.      Field Marshal Hifter is not entitled to head-of-state immunity.

Defendants request head-of-state immunity for Field Marshal Hifter, asking this Court to infer from a handful of press clippings that the Executive Branch believes Defendant Hifter is the head of the Libyan state and deserves such immunity. Def. Mem. 8–10. There are several problems with this argument.

As an initial matter, head-of-state immunity is rarely granted, and almost never unless the Executive Branch files an official "Suggestion of Immunity" with the court. The doctrine of head-of-state immunity affords absolute immunity from suit to foreign heads of state while they remain in office. *See Lafontant v. Aristide,* 844 F. Supp. 128, 131–32 (E.D.N.Y. 1994). It is settled law that "a determination by the Executive Branch that a foreign head of state is immune from suit is conclusive and a court must accept such a determination without reference to the underlying claims of a plaintiff." *Ye v. Zemin,* 383 F.3d 620, 626 (7th Cir.2004); *see also Tawfik v. al-Sabah,* No. 11 Civ. 6455(ALC)(JCF), 2012 WL 3542209, at *2–3 (S.D.N.Y. Aug. 16, 2012); *Leutwyler v. Office of Her Majesty Queen Rania al-Abdullah,* 184 F.Supp.2d 277, 280 (S.D.N.Y. 2001); *Lafontant,* 844 F. Supp. at 139.

In most instances where the Government does not file a Suggestion of Immunity, courts denied the underlying motions to dismiss. *See Head of State Immunity as Sole Executive Lawmaking*, 44 Vand. J. Transnat'l L. 911, App. A (2011) (listing 10 such instances); *see also Yousuf v. Samantar*, No. 1:04cv1360, 2011 WL 7445583 (E.D. Va. Feb. 15, 2011) (order denying motion to dismiss suit against former Somali President and Defense Minister Samantar where Executive Branch determined that no immunity applied); *In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108 (4th Cir. 1987) (declining to recognize head-of-state immunity for a

former Philippine president in grand jury proceedings where the subsequent Philippine regime "waived any residual head-of-state or diplomatic immunity" he enjoyed).

As explained above, the Executive Branch has not filed a Suggestion of Immunity here. In fact, neither the United States nor Libya assert head-of-state immunity on Defendant Khalifa Hifter's behalf, despite extensive press coverage of this suit both here and in the MidEast.[2] The most recent and pertinent statements on this subject are an April 27, 2020 statement by the U.S. Embassy in Libya,[3] and an August 27 off-the-record press statement by a U.S. Department of State spokesperson about Defendants' motion in this case.[4]

Defendants try to bootstrap a few press clippings and offhand statements by the President of the United States as an official Suggestion of Immunity. Tellingly, Defendant does not cite any authority to suggest that press clippings are sufficient to warrant absolute immunity from a suit that is expressly authorized by Congress. But even if the clippings *were* relevant, they show that Marshal Hifter is *not* the head of the Libyan state. By Defendants' own telling, Marshal Hifter was appointed by and reports to the LNA. And no one, including their counsel, asserts that co-Defendants Khaled or Saddam Hifter are in any way entitled to head-of state-immunity. Head-of-state immunity therefore is not appropriate in this case.

---

[2] *See*, *e.g.*, J. Barnes, *Ex-C.I.A. Asset, Now a Libyan Strongman, Faces Torture Accusations*, NEW YORK TIMES (Feb. 18, 2020) (stating that a "spokesman for Marshal said he was not aware of the lawsuit and declined to comment on its allegations"); J. Abdalla, *Two families file complaint against Khalifa Haftar in US lawsuit*, AL-JAZEERA (Feb. 25, 2020); and I. deBre, *US court hears torture case against top Libyan commander*, WASHINGTON POST (Jun. 12, 2020) (stating that a "spokesman for Hifter did not respond to a request for comment").

[3] *See* https://twitter.com/USAEmbassyLibya/status/1254860488711614464.

[4] M. Hernandez & V. Dogantekin, *Questions Loom over Haftar's Legal Defense in US Court*: *Renegade Libyan general seeks immunity as head of state, even though US government recognizes opposing government*, ANDALOU AGENCY (Aug. 28, 2020), https://www.aa.com.tr/en/africa/questions-loom-over-haftar-s-legal-defense-in-us-court/1954628.

