# EXHIBIT 1

 

# OVERVIEW OF VIOLATIONS OF INTERNATIONAL HUMAN RIGHTS AND HUMANITARIAN LAW DURING THE ONGOING VIOLENCE IN LIBYA

**4 September 2014**

**United Nations Support Mission in Libya**

**Office of the United Nations High Commissioner for Human Rights**

**OVERVIEW OF VIOLATIONS OF INTERNATIONAL HUMAN RIGHTS AND HUMANITARIAN LAW DURING THE ONGOING VIOLENCE IN LIBYA**

**4 September 2014**

**1. Introduction**

This report by the United Nations Support Mission in Libya (UNSMIL), in cooperation with the Office of the United Nations High Commissioner for Human Rights (OHCHR), highlights human rights concerns arising from the violence between armed groups in Libya since mid-May 2014 to the end of August. In particular, the two largest cities, Tripoli and Benghazi, have been embroiled in internal armed conflicts with dire effects on civilians and the country's infrastructure.

Tripoli witnessed six consecutive weeks of violence from 13 July, when an alliance of armed groups primarily from the city of Misrata but also from other towns including al-Zawiya and Gheryan, and Tripoli-based armed groups, launched "Operation Dawn" ('*Amaliyat al-Fajr*) against the Zintan-affiliated *al-Qa'qa'* and *al-Sawai'q* armed groups allied with fighters from the Warshafana region west of Tripoli. The fighting was particularly intense around Tripoli International Airport but affected other large areas of Tripoli. On 24 August, Operation Dawn fighters seized control of the airport and other areas of Tripoli from Zintan-affiliated armed groups, which withdrew from the city. Fighting is still ongoing in the Warshafana region.

In Benghazi in mid-May, retired General Khalifa Haftar announced an armed campaign, "Operation Dignity" ('*Amaliat al-Karama)*, against the Shura Council of Benghazi Revolutionaries (SCBR), an alliance including *Ansar al-Shari'a,* Libya Shield units and other armed groups. Since mid-July, Benghazi appears to be mostly under the control of the SCBR, although the fighting continues, including near Benina Airport.

The conflicts in both cities have led to a deteriorating human rights and humanitarian situation. In Tripoli, there have been power-cuts of up to 18 hours at a time, and shortages of water, diesel, cooking gas, and other essential items such as milk. Fuel distribution difficulties have gravely affected the delivery of many services. Banking facilities are still limited and common criminality has risen markedly. A Crisis Committee was formed under the Prime Minister's Office in order to address the humanitarian situation, but due to the divisive political situation, parallel bodies were formed in some areas, under local councils or at the initiative of civil society.

## 2.  UNSMIL Mandate and Monitoring Challenges

UNSMIL was established in September 2011 by the Security Council[1] with a mandate most recently renewed by resolution 2144 of 13 March 2014. The Security Council, "in full accordance with the principles of national ownership" tasked UNSMIL to provide assistance in a number of areas, including supporting Libyan efforts to "Promote the rule of law and monitor and protect human rights, in accordance with Libya's international legal obligations"[2]. In fulfillment of its human rights mandate, the Human Rights Division of UNSMIL also represents OHCHR.

Due to the fighting in Tripoli, UNSMIL evacuated its international staff on 13 and 14 July. In spite of this, UNSMIL has continued to actively monitor the situation in Libya. In order to prepare this report, UNSMIL has obtained information from Libyan human rights defenders, medical personnel, members of the judiciary and Judicial Police, journalists, and families of victims, among others. All sources and the information they provided were analyzed for their reliability. However, many of these interlocutors have left Libya, are difficult to reach, or feel fearful of disclosing what they know. The deepening political polarization has generated a climate of fear in which people are reluctant to talk about certain violations and abuses that are taking place, particularly detention, abductions and torture, out of fear of retaliation by various armed groups. UNSMIL has thus decided not to report all reliable allegations received, in order to protect the source or the victims and their families.

UNSMIL continues to receive information on the recent events in Tripoli and Benghazi. This report does not attempt to be comprehensive, but seeks to highlight some of the main abuses and violations UNSMIL has learned about in the course of the recent fighting from mid-May to the end of August 2014, providing illustrative examples drawn from public or confidential sources. In most cases, the names of the victims and other details that may identify them have been omitted. UNSMIL and OHCHR will continue to document the human rights situation and report on it.