### III.   **Plaintiffs adequately pleaded their TVPA claims.**

Defendants argue that the TVPA claims fail because Plaintiffs allegedly did not exhaust remedies in Libya, Defendants were not responsible for the atrocities committed by their troops, or that Defendants' troops did not deliberate before torturing and killing Plaintiffs and their families. Def. Mem. 10–17. As discussed below, these arguments fail on both the law and facts.

### a. **Due process in Libya is unavailable.**

Defendants first argument is that Plaintiffs should have tried to sue in Libyan courts, but Defendants have not carried their burden of showing that domestic remedies are available, or that exhaustion should not be excused for futility.

To bring a claim under the TVPA, a claimant must have "exhausted [any] adequate and available remedies in the place in which the conduct giving rise to the claim occurred." TVPA § 2(b). The "exhaustion requirement pursuant to the TVPA is an affirmative defense, requiring the defendant to bear the burden of proof." *Jean v. Lump Sum Cap., LLC*, 431 F.3d 776, 781 (11th Cir. 2005). The Senate Report makes clear that exhaustion can be excused for futility, and that bringing a TVPA claim in the first place is *prima facie* evidence that exhaustion should be excused:

> [T]he committee recognizes that in most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. The committee believes that courts should approach cases brought under the proposed legislation with this assumption ... .

> More specifically, ... [the exhaustion requirement] should be informed by general principles of international law. The procedural practice of international human rights tribunals generally holds that the respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use … .

> The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant.

TVPA Sen. Rep., at 9–10. To "the extent that there is any doubt ... both Congress and international tribunals have mandated that ... doubts [concerning the TVPA and exhaustion are to] be resolved in favor of the plaintiffs." *Enahoro v. Abubakar,* 408 F.3d 877, 892 (7th Cir.2005).

Plaintiffs cannot obtain civil relief in Libya. According to a 2019 travel advisory issued by the U.S. Department of State, which remains in place, Libya is beset by "crime, terrorism, civil unrest, kidnapping, and armed conflict" and the "threat of kidnapping for ransom." The capital of Tripoli, and at least eight other cities including Plaintiffs' hometown of Benghazi, are fraught with "fighting among armed groups, as well as terrorist attacks … . Even demonstrations intended to be peaceful can turn confrontational and escalate into violence." Militia groups detain persons "for arbitrary reasons, do not grant detainees access to a lawyer or legal process, and do not allow detainees to inform others of their status."[5]

Libya, according to Amnesty International, has a "domestic judicial system [that] is highly dysfunctional and is unable to provide recourse for victims of human rights violations or bring those responsible for these abuses to justice. Perpetrators of serious human rights abuses continue to operate with absolute impunity without fear of accountability."[6]

And most importantly, the men who perpetrated these heinous crimes hold positions of power, including control over the country's military apparatus, and dominate the court systems. The court in *Chiminya Tachiona v. Mugabe*, 216 F. Supp. 2d 262 (S.D.N.Y. 2002) faced a

---

[5] Libya Travel Advisory, (Apr. 9, 2019), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/libya-travel-advisory.html.

[6] Statement for the United Nations Human Rights Council's Interactive Dialogue on the High Commissioner's Report on Libya, Amnesty International (Feb. 20, 2018), available at https://www.refworld.org/pdfid/5b55c0fb4.pdf.

similar situation. There, the court excused from the exhaustion requirement members of a party opposing Zimbabwean tyrant Robert Mugabe, who faced severe suffering at Mugabe's hands before being brutally murdered, on the ground that the plaintiffs showed that the defendants controlled the Zimbabwean judicial system, making any appeals thereto futile.

Likewise, the Suyids and Krshinys cannot get meaningful relief in Libya. Indeed, Plaintiffs would only subject themselves further to terror at Defendants' hands were they to seek redress in Libya. Hifter and his sons command the LNA, which now controls most of Libya and might soon overrun Tripoli itself. They dominate the court system in the remainder of Libya, which offers no semblance of justice. The NEW YORK TIMES recently reported that opposition members disappear without warning and reported that if "you are with Hifter then you are under his umbrella and you can do whatever you want. If you aren't, you are an enemy and you may be jailed, killed or exiled."[7] There is no justice system in Libya that Hifter and his sons are not above, and anyone who tries to bring them to court will suffer the same fate as Plaintiffs and their families.