## 3.  Key Findings

### i.   *Indiscriminate shelling and attacks on civilian objects*

In both Tripoli and Benghazi, all sides have been resorting to a variety of weapons in populated areas, including small arms, GRAD rockets, mortars, anti-aircraft guns, tanks and air attacks (see the Annex for a description of selected weapons). Air strikes by "Operation Dignity" on populated areas have been frequently taking place in Benghazi since May 2014, while in Tripoli there have been two air sorties against Operation Dawn armed groups.

---

[1] S/RES/2009 (2011)
[2] S/RES/2144 (2014)

The fighting between the armed groups has taken place at short, medium and often long ranges. Many of the weapons used are unreliable because they are old and poorly maintained, with faulty or inaccurate aiming systems and faulty ammunition. In comparison to typical armed forces, armed groups in Libya have received little training and do not operate with the appropriate discipline and command and control systems. Fighters appear often to disregard the likely impact on civilians, and sometimes on themselves, of their actions. Furthermore, with some exceptions, civilians have not been given the chance to evacuate before hostilities commenced and severe fighting has taken place in and around their houses and other places of refuge. These factors suggest that many attacks carried out in Tripoli and Benghazi are indiscriminate.

In Tripoli, the fighting was initially heaviest around the airport, but quickly engulfed other parts of the city, including densely populated areas such as Janzour, Hai Andalus, al-Sarraj, al-Swani, Gargaresh and Ghut al-Sha'al districts. On 17 July, families from Gasr Bin Ghashir, an area near the airport particularly affected by the shelling, organised a demonstration to protest against the fighting. Many subsequently fled to other parts of Tripoli or elsewhere.

The fighting for control of the airport also caused significant damage to other civilian objects, including hospitals, residential buildings and houses, and shops. It also resulted in the damage or destruction of numerous civilian aircraft and the ignition of a large fuel storage facility on airport road that burned for days. Infrastructure such as a major bridge, Bridge 27, has also been damaged.

During the reporting period, UNSMIL received reports of civilian casualties in Tripoli including women, children and foreign nationals. In Ghut al-Sha'al in mid-August, a middle-aged woman was reportedly killed together with a 25-year old man when a shell hit their house. In that same period, several civilians were admitted to the Shara' Zawiya Hospital in Tripoli, including a woman and two children. A nine-year-old girl was reportedly killed when a GRAD rocket hit her house in al-Swani neighbourhood on 15 August. Zawiya Academic Hospital reported that 34 men and one woman were killed, and 250 injured, including two children, as a result of the violence between 2 and 21 August. By 24 August, Tripoli Medical Center had reportedly received around 100 dead, including around 40 women and at least nine children. Among foreign nationals, a number of Sudanese were reportedly killed in separate incidents, including eight on 28 July in al-Krimeya neighbourhood. Land mines reportedly used in the airport area and unexploded ordnance are now a major hazard for civilians, especially children.

In Benghazi, several residential areas have been subjected to regular shelling during the reporting period. Some areas of the city were also subject to air attacks. UNSMIL has received reports that at least 37 civilians died as a result of shelling or crossfire from mid-May to mid-August, including five women and six children. The Bua'tni, Sidi Fraj, al-Guarsha, al-Hawari and Benina neighbourhoods were particularly affected by the recent fighting. Residents of those areas sought refuge in the centre of Benghazi, with host families, or left to other cities. Several families sought refuge in schools.

After Operation Dawn declared victory in Tripoli on 24 August, reports were received of retaliatory attacks involving the destruction or looting of a significant number of residential properties of persons affiliated with Zintan or those affiliated with the Government, including the residence of Prime Minister 'Abdullah al-Thini.

### ii. Casualty figures

The Ministry of Health announced official casualty figures for Tripoli on 30 July, stating that 214 persons had been killed in the city, and 981 persons injured as a result of the recent fighting. The statistics were not disaggregated by sex or age and further did not include details as to the cause of death or injury. No further figures have been published since then in Tripoli, and therefore official figures are not available to cover the period of intense recent fighting in August. UNSMIL has also received reports that Ministry officials were pressured by fighters to stop releasing this information. UNSMIL is not aware of any other Libyan organization keeping an overall count of casualties. On 28 August, the Ministry of Health reported 70 people killed in Benghazi in the recent fighting.