Seeking such remedy would possibly be deadly for Plaintiffs. For example, and just recently, according to Amnesty International a Libyan parliamentary critic of Defendant Khalifa Hifter who called for an end to the LNA's assault on Tripoli, Siham Sergiwa, was "disappeared" by the LNA; her husband shot, and her son beaten.[8] Plaintiffs, private citizens with less

---

[7] D. Kilpatrick, *A Police State With an Islamic Twist*, NEW YORK TIMES (Apr. 14, 2020), https://www.nytimes.com/2020/02/20/world/middleeast/libya-hifter-benghazi.html.

[8] *See Libya: Abducted politician's fate remains unknown a year on, amid ongoing disappearances*, Amnesty International (Jul. 17, 2020).  Sergiwa, a Benghazi resident, is widely believed to be deceased.  According to Human Rights Watch, Sergiwa was kidnapped by LNA's 106th Battalion, which is headed by Defendant Khaled Hifter.  *Libya: Abducted Politician Missing 4 Weeks*, Human RIGHTS WATCH (Aug. 16, 2019), https://www.hrw.org/news/2019/08/16/libya-abducted-politician-missing-4-weeks (reporting that

protection than any parliamentarian, could reasonably expect similar (if not worse) treatment, if they attempted within Libya to sue Defendants for war crimes.

Defendants further suggest that Plaintiffs bring their claims to the International Criminal Court (the "ICC"), rather than this Court. It would be a legal and practical impossibility for the ICC to conduct litigation under the Federal Rules of Civil Procedure and of Evidence, determine Plaintiffs' rights under the applicable United States statute, and then enforce any judgment in this District. Moreover, as individuals—and not states—Plaintiffs lack standing to sue in the ICC. Finally, and as discussed *infra*, far from deferring to ICC judgments, Defendants give command positions and promotions to officers currently under ICC war crimes indictments.

### b. Field Marshal Hifter is responsible for the war crimes that form the basis of Plaintiffs' claims.

Defendants admit, as they must, that someone can be held liable under the TVPA even if they did "not personally engage in torture or extrajudicial killing." Def. Mem. 11. They also admit, as they must, that a commander of a troops can be held liable under the TVPA for the actions of his subordinates under the doctrine of command responsibility. *Id.* at 19 (citing *Yousuf v. Samantar*, 1:04-CV-1360 (LMB/JFA), 2012 U.S. Dist. LEXIS 122403, at *1 (E.D. Va. Aug. 28, 2012) and *Warfaa*, 33 F. Supp. 3d at 653). However, Defendants contend they are not liable because plaintiffs allegedly failed to show that (1) the perpetrators of the alleged offenses were part of the LNA and under the control of Marshal Hifter; (2) that Marshal Hifter knew of subordinates that had committed, were committing, or planned to commit the alleged offenses, (3) that Marshal Hifter failed to address such offenses, or that (4) the torture and killings were deliberate. *Id.* at 20. Defendants arguments fail for the reasons set forth below.

---

some of the cars the perpetrators of Sergiwa's disappearance arrived in "were linked to an LNA-affiliated group known as 106th Battalion");

**1. Field Marshal Hifter is responsible for the conduct of the troops that attacked and tortured Plaintiffs.**

A military commander is responsible for everything his or her unit does or fails to do. Under the doctrine of "command responsibility," a higher-level official need not personally perform or order the alleged abuses to be liable. *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996); *United States v. Williams*, 8 M.J. 506, 509 n.1 (A.F.C.M.R. 1979) (noting that a "commander may be held criminally responsible for the acts of his subordinates").[9] Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person who commits the acts, and includes anyone with higher authority who authorized, tolerated, or knowingly ignored those acts. *Id.*

Defendants as commanders of the LNA bear responsibility for crimes that they knew, or should have known, were committed by their subordinates. Compl. ¶ 47. Indeed, Hifter and his sons authorized, tolerated, or knowingly ignored these killings.