UNSMIL believes that the casualty figures are an underestimate of the actual situation. Furthermore, it should be noted that Libyan health officials do not distinguish between fighters and civilians in issuing casualty figures, which makes it difficult to track the number of civilians killed in the conflict. This challenge is exacerbated because armed group members do not usually wear recognizable uniforms or carry distinctive insignia.

### iii. Access to medical care

International humanitarian law prohibits attacks against medical facilities, medical personnel and the wounded and sick. However, hospitals in Tripoli and Benghazi have been shelled. Al-Afya Hospital near the airport in Tripoli had to close on 17 July, after it was hit by several shells. The Tripoli Medical Centre was also hit by shells on 13 August. Hospitals in the al-Hawari area of Tripoli, including a psychiatric facility, have had to suspend operations for some time due to continuous shelling in the area. In Benghazi, al-Jala' Hospital was occupied for a several weeks by Ansar al-Shari'a.

The hospitals that remain operating in Tripoli and Benghazi have been overstretched in dealing with casualties of the shelling and fighting. Many national medical personnel could not report to work due to the prevailing insecurity. In addition, the departure from Libya of large numbers of expatriate medical personnel, who, according to the Ministry of Health, comprise up to 80 per cent of all medical personnel, has further hampered operations.

Hospital staff in Tripoli and al-Zawiya reported a lack of medical supplies that could not be retrieved from storage facilities, some of which are located near the airport road and were rendered inaccessible or were destroyed. On 16 August, the Office of the United Nations High Commissioner for Refugees (UNHCR), through its partners, the

International Medical Corps and the Taher Al Zawia Organization, sent two trucks with supplies to al-Zawiya.

### iv.    *Detentions, abductions, and torture*

UNSMIL has received reports that armed groups engaged in the fighting have detained fighters or abducted civilians. Of note, in October 2013, UNSMIL and OHCHR published a joint report[3] setting out the widespread torture, other ill-treatment, and deaths of those detained by armed groups in Libya. UNSMIL is concerned that in the current context these abuses are being replicated.

In addition to the detention of fighters or suspected fighters, UNSMIL has received initial reports that dozens of civilians were abducted in Tripoli and Benghazi during the reporting period solely for their actual or suspected tribal, family or religious affiliation, and have remained missing since the time of their abduction. Such abductions may amount to enforced disappearances if the parties to the conflict do not acknowledge their whereabouts.

In Tripoli, during the six weeks of the fighting both sides are reported to have carried out detentions and abductions, sometimes based on information found on the mobile phones of the victims or because of their family name. Fighters from Operation Dawn have reportedly continued to search for and abduct people following their takeover of Tripoli. UNSMIL is receiving details on the number, identity and possible whereabouts of people still held. It is raising these cases with the relevant armed groups and would welcome further information from concerned parties.

Among the victims reported to UNSMIL are a blogger and political activist who had opposed the presence of armed groups in Tripoli, abducted after attending a mosque on 19 July; a Sufi Imam known to have been critical of one of the alliances of armed groups, abducted on 6 August; a member of the crisis committee abducted on 8 August; and some 30 members of the Tawergha displaced community abducted in separate incidents, mostly in Tripoli during the recent fighting – eight of the 30 are reported to have been released. Some, victims were allegedly tortured, as in the case of four brothers reportedly abducted at a checkpoint in the Abu Surra area and severely beaten with water hoses, wooden sticks and metal bars before being released.

In Eastern Libya, UNSMIL has received information indicating that soon after mid-May, Operation Dignity detained dozens of men in areas under their control based on their political, religious affiliation or nationality, in addition to fighters of the SCBR. Some of those detained were allegedly beaten with sticks, hoses and gun-butts in several detention centres including al-Marj, al-Abyar, al-Rajma and Tukra. One detainee was reported to UNSMIL as being 17 and having died in custody following torture in a place of detention in Benghazi. He had reportedly been detained with three other youth at the end of May. Many detainees held by Operation Dignity have been taken to Gernada Prison east of

---

[3] Available from www.ohchr.org/Documents/Countries/LY/TortureDeathsDetentionLibya.pdf.

6

Benghazi, reported to currently contain about 80 inmates from the recent fighting.