Hifter at the very least *should have* known what happened to Plaintiffs. After all, he publicly announced "Operation Dignity" against those suspected to oppose the LNA, especially in the city of Benghazi. *Id.* ¶ 26. During that operation, Hifter's LNA prepared "a plan to divide the city of Benghazi into squares" and used a "list of names" to determine which people to "liquidate[ ]," specifically ordering the LNA to kill any prisoners. *Id.* ¶ 26. Defendants' direct subordinate issued a video announcement commencing "Operating Dignity" in Defendant's

---

[9] This high standard of accountability is the same for armies across the world under international law. "Commanders will be held criminally responsible under the law if: they knew, or should have known, that subordinates were going to break the law, i.e. commit a war crime, but did nothing to prevent it; they fail to take any action against (punish or report) subordinates who have already committed a war crime. **A commander therefore cannot use the excuse, 'I did not know'. Command means just that – being in control and being responsible for what is happening in your command all the time, every time.**" International Committee of the Red Cross Unit for Relations with Armed and Security Forces, *The Law of Armed Conflict: Command responsibility* (Jun. 2002) (emphasis in original).

name, called for named individuals to be "liquidated" and issued a religious ruling ordering the execution of prisoners. *Id.* ¶ 27. And Defendants' chief LNA propagandist, Khalid Bulagheeb, called for the expulsion of all families originally from the Libyan city of Misrata, and specifically listed the Krshinys as one of those families to be removed. *See* Compl. ¶¶ 34–36, 45.

Moreover, Field Marshal Hifter's two top lieutenants and direct subordinates executed the Operation. Among other things:

- On October 15, 2014, forces under LNA then-Major General al-Naduri, a two-star flag officer under Khalifa Hifter's immediate command, who has since been promoted to lieutenant general and appointed as Chief of Staff of the LNA and, as such, is now the immediate superior of Hifter, kidnapped Abdel Salam and Ibrahim al-Suyid, visibly tortured them, and killed them no more than a day later, without any due process. General Naduri was assisted by a field-grade officer, Colonel Bukamada. *Id.* ¶ 29–33.

- On October 17, 2014, forces under LNA Major General Jamal al-Zahawi, another flag officer under Khalifa Hifter's immediate command responsibility, captured Ibrahim and Mustafa al-Krshiny, who were taken to a location in Bersis, where they were beaten, and then transported to Khalifa Hifter's headquarters in ar-Rajma. There, Ibrahim al-Krshiny was tortured, mutilated, and underwent what was effectively a mock execution. *Id.* ¶¶ 34–44.

- Mustafa al-Krshiny was visibly tortured, bound, and shot dead without due process between October 17 and November 5, 2014. Abdalla, Ahmad, Ali, and Mahmud al-Krshiny were captured and brought to Benghazi where each was shot while in custody, and Ali died from his wounds. *Id.* ¶ 45.

- General al-Zahawi was assisted by Colonel Almadi al-Bargathi. Khalifa Hifter subsequently released a video announcing that LNA opponents would be shown no mercy, and that the LNA would keep no prisoners: "There is no prison here. The field is the field, end of the story" – just as they had in Benghazi. *Id.* ¶ 34, 36, 45–46.

- Defendants Khalid Hifter and Saddam Hifter led LNA forces in Benghazi in 2014, and Saddam additionally represented the LNA internationally to obtain financing. Leading troops and raising funds are purposeful acts which provided substantial assistance to facilitate the crimes in question. *Id.* ¶ 25.

The inaptly named "Operation Dignity" relied upon militia forces supervised by only twenty-seven LNA officers. The suggestion that these LNA officers were somehow strangers to,

or beyond the control of, Khalifa Hifter or his sons, is at best improbable.[10] Defendants should have known what their direct subordinates were doing in an operation that they specifically authorized, that their top lieutenants carried out, that their propaganda minister announced, and that was widely covered in the press.

Furthermore, it appears that Field Marshal Hifter *did* know what his troops were doing. As set forth in the Complaint, after his LNA forces committed the extrajudicial killings in Benghazi at issue in this case, Khalifa Hifter subsequently released a video announcing that LNA opponents on subsequent operations would be shown no mercy. He continued to state that the LNA would keep no prisoners: "There is no prison here. The field is the field, end of the story"—just as they had in Benghazi. *See id*. ¶ 46. For him to now claim he had no idea his troops committed these atrocities simply is not credible.