### v. *Unlawful killings*

During the reporting period, assassinations and other unlawful killings have continued to be reported in Benghazi and Tripoli. On 25 June, prominent human rights and political activist Salwa Bugaighis was killed in her home in Benghazi. Since her death, several other women activists have fled the country. On 17 July, former GNC member for Derna, Fariha Birkawi, was attacked and killed in her town by unknown assailants. On 21 July, according to the Philippines Department of Foreign Affairs, an armed group in Benghazi beheaded a Filipino construction worker for being a non-Muslim. On 13 August, the Tripoli Chief of Police, Col. Muhammad Sweissi, was shot dead in Tripoli by unknown assailants.

Public executions that amount to summary executions were reportedly carried out in Derna by the Shura Council of Islamic Youth armed group. They include the execution of two men, on 24 July, and of one man, an Egyptian national, on or around 19 August. He had reportedly confessed to murder and theft during interrogation by the "Shari'a Committee for Dispute Resolution", operating under the Shura Council of Islamic Youth, and was shot dead in a football stadium.

### vi. *Situation of displaced persons, migrants, refugees, and asylum seekers*

UNSMIL estimates that at least 100,000 Libyans have been internally displaced by the recent fighting and a further 150,000, including many migrant workers, left the country. Many internally displaced Tawerghans reportedly left their displacement camps in al-Fallah and near the airport road at the beginning of the fighting in Tripoli because of the shelling and fear of abduction. Following the victory of Operation Dawn, al-Fallah camp, in an area under the control of Operation Dawn, was raided on 30 August. One person was reportedly killed and three injured, including a 15-year-old boy. Five men were reportedly abducted for a few hours and beaten before being released. Many Tawerghans also left their displacement camp at the Janzour Marine Academy for fear of further abductions. They moved to a number of locations including Bani Walid and Tarhouna to the east of Tripoli, and al-Zawiya, Surman, and Ajaylat to the west.

According to UNHCR, the Benghazi Local Council reported on 24 August that there were over 4,800 displaced people (800 families) in Benghazi, including foreign nationals. Many of those displaced have found shelter in schools.

Since the start of the most recent violence, a steady flow of Libyans and migrants have crossed the border between Libya and Tunisia through the two main land crossing points at Ras Jdir and Dhehiba. Since Eid al-Fitr (28 July) the normal flows of migrants increased from 4,000 persons to about 16,000 per day for several days.

UNHCR has expressed concern over the situation of migrants, refugees and asylum-seekers located in Tripoli without the means to leave areas affected by the fighting.

Migrants have always been vulnerable in Libya, but are particularly exposed in the current context. Some neighboring States have also intermittently imposed restrictions for migrants seeking to cross the border during the reporting period - for example by requiring airline reservations for onward travel. In a visit to Zuwara in mid-August, UNSMIL staff encountered more than 400 migrants, refugees, and asylum seekers who had been waiting to cross into Tunisia for up to 17 days. UNSMIL interviewed a number of migrants who reported that they sought to flee the shelling in the al-Krimeya neighbourhood. They were living without adequate shelter, proper sanitary facilities, sufficient food, or basic physical security, and reported threats from Libyan border guards.

Migrants in other areas of the country are believed to face similar hardship, particularly those in detention. Detention of migrants, asylum seekers and refugees in Libya, rather than being the exception as required under international law, is widespread and prolonged. Conditions for the detention of migrants were poor in Libya prior to the current fighting and have worsened as a result of the fighting, and the related scarcity of food, medicine and other basic items.

While some detention centres released migrants reportedly because of the shortages of basic goods, others moved migrants to different areas. Amidst the current violence and fighting, migrants are further vulnerable to abuse. These factors add to the already widespread attempts to cross the sea from Libya towards Italy and the risks associated to that. According to UNHCR, Syrians and Palestinians have reportedly attempted crossing also from Benghazi, which involves an even longer and more dangerous journey.

UNHCR reports that approximately 2,000 people have died attempting to cross the Mediterranean by the end of August despite the rescue efforts of the Italian navy, the Libyan coast guard and others. Of this number, some 1,600 people have died since June. Libya is the primary departure point for migrants attempting to reach Europe. As of 29 August 2014, UNHCR estimated that around 98,000 of an approximately 109,000 arrivals in Italy were believed to have departed from Libya. In late July, 128 migrants, including many children, drowned off the coast of al-Khoms. On 26 August, UNHCR reported that over 300 migrants had drowned in three separate incidents within a single week, including off the coast of Tripoli.

### vii. Attacks on media professionals

Attacks on media professionals have been steadily increasing in 2014. UNSMIL is particularly concerned by the continued harassment of and attacks on journalists by all parties to the conflict, including restrictions of movement, confiscation of equipment, abductions, and assassinations.