### 2. Field Marshal Hifter failed to address the torture and extrajudicial killings.

Defendants say that Plaintiffs failed to show that Field Marshal Hifter failed to address these war crimes. Tellingly, Defendants do not provide any evidence or even allegations that a single participant in Operation Dignity was investigated, disciplined, court-martialed, or even chastised for the torture and murder of Plaintiffs and their relatives. Instead, as mentioned above, Marshal Hifter condoned the behavior. Compl. ¶ 46.

This is not surprising as Defendant Hifter continues to employ indicted war criminals, whom the ICC already accused of war crimes. For example, Mahmud al-Werfalli—whom Defendant Hifter refused to hand over to the ICC despite two arrest warrants that Court issued against him—retains a position of command in Marshal Hifter's army, even though the ICC issued

---

[10] By way of analogy, twenty seven is about the same number of commissioned officers in a 750-soldier U.S. Army infantry battalion, each of whom is personally known, led, and counseled by its commander.

multiple indictments for war crimes, including forty extrajudicial, summary executions of prisoners. *See, e.g.*, *The Prosecutor v. Mahmoud Mustafa Busayf Al-Werfalli*, ICC-01/11-01/17. In fact, al-Werfalli appears to have been promoted from major to lieutenant colonel while under indictment for these murders.[11] Similarly, Defendants Khalid and Saddam Hifter have been promoted from lieutenant colonel to full colonel.

### 3.   The killings are both "extrajudicial" and "deliberate."

Plaintiffs adequately alleged that Defendants committed custodial, extrajudicial killings of four members of the Suyid family (Abdel Salam, Ibrahim, Khalid, and Mustafa) and two members of the Krshiny family (Mustafa and Ali).

The TVPA defines an "Extrajudicial Killing" as a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people." TVPA § 3(a), note following 28 U.S.C. § 1350. The same section proceeds to exclude from the definition "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation." *Id.*

Defendants' forces committed extrajudicial killings on all fours with that definition. LNA forces kidnapped Abdel Salam and Ibrahim al-Suyid, who were on their way home to protect their families during Hifter's "Operation Dignity." *Id.* ¶¶ 29–33. Abdel Salam's and Ibrahim's bodies were found the next day in a nearby industrial area. *Id.* ¶¶ 29–33. There is no evidence that a judicial process took place, and there was not enough time to conduct any trial with due

---

[11] *See Libya's Haftar Promotes Accused War Criminal Wanted by International Court: Mahmoud Mustafa al-Werfalli, wanted since 2017 over alleged killings, promoted to rank of lieutenant colonel in Libyan National Army*, MIDDLE EAST EYE (July 9, 2019), https://www.middleeasteye.net/news/libyas-haftar-promotes-accused-war-criminal-wanted-international-court.

process. *Id.* ¶ 33. And they killed Khalid and Mustafa al-Suyid outside their homes, gunning them down with no semblance of judicial process. *Id.* ¶ 31.

The evidence is equally strong for the Krshinys. LNA forces captured Mustafa al-Krshiny and detained him in LNA barracks that were co-located with Defendant Khalifa Hifter's headquarters. *Id.* ¶¶ 34–38. Mustafa's body was found two weeks later, dumped on the side of a deserted road, along with several other victims. *Id.* ¶ 44. His hands were tied behind his back and he had execution-style bullet wounds to his head and chest. *Id.* Ali al-Krshiny was detained and brought in a truck to an LNA camp in Benghazi. *Id.* ¶ 45. Upon the truck's arrival, LNA members opened fire on the truck—with no judicial process—killing Ali. *Id.*

Defendants say these were not extrajudicial killings because they were the result of lawful military operations. It is true that the TVPA does not create liability for "collateral civilian casualties resulting from legitimate military operations undertaken in a civil war." Dkt. 39 at 22 (citing TVPA Sen. Rep., at 5). That is because good-faith accidents and errors tragically happen in the fog and friction of war, and sometimes civilians are inadvertently killed.