Media professionals reportedly attacked include a reporter and camera operator from al-Aseema television abducted on 1 August for several days after covering a demonstration in Tripoli; a television programme presenter shot at in Abu Salim on 2 August; five staff members of Barqa television station in Ajdabiya abducted on 9 August on their way back

from the opening ceremony of the House of Representatives in Tobruk earlier that week; and two journalists for al-Dawliya (Libya International Channel Television), abducted at a checkpoint in Tripoli between 17 and 18 August.

Increasingly, the media has been caught up in the conflict, with various stations publicly supporting one of the parties, or being put under pressure to doing so, and broadcasting propaganda or material deemed inflammatory by their opponents. In Tripoli on 20 August, the Government halted the broadcast of al-Wataniya and al-Rasmiya state television channels, citing the takeover of these stations by one of the factions involved in the conflict and what it considered as biased broadcasting. Between 24 and 25 August, Operation Dawn members reportedly ransacked al-Aseema and al-Dawliya television stations in Tripoli.

### viii. *Administration of justice*

The courts in Tripoli effectively stopped functioning during the reporting period, although the public prosecution has continued its work to an extent. The Offices of the Prosecutor General and courts in central Tripoli were hit by shells on 20 August. The courts have been suspended in Derna, Benghazi and Sirte as recently as March 2014, with some judges reporting to duty in adjacent towns. The Government announced on 31 August that it had lost control of most ministries, as well as other government facilities in Tripoli, including the Ministry of Justice.

The trial in Tripoli of 37 former senior and other regime members (Case 630/2012) was due to resume on 18 August, but was postponed to 12 October. Saif al-Islam Qadhafi continues to be held in Zintan, despite the final ruling by the International Criminal Court, on 21 May 2014, that he should be handed over to The Hague[4]. A further eight defendants who are part of the trial remain in detention in Misrata.

The conflict has also affected the situation in prisons. A Judicial Police spokesperson informed UNSMIL that prison inmates in Tripoli and Benghazi had not been taken to hearings. About 50 per cent of Judicial Police officers are estimated to have been reporting for duty during the fighting, but the prisons have maintained basic security. However, prisons have been affected by the disruption in the distribution of goods and services, which has led to a lack of medical supplies and scarcity of certain food items. In early August, a rocket hit al-Jibs detention facility in Tripoli, and its inmates were evacuated to another prison.

### 4. Legal Framework

The fighting in Libya is non-international in character. All parties are bound by the relevant provisions of international humanitarian, criminal, and human rights law.

---

[4] See decision on the admissibility of the case against Saif al-Islam Qadhafi, No.: No. ICC-01/11-01/11 OA 4 dated 21 May 2014, available at http://www.icc-cpi.int/iccdocs/doc/doc1779877.pdf

On 27 August 2014, The Security Council unanimously adopted resolution 2174 (2014) reiterating such call for an end to fighting and for political dialogue, condemning the use of violence against civilians and civilian institutions, and calling for those responsible to be held accountable. The Security Council also decided that targeted travel ban and asset freeze measures shall apply on, inter alia, individuals or entities "planning, directing, or committing acts that violate applicable international human rights law or international humanitarian law, or acts that constitute human rights abuses, in Libya".

### i.   *Obligations under International Human Rights Law*

Libya is a State party to key human rights treaties, all of which continue to apply in times of conflict, including the International Covenant on Civil and Political Rights and its Optional Protocol; the International Covenant on Economic Social and Cultural Rights; the Convention on the Elimination of All Forms of Discrimination against Women; the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; the Convention on the Rights of the Child; and the International Convention on the Protection of the Rights of All Migrant Workers and Members of their Families. Libya is also a party to the African Charter on Human and Peoples' Rights and has ratified the Protocol establishing the African Court for Human and Peoples' Rights.

### ii.   *Obligations under International Humanitarian Law*

Libya is a party to the four Geneva Conventions of 12 August 1949, as well as to Additional Protocol II to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts of 8 June 1977, which prohibits attacks against civilians and objects indispensable to the survival of the civilian population.

Article 3 common to the four Geneva Conventions requires that persons not taking an active part in hostilities be treated humanely and prohibits at any time and in any place violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture; the taking of hostages; and outrages upon personal dignity.