But "Operation Dignity" is not a "legitimate" military operation, and civilian casualties are not "collateral" where, as here, the commander's intent of the operation is to specifically target and kill civilians. Under the Rome Statute of the ICC Article 8, it is a war crime to

- "Intentionally direct[] attacks against the civilian population as such or against individual civilians not taking direct part in hostilities" *Id.* at §2(b)(i)

- "Intentionally launch[ ] an attack in the knowledge that such attack will cause incidental loss of life or injury to civilians or damage to civilian objects." *Id.* at §2(b)(iv)

- "Attack[ ] or bombard[ ], by whatever means, towns, villages, dwellings . . . which are undefended and which are not military objectives." *Id.* at §2(b)(v)

*See* Rome Statute of the International Criminal Court, 8 J. Int'l L. & Prac. 227, 232 (1999). None of these are "legitimate military operations" and all are egregious violations of international law.

And those acts—prohibited by the Rome Statute—are precisely what Defendants allegedly did in this case. Defendants and their lieutenants planned Operation Dignity, Compl. ¶¶ 26–28, Defendants' subordinate made a video calling for attacks on certain ethnic groups and families, Compl. ¶ 27, Defendants' propaganda minister specifically included the Krshiny family on a list of civilian targets for eradication, Compl. ¶ 35, troops under Defendants' command responsibility launched an attack against Plaintiffs' family homes, Compl. ¶¶ 30, 34, 36, the troops knew that the homes housed multiple generations including women and children and attacked anyway. Compl. ¶¶ 6, 29, 36. This is not a "legitimate military operation" as Defendant suggests. This is a war crime in which Defendants' troops attacked civilians in their home, abducted members of the Suyid and Krshiny families, tortured them, killed them, and then dumped their bodies. Compl. ¶¶29–46.

Second, Defendants claim that the killings were not deliberate in the sense of being undertaken with studied consideration and purpose, but rather in the "heat of the moment." Def. Mem. 15–17. Defendants cite *Mamani v. Berzaín* for the proposition that deaths resulting from precipitate shootings during a civil war, accidental discharges of weapons, or the shooters' personal motivations might not be actionable under the TVPA. *See* 654 F.3d 1148, 1155 (11th Cir. 2011). There, plaintiffs alleged that Bolivian security forces armed with high-powered rifles were ordered to kill scores of unarmed civilian protesters. The court in *Mamani* found that shootings were not "deliberate" because "each of the plaintiffs' decedents' deaths could plausibly have been the result of precipitate shootings during an ongoing civil uprising." *Id.*

The allegations in this case are far different from those in *Mamani*—the killings in this case are the result of studied consideration and purpose. The victims were bound and shot execution style. Negligent weapons discharges did not coincidentally happen to hit handcuffed detainees in the backs of their heads. Plaintiffs' family members were murdered—killed extrajudicially—execution-style. And Plaintiffs and their decedents were not collateral damage. Rather, they and their residences were the specifically enumerated *targets* of Defendants—their names and addresses on an enemies list circulated by Hifter's ally Khalid Bulagheeb prior to execution of the war crimes at issue. These are not heat-of-the-moment reactions. These are deliberate, intentional, planned killings.

**IV.**  **Defendants were properly served, and had actual notice of this suit.**

Consistent with Fed. R. Civ. P. 4(e), Plaintiffs complied with the applicable Virginia procedural requirements in serving the summons and complaint on Defendants in this case. Furthermore, Defendants had actual notice of this action. If, for some reason, the Court decides service was improper, Plaintiffs request the chance to re-serve the Defendants as the TVPA claims are still within the statute of limitations.

**a.  Defendants were properly served.**

Defendants and Plaintiffs agree that service of process must be effective to grant this Court personal jurisdiction over Defendants under Fed. R. Civ. P. 4(e)(1), and that, as Magistrate Judge Anderson found, Va. Code Ann.§ 8.0l-296(2)(b) (2018) applies in this regard. Plaintiffs do bear the burden of demonstrating valid service, and believe that Magistrate Judge Anderson was correct when he found that Defendants were properly served under Virginia law, and therefore under Rule 4.