One of the fundamental principles of international humanitarian law is that all parties to the conflict must ensure full respect for the principles of distinction, proportionality, and precautions in attack. In this regard, all parties must at all times distinguish between fighters and civilians. Accordingly, attacks may be directed only against fighters and military objectives, and parties may not use means that cannot be specifically directed. Directing attacks against civilians who are not taking a direct part in hostilities, as well as indiscriminate and disproportionate attacks, are prohibited, as is collective punishment of a population. To the maximum extent feasible, fighters must distinguish themselves from civilians and avoid locating military objectives within or near populated areas. The parties to the conflict must ensure that all necessary precautions are taken to protect civilians and other protected persons. Furthermore, attacks against medical facilities, medical personnel and the wounded and sick are also prohibited. The wounded and sick must be collected and cared for without discrimination. Compliance with these rules by

one party does not depend on compliance by the other parties.

### iii. Obligations under International Criminal Law

Libya is under the jurisdiction of the International Criminal Court following the referral of the situation in Libya, since 15 February 2011, to the Prosecutor of the Court by Security Council resolution 1970 of 21 February 2011. The Court has jurisdiction over a wide range of crimes, including war crimes and crimes against humanity as defined in the Rome Statute.

Indiscriminate attacks constitute war crimes, as are attacks on civilians or civilian objects, such as airports – unless such civilian facilities are being used for military purposes, in which case those targeting such facilities must still take precautions to protect civilians. Similar considerations apply to air strikes and any other means of combat. Extensive destruction of property not justified by military necessity and carried out unlawfully and wantonly, wilful killing, and torture or inhuman treatment also constitute war crimes.

Political or military leaders can be held criminally responsible not only if they order crimes, but also if they are in a position to stop them and do not do so.

UNSMIL fully supports the statement, on 25 July, of the Prosecutor of the International Criminal Court reminding the parties that she "will not hesitate to investigate and prosecute those who commit crimes under the Court jurisdiction in Libya irrespective of their official status or affiliation."

### iv. Obligations under the national legal framework

The Libyan Penal Code includes provisions criminalising the intentional destruction of State property (Article 198); acts putting the public safety at risk through indiscriminate killing (Article 296); the intentional interruption of public services and electricity supply (Article 301); acts of looting and destruction of property (Article 323); the use of explosives to create a situation of general fear among the civilian population (Article 325); and theft (Article 446).

In relation to the allegations received of torture and other ill-treatment during the reporting period, Law 10 of 2013 on Criminalising Torture, Enforced Disappearances and Discrimination is of direct relevance. The law was adopted by the General National Congress on 14 April 2013, and specifies that torture, enforced disappearances and discrimination are crimes and remain punishable as such.

UNSMIL welcomed the declaration by the Libyan Prosecutor General, on 17 August, that he will investigate crimes committed during the recent fighting, and has urged his office to initiate prompt, thorough, independent and impartial investigations in Tripoli and Benghazi.

## 5. Recommendations

UNSMIL and OHCHR have appealed to all sides of the conflict to cease all armed hostilities and engage in an inclusive political dialogue to build a state based on the respect of human rights, democracy and the rule of law.

If the current situation persists, widespread human suffering, including to the most vulnerable members of society, such as the sick, displaced, elderly and children, will continue. In light of the continued fighting, UNSMIL and OHCHR recommend that:

- Protection of civilians must be a priority. All armed groups must comply with the principles of distinction, proportionality and precautions in attack. This is particularly important in densely populated areas.

- All armed groups must desist from violations of international human rights and humanitarian law, in particular all acts that may amount to war crimes, including indiscriminate shelling, enforced disappearances, murder, abductions, torture and other ill-treatment, and destruction of property.

- All armed groups detaining people in the current fighting must release them or hand them over to the justice system. Armed groups must account for the fate of those under their control who are presumed missing.

- All armed groups must refrain from carrying out reprisals and collective punishment.

- All armed groups must remove from active duty and hand over to the justice system those among their members suspected of having committed abuses.

- The Libyan authorities must hold accountable, in accordance with international standards, all parties responsible for serious violations of international human rights and humanitarian law regardless of affiliation. Comprehensive measures, including prosecutions and transitional justice measures, should be put in place to support such efforts.

- The Libyan authorities must cooperate fully with the International Criminal Court by assisting its investigations and complying with its rulings.