As noted by Magistrate Judge Anderson, in Virginia, if an individual cannot be personally served and a copy of the process cannot be left with that individual's adult family

member, "a party may post a copy of the process on the main entrance of the individual's place

of abode," and "mail a copy of the process to the individual served …." Report &

Recommendation at 7. Magistrate Judge Anderson found that between March 10 and 20, 2020,

process server Abel Emiru posted Plaintiffs' alias summons and complaint at the main entrance

of 5505 Seminary Road, Unit 2310N in Falls Church, Virginia, which Plaintiffs believe to be

Defendants' usual place of abode, and Plaintiffs filed affidavits of service for each Defendant

with the Clerk of this Court. *See id*. Magistrate Judge Anderson therefore recommended finding

that Defendants "were properly served with the alias summons and complaint and are deemed to

have notice of this action." *Id*.

Defendants rely chiefly upon *Painter v. Blue Ridge Reg'l Jail Auth*., No. 6:17-cv-00034,

2019 WL 302509, at *1 (W.D. Va. Jan. 23, 2019) and *Malibu Media, LLC v. Bondoc*, No. 1:18-

cv-052, 2018 WL 6683937, at *1 (E.D. Va. Nov. 14, 2018) (Report & Recommendation),

*adopted*, 2018 WL 6681195 (Dec. 18, 2018), for the proposition that property ownership does

not indicate residence for the purpose of effective service under Virginia law.

*Painter* in turn relies heavily upon *Earle v. McVeigh*, 91 U.S. 503 (1875), a 145-year-old

case which predates pertinent modern communications and travel technologies such as

telephones and airplanes. *Painter*, 2019 WL 302509, at *3. The internet, for example, is pertinent

to whether Defendants, international travelers and dual citizens of the U.S. and Libya who retain

a residence in a full-service condominium building in Alexandria, had notice of this case,

because the gravamen of Defendants' argument is that Plaintiffs "did not adequately apprise

them of the pending lawsuit." Mot. at 20.

In *Malibu Media*, *LLC*, the court found that there was no evidence, beyond appraiser

records, that a residence was associated with defendants. *See Malibu Media, LLC*, 2018 WL

23

6683937, at *4. In the instant case, however, as demonstrated by public records, Defendants paid their taxes on their condominium as recently as 2018. Contrary to Defendants' assertion that they left this jurisdiction in 2011 and never returned, in the same article they cite, Defendant Khalifa Hifter stated that he returned to this district periodically and repeatedly, including from 2011 to 2014. *See* J. Anderson, *The Unravelling*, THE NEW YORKER (Feb. 16, 2015) (after participating in the 2011 uprising, Defendant "said[] he went home to Virginia for a time, 'to enjoy my grandchildren.'").

Moreover, Plaintiffs understand that aircraft registered to Defendants landed in the U.S. as recently as this summer. Defendants thus continue to avail themselves of the benefits of citizenship in this country and Commonwealth. They are therefore subject to service of process at the luxury, doorman building where they maintain a residence, just five miles from this courthouse.

### b.  Defendants had actual notice of this suit

Defendants cite *Amazon Web Servs. v. Global Equity Mgmt., S.A.*, for the proposition that service of process satisfies due process when it provides "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 2017 U.S. Dist. LEXIS 148477, at *9 (E.D. Va. 2017). Plaintiffs agree, and note that given Defendants' notoriety, the filing of Plaintiffs' suit attracted significant press attention in both this jurisdiction and within Libya and the Mideast as well.

Including the NEW YORK TIMES and WASHINGTON POST articles cited *supra*, in which reporters contacted Hifter's spokesman about this suit in both February and June, a review of online activity from February 18 to June 11, 2020—the date this case was filed and the day before the default judgment hearing was held—revealed at least nineteen separate news articles were independently published, one podcast was produced, and twenty-eight separate social

media posts were made, by at least twenty separate news agencies. All together, these news outlets potentially reached tens of millions of followers across Twitter and Facebook alone.