- The Libyan authorities must resume building state institutions as soon as feasible, particularly the armed forces, law enforcement agencies and the overall justice system.

## ANNEX

### UNSMIL Analysis of Selected Weapons used in the Fighting in Libya

**Weapons and Munitions**

Weapons currently being used in Libya include a range of weapons from 7.62 mm small arms to heavy calibre weapons such as rockets and artillery. In the time UNSMIL has been in Libya it is clear that very little weapon maintenance or training is carried out. Weapon platforms have generally been operated as direct line of sight weapons, adjusting the range by observing the fall of shot. In many cases, incorrectly armed fuses or faulty ammunition have resulted in large numbers of unexploded ordnance, which increases risk to civilians.

**Small Arms and Ammunition**

In conflict in general, the number of times a firer actually hits the intended target is extremely low and this, in UNSMIL's experience, is particularly true in Libya. Furthermore, given the number of actual rounds fired and the range of the weapons and munitions, the risk of civilians being hit by random fire in Libya is very high.

For example, a 14.5 mm heavy machine gun, such as the anti-aircraft weapon mounted on "technicals" (pick-up trucks) and popular with the armed groups, has a rate of fire of 2,000 rounds per minute, with a range of 2.5 km. This means that for every round that misses the intended target there is a danger area of approximately 2.5 km spreading out from the firer at 45 degrees. A 12.7 mm machine gun has a rate of fire of 600 rounds per minute, with a range of 6 km.

**Free Flight Rockets**

RPG 7 is a weapon commonly used for short-range action in Libya. It is designed to disable armoured vehicles, with an operational range of 500 m and a self-destruct mechanism that functions at approximately 900 m. Well-trained soldiers using an RPG 7 are expected to achieve a 50 per cent hit rate at 300 m, which means that about half miss their intended target. Therefore, the use of this weapon in urban area presents a considerable risk of harming civilians.

**GRAD Rockets**

The GRAD rocket system has lower precision and accuracy than traditional tube artillery and cannot be used in situations that call for pinpoint precision. The system is designed to deliver munitions over a broad area. It has a range, depending on type, of 20 km to 45 km and can contain a 20 kg warhead or cluster munitions containing anti-personnel or anti-tank mines (in Libya, in most cases these munitions have little or no marking resulting in cluster munitions being fired inadvertently).

The GRAD rocket system is an aerial denial weapon and it is extremely difficult to target individual targets with it. GRAD systems in Libya are generally extremely poorly

maintained. The rockets have been stored in substandard storage conditions and subjected to extreme temperature changes affecting the accuracy and efficiency of the system. This increases failures and inaccuracy with a resulting increase in collateral damage.

**KH-29 Air-to-Surface Missiles**
The KH 29 missile is an air-delivered weapon that normally uses TV-guidance to reach its intended target. In Libya, it is fired directly by line of sight from the ground. The KH-29 is an air-to-surface missile with a range of 10–30 km. It has a large warhead of 320 kg, which can cause considerable damage in heavily populated urban area. The KH-29 is intended for primary use against larger battlefield targets and infrastructure. The missile is not a direct fire weapon and the method of use in Libya is extremely dangerous for both those using the missiles and civilians.

**Mortars**
Armed groups in Libya have used a variety of mortar weapons that deliver explosive rounds by firing them into the air and delivering them indirectly to the target. These vary in size and in range, from small 50/60 mm mortars with ranges up to 3.5 km to 81/82 and 120 mm rounds with ranges in excess of 5 km. Mortars are more portable than conventional artillery and can be moved and sited without the use of vehicles.

Ensuring accuracy of mortar fire is extremely difficult, and relies on observation of the impact site, accurate placement, and good maintenance of the propellant charges. Propellant charges that are badly affected by storage conditions result in rounds falling short and putting the public at risk, especially when mortars are fired over the heads of civilians. A large proportion of the munitions malfunctioned during the recent conflict because the fuse was not set correctly, safety pins were not removed, or because of, a failure to understand the types of mortar ammunition (e.g. illuminating, smoke and high explosive).

**Air Delivered Munitions**
The use of air-delivered munitions in populated areas presents high risk to civilians. These munitions are normally dropped from aircraft by well-trained personnel, using the latest aiming equipment and even then, they can cause considerable collateral damage. The risk of this happening in Libya is markedly increased by their use by insufficiently trained personnel, using modified firing and sighting equipment with munitions that have not been maintained correctly.