For example, a video feature about this lawsuit was broadcast by al-Jazeera, which has twenty-five million Facebook followers and fifteen million Twitter followers in Arabic alone, and that video in question had 25,100 views, even before being reposted by al-Manara Media, a specifically Libyan media outlet with 269,500 Twitter followers of its own. The filing of this lawsuit was noted by Arabic news sources such as al-Hurra, with fifteen million Facebook followers, and al-Quds, with ten million Facebook followers. An article by the Andalou Agency about the lawsuit was posted on its Twitter feed, where the agency has nearly a million followers in Arabic alone. A television program about the lawsuit was produced by al-Ahrar Libya, which was posted to its Twitter feed, which has 435,500 followers. A social media feature about the lawsuit was posted by EAN Libya as well, which has 287,000 Twitter followers.

Moreover, 218 News, an LNA-friendly media outlet owned by Field Marshal Hifter's political ally, Aref Naved, published a February 19, 2020 article entitled "A lawsuit against Field Marshal Haftar in the U.S.," and linked to the article on its Twitter feed, where the outlet has approximately 45,000 followers.[12]

It is therefore deeply implausible that Khalifa Hifter, a media-savvy field marshal, and self-described head of state, who employs propagandists and spokesmen, was somehow unaware of the filing of this suit. It was very widely discussed, in the Arabic language press in general, and within Libya specifically.

---

[12] K.Williams, *Trump Officials Meet with Libyan Politician Aligned with Opposition 'Strongman' in Potential Policy Shift*, Defense One (Nov. 21, 2019), https://www.defenseone.com/policy/2019/11/trump-officials-meet-libyan-politician-aligned-opposition-strongman-potential-policy-shift/161479/ (noting that Nayed "presents himself as close to Hifter").

As Magistrate Judge Anderson recommended finding, Defendants were properly served under Rule 4. Report & Recommendation. But even assuming *arguendo* they were not, Virginia law also provides that except for matrimonial actions, for example, "process which has reached the person to whom it is directed within the time prescribed by law, if any, shall be sufficient although not served or accepted as provided in this chapter." Va. Code Ann.§ 8.01-288. *See, e.g., Airlines Reporting Corp. v. Cartagena Travel & Tours*, 2012 U.S. Dist. LEXIS 202661 (E.D. Va. Aug. 3, 2012) (upholding sufficiency of service under Virginia law on defendants when they "had actual notice of service within the time prescribed by law"). And the evidence is overwhelming that Defendants had actual notice of this suit beginning immediately after it was filed and through the default hearing at which they chose not to appear.

Magistrate Judge Anderson correctly recommended finding that this Court has personal jurisdiction over Defendants as United States citizens and residents of Virginia, who own property in this District and have maintained a residence here for approximately twenty years, and who own substantial other property in the District purchased as recently as 2017. Report & Recommendation at 7.

## CONCLUSION

This Court described the elements of an actionable TVPA claim in *Warfaa v. Ali*. A plaintiff must adequately allege that: (1) a defendant possessed power by dint of his or her official position; (2) extrajudicial killing and torture derived from an exercise of that power; and (3) plaintiff exhausted all available remedies abroad. 33 F. Supp. 3d at 665–66. This Court further recognizes that "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing," as courts have "recognized secondary liability for violations of international law since the founding of the Republic." *Id.* (citing *Mohamad v.*

*Palestinian Auth.*, 132 S. Ct. 1702, 1709, 182 L. Ed. 2d 720 (2012), and quoting *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 396 (4th Cir. 2011).

Defendants admit that Khalifa Hifter acted under the authority of a Libyan governmental body; they even claim, albeit inaccurately, that he is in fact Libya's head of state. Plaintiffs and their deceased family members were tortured and killed, including through electrocution, and shot, several with their hands still bound behind them, including while in Defendants' custody, and with no judicial due process whatsoever. This is torture *per se*, and extrajudicial killing by any definition.

Plaintiffs' TVPA claim deserves to move forward to discovery; and they respectfully request that Defendants' motion to dismiss be denied.

Dated: September 10, 2020

/s/ Kevin T. Carroll

Kevin T. Carroll (VSB#95292)
Joseph G. Grasso (admitted pro hac vice)
Wiggin and Dana LLP
800 17th Street, NW, Suite 520
Washington, DC 20006
kcarroll@wiggin.com
jgrasso@wiggin.com
Phone: 202-800-2475
Facsimile: 212-551-2888