# EXHIBIT 2

 

# REPORT ON THE HUMAN RIGHTS SITUATION IN LIBYA

## 16 November 2015

**United Nations Support Mission in Libya**

**Office of the United Nations High Commissioner for Human Rights**

# Report on the human rights situation in Libya

*16 November 2015*

## Contents

1. Introduction ........................................................................................................................... 1

2. Summary ............................................................................................................................... 1

3. Methodology ......................................................................................................................... 2

4. Background ........................................................................................................................... 2

    4.1 Parties to the conflicts ................................................................................................. 2

    4.2 Recent security and political developments ................................................................ 4

5. Applicable legal framework ................................................................................................. 6

6. Key Concerns ....................................................................................................................... 8

    6.1. Conduct of hostilities ................................................................................................. 8

        6.1.1. Eastern Libya: Benghazi and Derna .................................................................. 8

        6.1.2. Tripoli and western Libya ................................................................................. 11

        6.1.3. Southern Libya .................................................................................................. 12

    6.2. Attacks on medical facilities and personnel ............................................................ 13

    6.3. Summary executions and other unlawful killings .................................................... 14

    6.4. Abduction, detention and torture .............................................................................. 16

        6.4.1. Western Libya .................................................................................................... 17

        6.4.2. Eastern Libya .................................................................................................... 20

        6.4.3. Derna .................................................................................................................. 22

    6.5. Situation of Internally Displaced Persons ............................................................... 22

    6.6. Situation of refugees, asylum-seekers and migrants ................................................ 24

    6.7. Attacks on human rights defenders, humanitarian workers and media professionals ............... 26

7. Administration of justice .................................................................................................... 29

8. Conclusion and recommendations ...................................................................................... 31

**Report on the human rights situation in Libya**

*16 November 2015*

### 1.  Introduction

This report is published by the United Nations Support Mission in Libya (UNSMIL) in accordance with its mandate[1], in cooperation with the Office of the United Nations High Commissioner for Human Rights (OHCHR). It provides an update on the human rights situation in Libya since the reports issued on 4 September and 23 December 2014, which covered the period from mid-May to end of December 2014. UNSMIL/OHCHR also issued a briefing on 25 March 2015, which focused on the situation of human rights defenders in Libya.

This report includes information on the human rights situation in Libya including on violations of international human rights and humanitarian law, and abuses of human rights, committed between 1 January and 31 October 2015.

### 2.  Summary

Libya continues to be embroiled in deadly violence and multiple armed conflicts, non-international in character, affecting several regions, and contributing to a general breakdown of law and order. All parties to the conflicts continue to commit violations of international human rights and humanitarian law, and abuses of human rights, including indiscriminate and disproportionate attacks; summary executions and other unlawful killings; arbitrary deprivations of liberty; and torture and other cruel, inhuman or degrading treatment (ill-treatment).

During the reporting period, the violence in Libya has led to hundreds of deaths and mass displacement, with an ongoing humanitarian crisis in many areas. Refugees, asylum-seekers and migrants were increasingly vulnerable to abuses. Human rights defenders, humanitarian workers and media professionals also faced violent attacks and intimidation. Thousands of individuals were held in prisons and other detention centres under the official oversight of the Ministries of Justice, Defense and Interior as well as in facilities run directly by armed groups, amid frequent reports of torture or other ill-treatment. The justice system, where it was functioning, failed to ensure accountability, while abuses by armed groups continue to take place with impunity.

---

[1] The mandate of UNSMIL, renewed most recently by United Nations Security Council resolution 2238 on 10 September 2015, includes the undertaking of "human rights monitoring and reporting". The Director of the Human Rights, Transitional Justice and Rule of Law Division of UNSMIL is the representative of the United Nations High Commissioner for Human Rights in Libya.

### 3.   Methodology

Due to the volatile security situation in Libya, UNSMIL has continued to operate outside the country since the evacuation of international staff members in July 2014. In preparation for this report, UNSMIL gathered information from human rights defenders and other activists; medical personnel; humanitarian workers; lawyers; journalists; current and former officials; released detainees; migrants and asylum-seekers who had fled Libya; and relatives of victims. Interviews were conducted in person or by telephone with interlocutors based in different countries, including in Libya, Egypt and Tunisia. Further information was collected during short missions to several locations in Libya. Where possible and relevant, UNSMIL reviewed medical records, legal complaints, court documents, photographic and audiovisual evidence, and other information. Some sources were reluctant to disclose information due to threats, intimidation, and/or fear of reprisal. Others provided information but asked that they not be named or that identifying details be removed.

This report does not seek to provide a comprehensive account of all human rights concerns in Libya during the reporting period. It provides an overview of patterns of violations of international humanitarian and human rights law, and abuses of human rights, illustrated by emblematic cases.

### 4.   Background

### 4.1       Parties to the conflicts

During the 2011 internal conflict and in its aftermath, a plethora of armed groups were formed around frequently overlapping political, ideological, tribal, factional and regional lines. Despite successive governments' declared efforts to integrate fighters into government structures or disarm and reintegrate them into civilian life, armed groups proliferated, grew in membership, accumulated weapons and consolidated effective control over large swaths of territory, strategic installations and State institutions. Armed groups were given salaries by successive governments and some were also officially given law enforcement and custodial functions under the Ministries of Justice, Defense or Interior. However, even in these cases, they have maintained their own command and control structures, and operated largely independently.

In the course of 2014, a set of major security and political developments led to the formation of two main broad and rival coalitions of armed groups. In May 2014, the then retired General Khalifa Haftar launched Operation Dignity in eastern Libya with the declared goal of combatting

terrorism. Operation Dignity is composed of former soldiers[2] as well as volunteer fighters. With the launch of a renewed military offensive in Benghazi by Operation Dignity in mid-October 2014, local residents formed armed youth groups, referred to as "sahawat" (awakening) by their opponents, purportedly to support Operation Dignity and protect their neighborhoods.

In opposition to Operation Dignity, various armed groups formed a coalition under the banner of the Benghazi Revolutionaries Shura Council (BRSC), composed of the armed groups from the Libya Shield Forces and Ansar al-Sharia, as well as other armed groups active in Benghazi since the 2011 uprising, including the 17 February Martyrs and Rafalla Sahati Company. Groups that have pledged allegiance to the so-called Islamic State in Iraq and the Levant (ISIL) are also active in fighting Operation Dignity.

In March 2015, the House of Representatives (HoR), the parliament elected on 25 June 2014, appointed Khalifa Haftar to the newly-created position of General Commander of the Libyan National Army with the rank of Lieutenant General. The House of Representatives had publicly endorsed Operation Dignity in October 2014. The House was to be based in Benghazi as per amendments to the 2011 Constitutional Declaration, but has been convening in Tobruk given fighting and insecurity in Benghazi. On 5 October, members of the House of Representatives voted to amend the Constitutional Declaration to extend the legislative body's term beyond the 20 October deadline.

In western Libya, Libya Dawn was formed in July 2014 by armed groups from Misrata, Tripoli, al-Zawiya, Zuwara and other towns. They are also supported by armed groups from towns in the Nafusa/Western Mountain including Gheryan and Kikla. Libya Dawn was launched with the declared objective of evicting Zintan armed groups from the capital, including the airport. Armed groups from Zintan and Warshafana subsequently formed a coalition against Libya Dawn and allied themselves to Operation Dignity.

Following some six weeks of fighting, Libya Dawn gained control of the capital as Zintan armed groups withdrew. The outgoing parliament, the General National Congress (GNC), reconvened and announced the establishment of a "government of national salvation". It took control of Tripoli-based ministries and other institutions as the government of incumbent Prime Minister Abdallah al-Thinni relocated to al-Baida in eastern Libya, where it remains to date. This government was subsequently sworn in by the House of Representatives.

In Derna, in eastern Libya the Shura Council of Muslim Youth pledged allegiance to ISIL in October 2014, under the self-declared name of Cyrenaica Province ("Wilayat Barqa"). The move triggered a split with other armed groups, most notably the Abu Salim Martyrs Brigade. The latter led a coalition under the name of the Derna Mujahidin Shura Council (DMSC), which drove the groups pledging allegiance to ISIL out of most of central Derna in June 2015. Fighters

---

[2] Comprising of those who served in the army during the Qadhafi regime, and those who defected during or prior to the 2011 armed conflict.

pledging allegiance to ISIL under the self-declared name of Tripoli Province (Wilayat Tarablus) took control of Sirte in June 2015 and much of the 200 kilometer coastal area east of the city. These groups have also called themselves "soldiers of the Caliphate" (Junud al-Khilafa). The extent of the linkages and coordination between these groups and ISIL are not clearly established.

### 4.2   Recent security and political developments

Although major fighting has ceased in Tripoli and surrounding areas during the reporting period, the situation in the capital continues to be extremely fragile. Intermittent clashes have taken place around south-west Tripoli, between forces of Libya Dawn and those allied to Operation Dignity.

In April 2015, Tripoli-based armed groups allied to Libya Dawn and Operation Dignity clashed for two days in and around the Tripoli neighborhoods of Tajura and Fashlum. Other armed confrontations flared-up sporadically in Tripoli including between armed groups within Libya Dawn. The capital was also rocked by a number of violent attacks, most notably on the Corinthia Hotel, on 27 January 2015, by Libyan groups claiming affiliation to ISIL, and on a number of foreign embassies, including the Moroccan, Spanish and South Korean embassies in April, and the Tunisian embassy in June.

During the reporting period, sporadic fighting broke out in other parts of western Libya and the Nafusa/Western Mountain, as armed groups supporting either of the two main rival factions sought military advances or engaged in retaliatory attacks. Shelling, including of civilian objects, was reported in al-Ajilat, Gheryan, Sabratah, Warshafana, al-Zawiya, Zintan and Zuwara. The two main factions also carried out airstrikes against each other, which damaged civilian infrastructure. However, in recent months an uneasy calm has prevailed following a series of local ceasefire agreements. Tensions escalated following the crash of a helicopter near the city of al-Zawiya on 27 October 2015, reportedly killing passengers onboard, including military officers and armed groups commanders, but have not spilled over into major violence following mediation efforts by officials and others in the cities of Rajban, Zintan, Misrata, Sabratah , and Assabaa with Warshafana and al-Zawiya.[3]

Cracks have appeared in Libya Dawn, as a result of which a number of armed groups established the Steadfastness Front (Sumud) in June, in Tripoli. The move appeared to be a reaction to ceasefires and reconciliation initiatives between rival towns by other armed groups within Libya

---

[3] See press release by UNSMIL entitled "UNSMIL welcomes the de-escalation efforts in Western Libya, reiterates call for calm", issued on 31 October 2015:
http://unsmil.unmissions.org/Default.aspx?tabid=3543&ctl=Details&mid=6187&ItemID=2099314&language=en-US

Dawn as well as their support for the UNSMIL-facilitated political dialogue.

In eastern Libya, Benghazi has endured protracted armed hostilities between Operation Dignity forces and BRSC, resulting in over 90 civilian deaths as a result of shelling or crossfire, documented by UNSMIL during the reporting period - although their number is believed to be higher.

Civilians were also killed during the armed hostilities in June between the DMSC and the Cyrenaica Province ("Wilayat Barqa") armed group in Derna. The group withdrew from much of Derna in June although clashes continued on its outskirts.

During the reporting period, Libyan armed groups pledging allegiance to ISIL gained territory and consolidated control in central Libya, namely in Sirte, Harawa and Nofliya, and claimed responsibility for a number of attacks, including on oil fields, checkpoints and petrol stations.

The military conflict between the Libya Dawn and Operation Dignity forces continued to have a spillover effect in southern Libya, fueling pre-existing tensions. Fighting between Tabu and Tuareg communities continued in Awbari throughout much of the reporting period, and spread to Sabha in July despite ceasefire agreements reached in June. Fighting broke out in Barak al-Shati in early March, lasting for some seven weeks.

The security situation in Sabha deteriorated severely, with a sharp rise in murders, abductions and kidnappings, armed robberies and other criminal activities, against the backdrop of increasing tensions between the Awlad Sliman, Tabu, Tuareg and al-Qadhadhifa tribes.

Tensions between the Tabu on one side and Zwaya and other Arab tribes on the other, in the southeastern city of Kufra, also periodically broke out into deadly communal violence.

At the political level, Libya continued to witness a divide affecting efforts to achieve peace and security. Despite the instability, UNSMIL has facilitated multiple rounds of talks among key Libyan stakeholders, which culminated on 11 July 2015 in the initialing of the Libyan Political Agreement by most participants.

This agreement lays down an institutional governance framework for a transitional period, pending the adoption of the Constitution, and the subsequent holding of new parliamentary elections. The agreement also includes a number of key human rights provisions pertaining to commitments by all parties to release illegally-held detainees; to strip armed groups of powers of arrest and detention; to transfer all detention centres to the effective control of the state; and to address the situation of the missing and the displaced. The agreement also highlights commitments to conduct prosecutions for murder, torture and other crimes under international law.

On 11 October, UNSMIL transmitted the Libyan Political Agreement to the main political stakeholders for their endorsement, urging them to redouble their efforts to reach an agreement to form a Government of National Accord.

In the meantime, the Constitution Drafting Assembly (CDA), convened in April 2014 has

continued its work amidst security, political and institutional challenges, debating preliminary drafts released by eight substantive committees in December 2014. A consolidated draft was produced on 6 October. UNSMIL continues to engage with the CDA to ensure the inclusion of strong human rights guarantees in the text.

### 5. Applicable legal framework

Libya continues to be affected by concurrent non-international armed conflicts. All parties engaged in the fighting are bound by relevant provisions of international humanitarian law. Article 3 common to the four Geneva Conventions relating to conflicts not of an international character is applicable to the situation in Libya, with all parties to the conflict being bound to respect the guarantees pertaining to the treatment of civilians and persons hors de combat contained therein.[4] Common Article 3 binds all parties to the conflict to respect, as a minimum, that persons taking no direct part in hostilities as well as those placed hors de combat shall be treated humanely, without any adverse distinction.[5]

In particular, all parties must respect the principles of distinction, proportionality and precautions in attack. Attacks on civilians and civilian objects are prohibited, as are attacks that do not discriminate between civilians, civilian objects and military objectives. Also prohibited are attacks that may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, which is excessive in relation to the concrete and direct military advantage anticipated. The presence of fighters, or other military objectives, in areas under attack does not absolve parties to the conflict from their responsibility to take all feasible precautions to avoid and minimize incidental loss of civilian life, injury to civilians and damage to civilian objects. Moreover, parties to the conflict must call off any attacks that may be expected to cause excessive impact on civilians and civilian objects compared to the concrete and direct anticipated military advantage.

Hospitals and medical personnel enjoy very specific protections under international law. Attacks on hospitals and medical units are prohibited, unless these installations are clearly used for military purposes, and if, despite adequate warning with a reasonable time limit to cease such uses, the use continues. Medical personnel are also protected and making medical personnel the object of an attack is a war crime.

---

[4] ICJ, Case Concerning Military and Paramilitary Activities in and Against Nicaragua (Nicaragua v. United States of America), I.C.J. Reports, 1986, p. 14, para. 218, The International Court of Justice has held that the rules contained in common Article 3 reflected elementary considerations of humanity.

[5] Common Article 3 prohibits violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture, taking of hostages, outrages upon personal dignity as well as the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, respecting the generally recognized principles of fair trial and due process.

Civilian property is protected from attack under international humanitarian law. Such attacks when directed towards specific groups and their property on the basis of their identity or family links may further amount to collective punishment.

Abductions, the taking of hostages, as well as arbitrary deprivations of liberty, including detention on the basis of a person's individual or group identity, are prohibited. All those in custody, enemy fighters or civilians, must be treated humanely, and the wounded in particular must be taken care of, regardless of their affiliation.

Murder is a war crime in clear violation of international humanitarian law. The despoliation of dead bodies is also prohibited. International law also prohibits collective punishment, including reprisals against family members of armed group fighters and the destruction of their property.

International human rights law, which continues to apply in times of armed conflict[6], prohibits violations to the right to life, liberty and security of person, torture, discrimination and arbitrary detention; and upholds the rights to freedoms of association and expression. Libya is a state party to key international human rights treaties, including the International Covenant on Civil and Political Rights; the International Covenant on Economic Social and Cultural Rights; the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; and the Convention on the Elimination of all Forms of Discrimination against Women. Libya is also party to the African Charter on Human and Peoples' Rights and the African Union Convention Governing Specific Aspects of Refugee Problems in Africa.

Those committing crimes under international law, including war crimes, as well as political leaders and commanders of armed groups who order the commission of such crimes or fail to take reasonable and necessary measures to prevent or punish their commission, are criminally liable, including before the International Criminal Court (ICC). Many of the violations and abuses described within this update potentially fall under the jurisdiction of the ICC, which is continuing to investigate the situation in Libya.

Under resolution 2174 (2014), adopted on 27 August 2014, the Security Council decided that targeted travel ban and asset freeze measures shall apply on, inter alia, individuals or entities "planning, directing, or committing acts that violate applicable international human rights law or international humanitarian law, or acts that constitute human rights abuses, in Libya".

---

[6] See OHCHR publication "International Legal Protection of Human Rights in Armed Conflict" for more information at http://www.ohchr.org/Documents/Publications/HR_in_armed_conflict.pdf

6. Key Concerns

### 6.1.    Conduct of hostilities

Across Libya, warring factions showed little regard for avoiding or minimizing loss of civilian life, injury to civilians and damage to civilian objects. They have used imprecise weaponry[7] in densely-populated residential areas in what often amounted to indiscriminate attacks, leading to civilian fatalities and damage to civilian infrastructure. UNSMIL has also received reports that airstrikes by Operation Dignity, Libya Dawn and in one instance the Egyptian air-force led to civilian casualties and / or damage to civilian infrastructure.

UNSMIL obtained information that rival armed groups looted, burned or otherwise destroyed homes and other civilian property seemingly in retaliation for owners' actual or perceived political allegiances. UNSMIL also documented a number of instances where the neutrality of hospitals and other medical facilities was violated, while medical personnel were caught-up in the violence and subjected to physical assaults, abductions and harassment.

Bomb attacks, including suicide attacks, have claimed the lives of dozens, including civilians. In one such incident, at least 42 people, including children, were killed on 20 February 2015 in bomb attacks in the town of Qubbah, in eastern Libya. Most victims were queuing at the local petrol station, when the attacks took place. Responsibility for the bombings was claimed by a Libyan armed group pledging allegiance to ISIL, allegedly in retaliation for the airstrikes on Derna on 16 February (see page 11).

### 6.1.1.   Eastern Libya: Benghazi and Derna

In Benghazi, civilians were caught-up in fighting between Operation Dignity and BRSC[8]. UNSMIL has documented over 90 civilian fatalities as a result of shelling or in crossfire, through information provided by witnesses, relatives and medical professionals. The actual number of civilian fatalities is likely to be higher. The overall death toll as a result of hostilities in Benghazi since the beginning of 2015 to the end of July had exceeded 750 people according to medical sources. Homes, medical facilities, schools, farms, businesses and other civilian infrastructure have been indiscriminately hit and damaged in fighting.

---

[7] See analysis of weapons used in the fighting in Libya, pages 13-14, UNSMIL/OHCHR report on violations in Libya, www.ohchr.org/Documents/Countries/LY/OverviewViolationsLibya_UNSMIL_OHCHR_Sept04_en.pdf. Similar types of weapons continue to be used.
[8] See section 4.1 for further background on Operation Dignity and BRSC

UNSMIL recorded loss of civilian life and injuries among civilians as a result of the shelling of a number of residential areas including al-Kish, al-Kerimia, al-Lithi, al-Salam, al-Salmani, Beirut Street, Bouhdema, al-Fuweihat, Sidi Hussein, Talabino, Tarik al-Nasr, Sirti and Zuwawa. Fighters have taken up position in residential areas in Benghazi, often using them as launching pads for attacks and increasing the risk of retaliation attacks.

In May, at least 11 children and a civilian adult were killed in Benghazi. Relatives reported the death of three children aged between two and 12, when their house in the Bel'un neighborhood of Benghazi was shelled on 12 May. Two other children were injured, including a 13-year-old boy, who had one leg amputated as a result of the attack. To the best knowledge of UNSMIL, there were no fighters or other military objectives present in the area itself. A number of Benghazi interlocutors speculated that the target might have been the 204 Tanks Brigade, part of Operation Dignity, located west of the affected area, but UNSMIL could not verify these allegations. On 13 May, a shell hit a house in the al-Salam neighborhood during a wedding celebration, resulting in the death of nine civilians, including eight children aged between two and 15. Four further children, a man and a woman sustained shrapnel injuries.

At least 15 Benghazi residents died in another week of heavy fighting between 7 and 14 July. Others, including children, were injured. According to residents and medical professionals, eight residents were killed in the shelling of Tarik al-Nasr and Bouhdema on 7 July. Victims included four brothers who died in the reported mortar shelling of their home. On 8 July, two toddlers were admitted to the Jalaa Hospital with shrapnel wounds following the shelling of the Zawiya neighborhood in Benghazi; one of them succumbed to his injuries on 14 July. According to local sources, a further five elderly men sustained fatal shrapnel wounds on 12 July, when Shara' 'Ashrin (Street 20) was shelled. UNSMIL understands that armed "neighborhood youth" allied to Operation Dignity had previously set-up checkpoints in the area surrounding Shara' 'Ashrin.

On 23 October, al -Kish Square in Benghazi, where hundreds of persons were participating in a demonstration against the Libyan Political Agreement, was shelled by unknown perpetrators. According to residents, officials and medical professionals, the attack left nine civilians dead, and at least 45 persons injured as a result of shrapnel wounds. On 16 October, a demonstration at the square was also shelled without causing casualties. On 15 October, the neighbourhoods of Kish, Tabalino, and Sirti in Benghazi were shelled leading to the death of two civilians (a man and a woman).

UNSMIL received reports that forces allied to Operation Dignity were responsible for damaging civilian property and for forcibly expelling entire families suspected of having relatives fighting for the BRSC. For instance, on 20 February 2015, armed men in civilian clothes, believed to be neighborhood vigilante groups supportive of Operation Dignity, reportedly entered six apartments in the al-Salmani neighborhood and forced the residents, including an 87-year-old man, to leave their homes. They physically assaulted at least one man who resisted. The same perpetrators then reportedly looted and destroyed six houses of alleged supporters of the BRSC.

The protracted fighting in Benghazi has led to widespread displacement of civilians within the city, as well as further afield. Nonetheless, a number of civilians were still believed to be trapped in areas of active fighting and in need of safe evacuation. The Assembly of Residents of Centre City (*Wast al-Blad*) in Benghazi claimed that as of June 2015, some 72 Libyans and 52 foreign nationals from Bangladesh, Egypt, Syria, and the Occupied Palestinian Territory, remained under siege in areas under the control of the BRSC, namely in Kharabeish, Suq al-Hut and other parts of al-Blad and Sabri. It has not been possible to verify these numbers. Thus far, efforts to negotiate their safe evacuation with both parties to the conflict have been unsuccessful. There are fears for the safety of people in these areas, particularly their exposure to possible attacks during evacuation. There are also concerns that they might be at risk of arbitrary detention, as Operation Dignity forces reportedly consider all those who have remained in these areas to be supporters of the BRSC. Residents have also reported that there is no electricity and shortages of food, medicine and other essential supplies.

UNSMIL also documented a number of civilian deaths and injuries in Derna against the backdrop of fighting between the DMSC and a Libyan armed group pledging allegiance to ISIL, and airstrikes carried out by Operation Dignity and the Egyptian Air Force. The Egyptian Government announced airstrikes against targets in Libya on 16 February 2015 in retaliation for the beheadings of 20 Egyptian nationals by a Libyan armed group pledging allegiance to ISIL. Libyan Air Force units aligned to Operation Dignity also announced airstrikes on the same day. Whilst the airstrikes struck a number of military objectives in and around the city of Derna, including the headquarters of the Jabel Company, used by the "Islamic Police", and a number of military and training bases, including in Wadi al-Naqa and al-Thahr al-Ahmar, UNSMIL collected information on the deaths of at least seven civilians in the residential neighbourhood of Shiha al-Gharbiya. Two women and three children were among those killed. One Derna resident speculated that the area might have been targeted due to the alleged presence of a military workshop, but this claim could not be verified. Interviewed witnesses and other neighborhood residents denied knowledge of the workshop or of any military activity in the area.

UNSMIL also received reports that airstrikes by the Libyan Air Force units aligned to Operation Dignity harmed civilians in Derna. For instance, the roof and last floor of a residential apartment block, located between the neighbourhoods of Shiha and al-Blad, were hit on 5 May. UNSMIL received reports that a girl aged four months was killed, while her mother and brother sustained injuries. Fighting between a Libyan armed group pledging allegiance to ISIL and the DMSC also resulted in at least one civilian death. According to relatives and medical professionals, a 23-year-old civilian man sustained fatal shrapnel wounds when his home in the area of 'Imarat Majri was hit on 10 June. His sister sustained minor shrapnel injuries to her arms and legs. It is believed that the area was targeted due to the presence of fighters of a Libyan armed group pledging allegiance to ISIL.

### 6.1.2.   Tripoli and western Libya

During the reporting period, fighting sporadically flared up between Libya Dawn and Operation Dignity allies namely Zintan-based armed groups and the Tribal Army (*Jaysh al-Qaba'el*).

Residential areas were affected by shelling in western Libya, including al-Ajilat, al-Zawiya, Sabratah and Warshafana, and led, in some cases, to civilian casualties and damage to homes and other civilian infrastructure. At least one man from the Philippines was killed in the shelling of al-Zawiya on 29 March 2015. On 6 July, the city of al-Ajilat was shelled reportedly by the Tribal Army leading to the death of a 17 year-old boy, who sustained fatal shrapnel wounds reportedly while walking home. A number of homes were also damaged in the shelling according to residents.

Armed confrontations broke out in the Tripoli neighbourhoods of Fashlum and Tajura on 17 April 2015 between armed groups supporting Libya Dawn and Operation Dignity. Medical sources told UNSMIL that by 19 April, 12 bodies with gunshot wounds and two with shrapnel injuries had been brought into Tripoli morgues, including a two-month-old and an 18-month-old female infants. Tajura residents reported that several houses and properties were looted and damaged, and some set on fire, by armed groups supporting Libya Dawn, although it was unclear which groups were responsible.

A number of families suspected of supporting Operation Dignity fled Tripoli for Zintan, al-Aziziya and eastern Libya. Prime Minister Abdallah al-Thinni's government established a fact-finding committee on 2 June mandated to investigate the violence in Tajura. The committee, headed by a public prosecutor, found that 20 people had died and 500 were displaced from Tajura as a result of the violence, attributing responsibility to Libya Dawn fighters.

During the reporting period, Sirte and surrounding areas witnessed armed clashes between a Libyan armed group pledging allegiance to ISIL and Misrata-based armed groups, as well as airstrikes. Reports received by UNSMIL suggest that whilst the majority of casualties were fighters, a number of civilians were also killed or injured. For instance, a civilian man and his daughter were killed when their car was hit during airstrikes on the city on 23 May, according to medical professionals and local residents. His son and other daughter were also injured. Reports were received that the area was targeted due to the alleged presence of fighters from Libyan armed groups pledging allegiance to ISIL in a nearby house

Fighting erupted in Sirte's 3rd district after a local imam, Khaled Ben Rajab al-Ferjani, was shot dead on 10 August. He was known for his vocal opposition to a Libyan group pledging allegiance to ISIL. He is reported to have been killed while resisting abduction by the group's fighters. By 13 August, the group had reportedly captured at least 16 men from the 3rd district. Witnesses have reported seeing four bodies hung from poles in three separate locations, including a roundabout, in Sirte. It is unclear whether these individuals were killed during the course of the fighting or had been summarily executed. Residents said that most civilians had

fled the area where fighting was taking place by the morning of 13 August. The total number of casualties remains unknown.

Sirte residents and officials also reported the deliberate destruction of at least six houses of alleged supporters of Libya Dawn in the area of al-Sawawa on 11 July, purportedly by Libyan armed groups pledging allegiance to ISIL. Houses of the former mayor and his relatives from the Ma'dan tribe were among those allegedly destroyed. The houses were empty at the time of the attack, as the residents had fled to Misrata together with the retreating forces of the 166 Brigade armed group from Misrata. A local official suggested that the attack was in retaliation for reports of torture and sexual abuse of detainees held in Misrata, who had been captured by the 166 Brigade armed group.

### 6.1.3.  Southern Libya

Despite local ceasefire and reconciliation initiatives, periodic armed clashes and insecurity engulfed several regions in southern Libya, including Awbari, Barak al-Shati, Kufra and Sabha.

The situation in southeastern Libya has remained tense, with occasional violence taking place between the Zwaya and Tabu tribes in Kufra and its environs. For instance, on 6 May 2015, fighting was reported in Kufra following news of a gun battle at the university campus between Tabu and Zwaya students. The fighting, which reportedly led to the death of two male students and injury to two women, spread to the rest of the city.

Tabu residents reported the shelling of Tabu neighborhoods of Shura and Qadrufay, resulting in the death of a four-year-old boy. His mother, brother and two other relatives were injured in the shelling. Three other children aged 11, 15, and 16, were also killed in the shelling of their houses on 6 and 7 May. Representatives of the Zwaya Crisis Committee also reported the shelling of Zwaya neighborhoods on 7 May, as a result of which six local residents and an Egyptian migrant worker were injured.

Violence between the Tabu and Zwaya tribes in Kufra lasting between 25 July and 6 August claimed 49 lives, according to medical sources from both sides. There were reportedly nine children and two women among the dead. Reports received indicate that during the clashes, both sides used artillery to shell their rival's residential areas, leading to a high number of casualties.

The security situation in Sabha deteriorated during the reporting period, with a sharp rise in murders, armed ambushes, abductions for ransom and other violent crimes. According to a police source, at least 26 people were killed in Sabha between 19 June and 11 July. Clashes between Tabu and Tuareg armed men erupted in al-Tayouri neighbourhood of Sahba, on 14 July, lasting until a ceasefire was agreed upon on 25 July. Medical staff told UNSMIL that at least 30 Tuaregs died as a result, including three women and four children. Dozens more were reportedly injured. The victims included a 55 year-old woman Sukeina Hemma Anara and her 19-year-old daughter

Bantul Mohamed Jebara, who were killed when their house was shelled on 17 July. A family with four children, all younger than five, were reportedly killed on 16 July when their car came under fire as they were trying to flee to safety. Residents also reported the destruction of a school, a mosque and other public property during the violence.  An estimated 2,000 displaced Tuaregs sought shelter in schools in Sabha, with more families fleeing to other parts of Sabha, Gheryan and Tripoli.

During fighting in Sabha in July, at least 20 Tuareg homes were looted and then destroyed according to medical staff, witnesses and residents. Some houses were set on fire, while others were destroyed by bulldozers. Tuareg activists and officials told UNSMIL that several houses of Tuareg families were deliberately set on fire on 11 February 2015 by Tabu fighters in the town of Awbari. The attacks took place in neighbourhoods known as "Masaken Sha'biya" (popular dwellings) and Hay al-Atrak (Turkish neighbourhood).

Civilians were also killed in Sabha on 12 February 2015, in the neighborhood of al-Mahdiya, when a mortar shell hit a wedding party. While it remained unclear who was responsible for the attack, local residents and relatives of victims alleged that members of the Qadhadhifa tribe sought to create disturbance ahead of the anniversary of the uprising against the Qadhafi regime on 17 February 2011. Residents and officials reported that three women were killed and about 25 wedding guests, including children, were injured during the attack.

### 6.2.    Attacks on medical facilities and personnel

During the reporting period, medical facilities were shelled during the fighting, while medical professionals were caught up in the violence, abducted or detained by the different actors, with some allegedly victims of torture and other ill-treatment.

In Benghazi, medical professionals were killed or injured and medical facilities shelled in the context of armed clashes between Operation Dignity and the BRSC[9]. Three medical personnel and an ambulance driver were killed, while on duty in Benghazi on 6 May. The Benghazi Medical Centre (BMC), the largest functioning hospital in Benghazi, was shelled on at least four occasions on 7 and 14 April, 9 May, and 19 July. In the last attack, a nurse sustained shrapnel wounds to her head and face, and risked losing her sight in one eye. The other attacks caused minor property damage including shattered glass in the Obstetrics Department, the kidney unit and the main entrance to the Hospital. The grounds of the Jalaa Hospital in Benghazi were also shelled on 8 July, reportedly leading to the death of a man who was visiting a patient. Three other people were injured. Hospital windows were shattered during the attack.

---

[9] See section 4.1 for further background on Operation Dignity and Libyan Dawn.

Medical professionals and other hospital staff across Libya complained of a general climate of insecurity, with armed men forcibly entering into, and engaging in armed skirmishes inside hospital premises, as well as threatening staff. A number of medical professionals have also endured violent attacks, abductions, threats and other intimidation at the hands of various armed groups. As a result, many foreign medical professionals left, while a number of their Libyan counterparts stopped reporting to work.

A Libyan female medical professional told UNSMIL that she was hit and sexually assaulted on 18 May at her place of work by an armed man receiving treatment. When the director of the medical facility tried to intervene to protect the employee, four other armed men threatened him at gunpoint. She has since stopped working. The survivor noted that a number of similar incidents of abuse and harassment perpetrated by armed men targeting hospital staff, administration and patients.

On 11 May, armed clashes also broke out between two groups, purportedly both allied to Operation Dignity, inside the Jalaa Hospital in Benghazi. The hospital closed its doors for several hours on 14 July after armed men threatened a doctor on duty at gunpoint, allegedly because he did not dispense them medicine they demanded. On 5 July, a group of armed men affiliated with Operation Dignity reportedly threatened BMC administration and destroyed furniture.

Hospitals in other parts of Libya also became objects of attacks. Armed confrontations reportedly erupted between Awlad Sliman and Tabu armed men on 20 May, inside the "2 March" Hospital of Sabha. An elderly man from Awlad Sliman was reportedly injured in the cross-fire.

Armed groups also abducted medical professionals on account of their perceived political allegiances. For instance, in early January 2015, a medical professional was reportedly beaten and then abducted from his place of work in eastern Libya following accusations that he supported "Islamists" by groups supporting Operation Dignity. His fate and whereabouts remain unknown. Another medical professional was released from detention in eastern Libya in March 2015 after being held for some four months in various locations by Operation Dignity affiliated armed groups on accusations of supporting the BRSC. He had been abducted from his place of work by armed men. He reported having been subjected to torture and other ill-treatment during his initial period of detention with a view to extracting information. While in custody, he was asked to treat other co-detainees, including a man whose finger had to be amputated as a result of torture.

### 6.3.   Summary executions and other unlawful killings

During the reporting period, Libyan armed groups pledging allegiance to ISIL carried out summary public executions in Derna and Sirte. At least four such executions were carried out in

Derna, purportedly following decisions by a self-appointed "court", without due process, for "offences" ranging from engagement in same sex-relations to treason.

A man, aged approximately 50 years old, was publicly beheaded on 3 June outside of the Atiq Mosque in Derna, in front of a crowd including children. The man was reportedly a government official from al-Baida and was captured from a public road near Qubba several days before his execution. On 18 July, in the first such public execution in Sirte known to UNSMIL, a Libyan armed group pledging allegiance to ISIL shot dead a local man they accused of treason. His body was left on public display for about 24 hours until it was handed over to his family for burial. On 16 October, two Libyan men were publicly beheaded in Sirte over charges of "sorcery" following convictions by a self-appointed "court".

In June, the DMSC took control of Derna from armed groups pledging allegiance to ISIL. On 6 July, the DMSC announced that it had carried-out the execution of six alleged members of these armed groups including two foreign nationals for the alleged crimes of murder, abduction and the use of explosive devices to carry out attacks. It appears that the executions were carried following sentencing by a similar DMSC self-appointed "court".

Libyan armed groups pledging allegiance to ISIL also killed a number of foreign nationals on account of their religion. A video clip released on 15 February 2015 showed the beheading of 21 men, among them 20 Egyptian Copts. On 19 April 2015, other videos were released showing the beheadings and shooting of some 28 Ethiopian and Eritrean nationals. A video published on 18 October purportedly by the Cyrenaica Province ("Wilayat Barqa") armed group depicted a man, described as a Christian from South Sudan, having his throat cut. The fate of other Christian foreign nationals abducted since August 2014 remains unknown.

A Libyan armed group pledging allegiance to ISIL also carried out a number of unlawful killings of captured Libyans. For instance, following an armed attack on the Ghani oil field on 7 March 2015, armed men purportedly affiliated with this group captured and beheaded eight security guards at the oil field. According to their commander, the victims were all from southern Libyan cities including Gatrun, Um al-Araneb, Tragen and Murzuq. Following an attack on the city of Harawa on 14 May, fighters from these groups beheaded a child and a young man from the Awlad Suliman tribe aged 17 and 18 years-old, reportedly because of their perceived opposition to them. The mutilated heads and bodies of the victims were then allegedly taken to Nofliya and put on display.

A video published on 17 October purportedly by the Cyrenaica Province ("Wilayat Barqa") armed group showed a Derna resident being tied by a rope to the back of a pick-up truck and dragged to death. The video also depicted another Derna resident being forced to dig his own grave before being shot in the back of the head. In the video, both men were shown to "confess" to assisting forces fighting against groups that have pledged allegiance to ISIL whilst warning others to "repent". Derna residents confirmed the identities of the two men to UNSMIL, noting that the two men were abducted in September 2015.

UNSMIL has also documented what appeared to be politically-motivated assassinations during the reporting period, albeit at a reduced rate compared to previous reporting periods. Among possible reasons for this decrease is the fact that many targeted individuals have fled, gone silent, relocated to safer areas or sought protection among their tribes, following the surge of such assassinations in 2014. In one instance, in April 2015, a local man was shot dead while driving home to the Fateihia neighbourhood in Derna. According to area residents, he was known for his opposition to certain armed groups. A man from Zintan was abducted on 8 February 2015 while visiting his family in Tripoli. Two days later, his bullet-riddled body was found in the Abu Salim neighborhood. It is suspected that he was targeted due to his affiliation with a political party known for its opposition to Libya Dawn.

### 6.4. Abduction, detention and torture

During the reporting period, armed groups across Libya have continued to abduct civilians on the basis on their family links, origin or their actual or perceived political affiliations. Detainees were held in official prisons as well as makeshift unofficial detention facilities, including bases of armed groups. During their time in custody, detainees were frequently denied contact with the outside world and not referred to judicial authorities.

Notwithstanding periodic incremental releases, such as the release of some 185 detainees in four groups during 2015 from facilities in Misrata, thousands of conflict-related detainees have been deprived of their liberty since 2011 as judicial processes stalled. They have been held in facilities under the nominal oversight of Ministries of Justice or Defense as well as directly by armed groups, without trial and the opportunity to challenge the legality of their detention. Armed groups remained the key decision-makers on the fate of most detainees.

The Minister of Justice in Prime Minister Abdallah al-Thinni's Government, Almabruk Ghrira, stated on 27 April that his Ministry relinquished responsibility from " prisons that do not abide by legitimacy…especially those prisons in [the cities of] al-Zawiya, Tripoli and Misrata" , in reference to areas under the control of Libya Dawn. On 3 May, the Minister stated that the prisons of Grenada and Kuweifiya were under his control, and confirmed the detention of individuals suspected of "terrorism". The Deputy Minister of Justice responsible for human rights acknowledged on 25 June that even in territories under the control of Prime Minister Abdallah al-Thinni's Government, there were "illegitimate [detention] facilities", adding that the matter had been referred to the Chief Public Prosecutor for investigation. No further details were made available, while armed groups, including those aligned to Operation Dignity, continued to carry out abductions.

Detained civilians and fighters alleged that they had been subjected to torture or other ill-treatment. UNSMIL also gathered information on deaths in custody seemingly as a result of torture or summary execution.

On 2 August, a video clip apparently filmed at al-Hadba prison in Tripoli was released showing al-Sa'di Qadhafi being interrogated, slapped, beaten on the soles of his feet, and forced to watch and hear the screams of two other detainees apparently being beaten. In a written communication, UNSMIL urged the General Prosecutor to carry out a prompt and effective investigation, and called for the removal of individuals appearing in the video from contact with inmates, pending the outcome of criminal investigations. The prosecution announced an investigation, and in response to UNSMIL's letter stated that arrests had been carried out, without providing further details. In March 2014, UNSMIL had asked to visit al-Sa'di Qadhafi, among others, following reports that he had been tortured in al-Hadhba prison, but permission was denied on the grounds that he was under investigation. During its last visit to al-Hadhba prison in October 2014, UNSMIL briefly saw al-Sa'di Qadhafi and other detainees; but was unable to interview him in confidence.

During the reporting period, UNSMIL received reports of torture or other ill-treatment at official prisons as well as detention facilities run directly by armed groups affiliated to either Libya Dawn or Operation Dignity. Those detained were subjected to torture or other ill-treatment, particularly during their initial periods of detention. UNSMIL received numerous reports and direct testimonies of those detainees alleging that they had been subjected to beatings all over the body with various objects such as electricity cables, whips and water pipes; suspension in contorted positions for prolonged periods of time; electric shocks; deprivation of sleep; and denial of access to sanitary facilities. A number of those released also reported being deliberately shot at; burned with cigarette butts; having cold water poured on them; left without proper medical treatment; or forced to undertake manual labour. They also frequently reported being held in inhumane and unsanitary conditions, and being confined to their cells throughout their incarceration. Many also recalled being held for prolonged periods of time solitarily in small, poorly ventilated, dark and unsanitary cells; which may amount to torture. Several former detainees whom UNSMIL interviewed continued to suffer from medical ailments and complications linked to their detention. Many also suffered from post-traumatic stress disorder.

Criminal gangs have also been responsible for abductions for ransom, including of children. UNSMIL documented such crimes across Libya, including in Tripoli, Benghazi, Sabha and Sabratah. For instance, a nine-year-old child was reportedly abducted in Sabha in February and held for 10 days for ransom. Released individuals reported physical and other abuse at the hands of their captors, seemingly aimed at pressuring their families to expedite payments and to extract larger sums of money.

### 6.4.1.   Western Libya

In western Libya, armed groups have abducted civilians, often as hostages in the hope of exchanging them for fighters and civilians held by rival groups, in violation of international

humanitarian law. In the cases documented by UNSMIL, civilians were often abducted from their homes, workplaces and public roads or at checkpoints following identity checks. Those abducted included relatives of political figures, activists, lawyers and journalists as well as individuals, including children, abducted, it appears, solely because of their family or tribal identity.

Abductions were frequently accompanied by violence. For instance, relatives recounted how a large force of armed men in balaclavas took a 67-year-old man from Warshafana from his home in the middle of the night, on 15 March 2015. The men reportedly raided the house, hit his 14-year-old son on the head with a rifle butt, pushed his wife to the ground, and fired on adjacent houses belonging to the man's relatives. Subsequently, his relatives heard from released detainees that he was being held by an armed group in Janzur, but were denied access when they tried to visit.

Hundreds of fighters and civilians, including from the cities of al-Zawiya, Zintan, Kikla, Rujban, Sabratha, Tarhuna, Zuwara, Zintan, Warshafana, Misrata and Gheryan, were released in prisoner exchanges between February and October 2015.

Among those still detained is GNC member Suleiman al-Zubi. He is being held in Zintan, since his abduction in Tripoli, on 20 July 2014, by the Barq al-Nasser armed group. There are serious concerns about his health and treatment in custody. He has not been able to communicate with his family since his abduction. Multiple appeals by UNSMIL for his release have gone unheeded.

During the reporting period, UNSMIL documented allegations of torture and other ill-treatment in a number of detention facilities in western Libya including those run by the Faruk, Sareya al-Ula, Nasr and Sila' al-Tamwiniya armed groups in al-Zawiya; the Abu Salim, Shahid Hamza, Fursan Janzur, and the Mitiga-based Quwwa al-Rad' armed groups in Tripoli; the Watiya military base and Abu Bakr al-Siddiq armed group in Zintan; and military bases in Warshafana.

Among those who died in custody was Abdel Rauf al-Zaidi, a 19-year-old, outspoken social media activist of Zintani origin. He was reportedly taken from a Tripoli street on 23 April 2015 by an armed group affiliated to Libya Dawn. UNSMIL received information that he was held at the Abu Salim detention facility under the control of an armed group commanded by Abdel Ghani al-Kikli (Ghenewa), at least until 26 April. He was reportedly transferred to the Abu Salim Emergency Hospital some three days later. On 3 May, his family collected his body. According to information provided by the Zintan Municipal Council and relatives of detainees, at least 32 men of Zintani origin resident of Tripoli remain detained in Tripoli, many by the Abu Salim armed group. UNSMIL also documented at least two cases of women held by the Abu Salim armed group without referral to judicial authorities.

In a case also reportedly involving the Abu Salim armed group, a fighter in the Tajura-based Dhaman armed group allied with Operation Dignity, was reportedly killed after his capture during clashes in Tajura in April. Pictures showing him alive in captivity were circulated on social media, before it emerged on 26 April 2015 that he had died while held by the Abu Salim

armed group.[10] In another case documented by UNSMIL in Tripoli, relatives collected the body of a 35-year-old man of Warshafana origin, on 20 May, about a month after his abduction from a restaurant. Since his abduction, his family had been seeking information on his whereabouts and fate in vain. He was an outspoken critic of Libya Dawn.

UNSMIL also received reports of deaths of individuals held by armed groups in al-Zawiya and Warshafana. A local al-Zawiya man allegedly taken by the al-Nasr armed group on 10 February 2015 died on 11 March, apparently as a result of torture. A 45-year-old man from al-Zawiya, known for his support of Libya Dawn, was seized on 26 July from the street in the southern outskirts of al-Zawiya province by about seven armed men allegedly from Jaysh al-Qaba'el. Later that evening, his family was called from the Dar al-Shifa clinic in al-Aziziya in Warshafana to collect his body. A forensic report dated 27 July from the al-Zawiya forensic department concluded that his death was caused by beatings. According to relatives and officials, at least 20 other men from al-Zawiya continued to be held in October in Warshafana by armed groups including the Awlad Issa armed group. Many were abducted in late September on the basis of their identity.

Individuals from communities displaced during the 2011 conflict, namely Tawergha and Mashashiya, have also faced a wave of abductions particularly in March and April 2015 on account of their origin and perceived allegiances in the 2011 and/or ongoing conflict. One such individual recounted to UNSMIL that he was stopped at a checkpoint in April 2015, along with two cousins. They were asked to provide their identity cards, and were then taken to the base of an armed group in Gaser Ben Ghashir. The individual said that he was beaten on his head, back and legs during questioning, which revolved around his activities during the 2011 conflict. He was released within days, while his cousins were transferred to Misrata and continued to be held there at the time of writing.

During the reporting period, at least two Tawargha men died following their abductions in Tripoli. A 20-year-old person displaced from Tawergha had not been seen since his abduction on 15 December 2014. Relatives found his body in a state of decomposition at the Ali Omar military hospital, in the area of Sbi'a, at the end of April 2015. The victim was taken by armed men from a public road in Tripoli while driving with two friends. One managed to escape, while the other passenger was released the following day. The latter informed the victims' relatives of their detention at a farm in the vicinity of Tripoli. His friend confirmed that the victim was alive at the time of his own release.

Activists informed UNSMIL of the abduction of four Mashashiya men from a checkpoint near the area of al-Aziziya between 7 and 15 April 2015, reportedly by the Jaysh al-Qaba'el and other armed groups affiliated with Operation Dignity. The four men were then transferred to Zintan.

---

[10] UNSMIL/OHCHR documented other deaths while being held by groups affiliated to the Abu Salim armed group in the UNSMIL/OHCHR 2013 joint report on entitled "Torture and Deaths in Detention in Libya" : http://unsmil.unmissions.org/Portals/unsmil/Documents/Torture%20Report%20Libya%20En%2001Oct2013.pdf

One of the men was reportedly shot upon capture and has received treatment at the Zintan Hospital. They were all released about a week later.

### 6.4.2.  Eastern Libya

In eastern Libya, in addition to capturing fighters, forces loyal to Operation Dignity abducted civilians suspected of sympathizing with the BRSC or on account of their origin or their relatives' perceived involvement in fighting. Detainees were held in a number of facilities under the nominal oversight of the Ministry of Justice, the Ministry of Interior, or the Ministry of Defense, and at unofficial makeshift facilities, including farms, military bases and a hotel in Benghazi. Detention facilities frequently used to hold 2014-2015 conflict-related or political detainees include the Department of Criminal Investigations in Benghazi and Marj, the Birsis detention facility, the 21st al-Sai'qa Brigade (Special forces) facility, the Rajma facility, Kuweifiya Prison (judicial police and military wing) and Gernada Prison (judicial police and military wing).

UNSMIL documented a number of deaths in custody at the Criminal Investigations Department in Benghazi, including 29-year-old Rami Rajab al-Fitouri. He was abducted from his Benghazi home on 11 March and was believed to have been taken to the Department of Criminal Investigations in Benghazi. His family collected his bruised body on 22 March. On 30 June, another man died apparently as a result of torture at the Criminal Investigations Department of Benghazi. He was suspected of involvement in assassinations of supporters of Operation Dignity.

The Birsis detention facility, under the Department of Combating Terrorism of the Ministry of Interior, gained notoriety during the reporting period due to frequent reports of arbitrary and incommunicado detention for prolonged periods of time, torture and other ill-treatment and "confessions" filmed under duress. A number of abducted individuals appeared in televised "confessions" aired on Libya Awalan channel "admitting" to engaging in fighting and murder. Bruises and swellings were visible on those filmed. Among those appearing in such televised "confessions" and detained to date is a man abducted on 6 October 2014 along with nine others. All others have been released. His family suspected that he was singled out because the armed group found a text message on his phone insulting a prominent commander while searching the men. He was reportedly tortured and "confessed" to killing 49 people in separate incidents. All remaining detainees were transferred out of the Birsis detention facility in mid-June to Kuweifiya prison, amid concerns that their "confessions" will be used as evidence to convict them and that they continue to be denied access to lawyers. Even though civilians, they have been referred to the military prosecution. Even though the Deputy Minister of Justice for human rights announced in June that Birsis facility was closed, there are reports that the Department of Combating Terrorism is operating another facility in Boudezira in Kuweifiya, under the same leadership, amidst concerns of the repetition of abuses similar to those documented in Birsis. On

28 October, reports emerged that a number of detainees were taken out of the Kuweifiya prison and transferred to the Department of Combatting Terrorism.

Among former detainees who alleged to have been tortured or otherwise ill-treated is a man in his thirties who spent seven months in detention in various facilities in eastern Libya including Gernada Prison, the Department of Criminal Investigations in Marj, the headquarters of the former Internal Security Agency in Marj, the Rajma facility and a makeshift facility near Benina airport. He told UNSMIL he was tortured and otherwise ill-treated in all facilities. He described being suspended in stress positions, beaten with rods, burned with cigarettes, deprived of sleep, placed in solitary confinement for prolonged periods of time, and denied regular access to sanitary facilities. He also reported witnessing another man being shot dead upon capture.

Two brothers died after being abducted from their home in Benghazi on 28 April 2015, reportedly by the al-Sai'qa 21st Brigade, which is an armed brigade within the Operation Dignity coalition. On 7 May 2015, their bodies bearing visible marks of torture were collected from the BMC.

Relatives of a 31-year-old man of Misratan origin believed to be detained by forces loyal to Operation Dignity since 18 November 2014 on suspicion for involvement in "terrorism" have not received any calls from him for months. They are concerned about his health as he reportedly suffers from mental impairments. His relatives heard from unofficial sources that in the course of his detention, he was moved between different facilities, including Rajma and Deryana. In May 2015, UNSMIL wrote to the Ministry of Justice enquiring about the man's whereabouts, but had received no response at the time of writing.

Among those still missing by the end of the reporting period was the public prosecutor from the South Court of Benghazi, Abdel Nasser al-Jarushi. UNSMIL received reports that the Shuhada al-Zawiya armed group seized him from a street in central Benghazi on 20 October 2014. In April, the Ministry of Justice informed UNSMIL that he was held in Marj at an unofficial detention facility.

Armed groups affiliated to the BRSC were also involved in abductions of civilians on the basis of their actual or perceived political or religious affiliations and family connections. The fate and whereabouts of those held by the BRSC, including over 130 detainees held in relation to the 2011 conflict taken from the Buhdeima military prison in October 2014, remained unknown with serious concerns for their lives and safety. Others abducted by groups affiliated to the BRSC include a university student who was seized from his family farm along with a Sudanese migrant worker in October 2014, seemingly because he and his family were considered opponents of the BRSC. The migrant worker was released about a week later. The fate of the student remains unknown.

The fate of Mahmoud Mohamed Belgacem al-Maghrabi abducted on 24 April 2014 from Venecia Street in Benghazi remains unknown. On 27 April, his brother received a call from individuals who did not identify themselves asking for a ransom. After negotiations of several

21

months, the family agreed to pay a ransom in return for his freedom. In June 2014, Mahmoud's brother handed over the money at a location on the outskirts of Benghazi near Hawari to four men wearing balaclavas, but Mahmoud was not released as promised. Relatives have no confirmed news about his fate and whereabouts, but heard rumours that he may be held by armed groups affiliated to the BRSC.

### 6.4.3.  Derna

Since the expulsion of the Libyan armed group pledging allegiance to ISIL from Derna, the DMSC set up a makeshift detention facility at a school in the neighborhood of Shiha, where an estimated 300 people suspected of involvement with the group were believed to be held as of June.

During their control of the city until June, fighters of a Libyan armed group pledging allegiance to ISIL also abducted individuals they suspected of dissent. An activist who fled Derna in 2014 reported that the group abducted two relatives in late March 2015, due to their purported support of Operation Dignity. The two, including a man in his seventies, were reportedly held for two days, beaten with rifle butts and whipped. Whilst in control of Derna, the group also carried out cruel punishments including amputations. For instance, on 18 April 2015, the hand of a Derna resident in his twenties was publicly amputated in front of the al-Atiq Mosque as reported by Derna residents and medical professionals. He was apparently found guilty of theft by a self-appointed "court" located in the former headquarters of the Derna Local Council.

### 6.5.  Situation of Internally Displaced Persons

Throughout the reporting period, the situation of many IDP families remained precarious, especially those with limited support from host communities who were themselves suffering from the impact of the prolonged conflict and associated disruption of basic services, power, medical care, salary payments, and price increases. Living conditions for many IDP families remained poor and in some instances unsafe. IDP populations also suffered from loss of income and disruption of social networks. Furthermore, many IDPs faced difficulties in securing their rights to education, family life, and freedom of movement, in some cases as a result of having lost essential documents and being unable to obtain new ones due to logistical and security hurdles.

Prior to the escalation of violence in 2014, at least 60,000 Libyans were internally displaced, mainly as a result of the 2011 conflict and its aftermath. They included communities from Tawergha, Mashashiya and Gawalish. Tawerghan internally displaced in particular have since

faced multiple displacements, fleeing insecurity and/or renewed armed clashes including in Tripoli and Benghazi.

As of September 2015, UNHCR estimated that 435,000 people were internally displaced in Libya as a result of protracted fighting since mid-2014 and ongoing insecurity in many parts of the country. Up two 200,000 IDPs remain displaced in and around Benghazi according to estimates from humanitarian organizations. Some have relocated to safer parts of the city; while others have sought shelter further afield. Many Benghazi residents of Misratan origin as well as others accused of supporting the BRSC have fled to Misrata and other parts of western Libya. Their homes, businesses and farms were damaged in the fighting, or in some cases, deliberately destroyed by forces allied to Operation Dignity.

In western Libya, most IDPs from communities displaced during heavy fighting in and around Tripoli, Warshafana and the Nafusa/Western Mountain, between July and November 2014, were unable to return home due to risks of renewed hostilities, destruction of property and the political impasse. For instance, while IDPs returned to some areas of Warshafana, other localities, including Gargouza, al-Maya, al-Tina, Twibia and Ma'mura, remained unsafe for return. Some 5,700 families displaced from Kikla and Qal'a in the 2014 fighting have not been able to return to their lands which remain under the control of rival armed groups from Zintan. Mashashiya communities displaced from al-Awiniya village in earlier displacement waves linked to the 2011 conflict have also been unable to return. When a group of local men turned up to pray at the local mosque in al-Awiniya, on 24 July, to test the possibility of gradual return, they were fired at from armed groups reportedly allied to Zintan and fled.

There have been reports of increasing numbers of residents from Sirte leaving the city since groups pledging allegiance to ISIL consolidated their control of the city of Sirte in October. The groups called for "repentance" by the population particularly addressing those who worked in political and security functions, the judiciary, and the banking sector. The Sirte IDPs also cite a lack of essential services, the closure of banks, the disruption of telephone networks, and insecurity as main reasons for leaving their homes. They have sought shelter in other parts of Libya including Bani Walid, Sabha, Jufra, Marj and Tajura.

Sporadic conflict in southern Libya especially around the towns of Barak al-Shati, Sabha, Kufra and Awbari, involving Arab (Awlad Sliman, Magarha and Zwaya), Tabu and Tuareg armed groups, many allied with either Operation Dignity or Libya Dawn camps, has also led to widespread displacement of civilians. The situation of civilians displaced from Awbari, including to Ghat and al-'Awinat, appears to be particularly dire given difficulties in accessing humanitarian aid and medical treatment in their remote locations. Clashes between Tabu and Tuareg tribes in Sabha, in July 2015, have led to the displacement of an estimated 2,000 Tuaregs sheltering in schools in Sabha. Additional families fled to other areas of Sabha, Gheryan and Tripoli.

Members of particular IDP communities remain vulnerable to abductions and torture on account of their origin, perceived allegiances during the 2011 conflict, and the current political divide.

During the reporting period, UNSMIL documented the abduction of IDP men from Tawergha, Mashashiya, and Warshafana commonly taken on the basis of their origin following identity checks at checkpoints or public roads.

Since May, men from Benghazi were captured from inside their IDP accommodations in Misrata and Tripoli, on suspicion of their support of "terrorists." For instance, on 8 May, a 30-year-old man from Benghazi was taken from a shelter in Tripoli (used by IDPs from the east) along with two other IDPs from Benghazi, apparently by the Rad' armed group. They were then transferred to a makeshift detention facility in Mi'tiga. He recounted being subjected to torture and other ill-treatment including suspension in stress positions, beatings, the use of electric shocks and threats of a sexual nature. He was apparently held on suspicion of involvement in terrorist acts, including the attacks on the Corinthia Hotel. He spent 25 days in solitary confinement without being brought before the judicial authorities.

Building on commitments undertaken by the municipalities of Misrata and Tawergha in January 2015 in the context of UNSMIL-facilitated political talks, UNSMIL held several rounds of discussions between members of the Tawergha and Misrata communities with the aim of reaching an agreement enabling the safe and satisfactory return of Tawerghans to their homes. In May 2015, during an UNSMIL-facilitated meeting, the two parties agreed to establish a joint committee tasked with developing a concrete plan for return. About 40,000 Taweghans were forced to flee Tawergha in August 2011 and have been displaced ever since.

As a result of another reconciliation initiative between local and municipal councils in the Nafusa/Western Mountain, some 270 families - among some 1,400 families forcibly displaced from Gwalish during the 2011 armed conflict - returned to their homes by August, despite the lack of basic services according to community representatives.

### 6.6.   Situation of refugees, asylum-seekers and migrants

According to information collected by UNSMIL during the reporting period, foreign nationals including asylum-seekers and refugees, remained among the most vulnerable groups in Libya, where they were at risk of killings; detention in inhumane conditions; torture; abduction for ransom; physical assaults; armed robberies; and exploitation. UNSMIL has also documented severe abuses by smugglers and traffickers thriving in the context of lawlessness. Women migrants became increasingly vulnerable to sexual violence and sexual exploitation.

Following interception at sea by Libyan vessels, house raids or identity checks, thousands of migrants, asylum-seekers and refugees were arrested and detained for migration-related offences. Some were arrested by armed groups in apparent retaliation for actions of the governments of their country of origin including these governments having arrested Libyan nationals. For instance, over 60 Tunisians were held in Sabratah in apparent retaliation for the arrest of a

member of the Sabratah Municipal Council by the Tunisian authorities on 10 October. They were released on 13 October.

Foreign nationals faced torture and other ill-treatment upon arrest and in detention centres run by the Department of Combatting Irregular Migration (DCIM) under the Ministry of Interior, or directly by armed groups. By mid-October, there were over 3,000 detainees held in 11 centres run by the DCIM alone.

Foreign nationals interviewed by UNSMIL reported beatings and whippings, including with metal rods, cables and sticks; suspension in contorted positions; and racial and other verbal insults. In some centres, women were subjected to strip-searches, including intrusive cavity-searches, by male guards.

Foreign nationals have been held in inhuman detention conditions. Detainees were often crammed in overcrowded cells, without any or regular access to fresh air. Hygienic and sanitation conditions were deplorable with detainees suffering from inadequate access to washing and sanitary facilities. In most facilities, detainees were only allowed out of their cells to use sanitary facilities (usually twice a day). Otherwise, they were confined to their cells, unless they were forced to do some manual work without remuneration, including car washing and repair works.

In centres, such as Kararim, near Misrata, under the control of the Department of Combatting Irregular Migration, detainees had no access to potable water. Shortages of food and other necessities, including those linked to personal hygiene further exacerbated the situation of detainees. As a result of poor detention conditions, skin diseases had reportedly spread at an alarming rate. There were also reports of childbirths inside detention facilities, leading to post-natal complications as well as child deaths during birth or soon after. Detainees faced inadequate or non-existent access to medical care.

Thousands of migrants, asylum seekers and refugees undertook dangerous and frequently deadly journeys across the Mediterranean Sea in unseaworthy boats. From January to June, over 54,000 new arrivals were registered in Italy alone[11]. Over 2,430 people were believed to have perished in the Mediterranean *en route* to Europe from Libya in the course of 2015.[12]

Many migrants, asylum-seekers and refugees became victims of brutal violence, coercion and abuse perpetrated by smugglers along smuggling routes, as well as in so-called "connection houses", where they await departure to Europe. Many reported torture intended to extract more money from their families, in what appeared to be coordinated action from criminal gangs based in countries of origin as well as transit. Others reported regular verbal and physical abuse triggered by requests for food or use of phones, or simply for making "too much noise".

---

[11] See http://www.unhcr.org/557703c06.html
[12] See http://reliefweb.int/report/italy/mediterranean-migrant-arrivals-deaths-sea-soar

A number of migrants and asylum seekers who remained in "connection houses" in Zuwara, for periods lasting up to a month, between March and April 2015, said they were given little food for the apparent purpose of making travellers lose weight. They also complained about regular insults, beatings, and inadequate access to sanitation facilities, in some places limited to one toilet for 100 persons. Some also reported that women were taken away at night and sexually abused. Armed smugglers have forced migrants and asylum-seekers to board overcrowded boats and travel below deck in overheated engine rooms without water or ventilation.

Many migrants working on a casual basis complained of not being paid by their employers or being paid less than the agreed sums. Most Sub-Saharan African asylum-seekers and migrants interviewed by UNSMIL also reported having their money routinely stolen in the street at gun-point or knife-point, generally by individuals in civilian dress. They did not report the incidents to the police fearing arrest and further abuse in the general climate of lawlessness in the country.

A number of foreign nationals also complained of abuses suffered at the hands of police outside the context of detention, including the unnecessary use of force and firearms. According to the testimony of a 24-year-old man from North Darfur, in April 2015, armed men in police uniform fired at 30 foreign nationals at a gathering point for casual workers on the side of the road in Surman. He claimed that police fired immediately, without even asking them to disperse first.

Other foreign nationals had been taken on suspicion of engaging in armed hostilities or supporting "terrorism". They were held without appearing in front of judicial authorities and were allegedly subjected to torture or other ill-treatment. UNSMIL documented cases of foreign nationals suspected of involvement in "terrorism" who reported being tortured in eastern Libya as well as al-Zawiya.

Even diplomatic representatives have not been spared from arbitrary arrest. For instance, a consular representative of an African country in Libya was detained for a day along with his driver in Gernada Prison on 8 April 2015. He was apparently visiting the prison to ascertain the situation of his country's nationals held there. Media sources quoted officials in Prime Minister's al-Thinni's Government claiming that the Consul had made visits to "the eastern part of the country without permission from the Libyan Foreign Ministry." In Tripoli, 10 Tunisian consular representatives were abducted by an armed group on 12 June. They were all released within a week, and left the country.

## 6.7.    Attacks on human rights defenders, humanitarian workers and media professionals

The space for debate and civic action in Libya continued to shrink during the reporting period, with many of the interlocutors of UNSMIL describing the general climate as repressive and intolerant of any criticism of those in *de facto* control of any given region of Libya. Armed groups across the political, tribal and geographic spectrum have targeted human rights defenders,

other civil society activists and media professionals with total impunity, resulting in a severe impact on the enjoyment of the rights to freedom of expression and association and, in some cases, self-censorship reminiscent of the time under the Qadhafi regime. Little remains of the nascent vibrant media and civil society landscape that began to emerge following the 2011 armed conflict.

To highlight the situation, UNSMIL and OHCHR published a report[13] on 25 March 2015 documenting physical and verbal assaults, arbitrary detention, closure of civil society offices and death threats facing human rights defenders in Libya. Many independent human rights defenders have fled the country, have fallen silent or operate underground at great risk to themselves and their families. Violent attacks against human rights defenders have continued since.

The Benghazi offices of the National Council on Civil Liberties and Human Rights (NCCLHR), the national human rights institution of Libya, were raided on 16 March 2015. An employee of the Benghazi branch, who said that the institution's activities in Benghazi had been frozen since October 2014, reported surviving an assassination attempt in January. The NCCLHR headquarters in Tripoli had been closed since November 2014. The institution itself was affected by the political polarization. The House of Representatives did not appoint a new board of the NCCLHR when the term of Council expired at the end of 2014, as per Law 5 of 2011 regulating the NCCLHR. In contrast, in March, the Tripoli-based General National Congress announced the appointment of a new board, although it has not been recognized by a number of actors within the international community.

Humanitarian workers, Mohamed al-Monsef Ali al-Sha'lali and Walid Ramadan Shalhub, remained in captivity, with only limited telephone contact with the outside world since their abduction on 5 June. Seven staff members of Shaikh Taher Azzawy Charity Organization, were abducted, while travelling in a humanitarian convoy to distribute non-food items in southwestern Libya. The organization is based in al-Zawiya, and had been an implementing partner of United Nations humanitarian agencies and other international organizations. The staff members were stopped at gun-point by an armed group believed to belong to the Magarha tribe in the town of al-Sheweirif located some 400 kilometres south of Tripoli. They were taken to a local farm where they were apparently beaten and otherwise ill-treated by armed men. Five staff members were subsequently released and two remain detained, apparently for the purpose of exchanging them for a Magarha former military officer who had served the Qadhafi regime and who had been held in al-Zawiya since 2014. UNSMIL has been calling for their immediate and unconditional release.[14]

---

[13] See OHCHR and UNSMIL, *Human Rights Defenders under Attack*, 25 March 2015 available at:
http://www.ohchr.org/Documents/Countries/LY/HumanRightsDefendersLibya.pdf
14 See
http://unsmil.unmissions.org/Default.aspx?tabid=3561&ctl=Details&mid=8549&ItemID=2096468&language=en
-US

During the reporting period, journalists and other media professionals across Libya were also subjected to attacks, including abductions, torture and other ill-treatment, threats and intimidation against them or their families. UNSMIL has received reports of female journalists being subjected to sexual harassment and threats. Several journalists and media professionals have fled the country. Some have continued to receive threats on social media or via text messages even when abroad.

On 23 April 2015, a 33-year-old media professional and owner of a television production company in Benghazi, was shot and killed in his office by armed men, suspected of affiliation with the BRSC. UNSMIL has received reports suggesting that that he was assassinated due to his work preparing reports about clashes in Benghazi which were used by several satellite television channels.

On 29 April, the Deputy Minister of Justice told UNSMIL that five detained individuals "confessed" to the killing of seven journalists in two separate incidents. The victims were named as Barqua TV crew members Khaled al-Humeil, Younis al-Sal, Abdul Salam al-Kahla, Yousef al-Gamoudi, and Mohamed Jalal (an Egyptian national), who had been missing since August 2014, and two Tunisian journalists Soufiane Chourabi and Nadhir El-Ktari, missing since September 2014. No evidence of the killings was provided as Prime Minister al-Thinni's government claimed initially that the bodies were buried in an area under the control of extremist armed groups from Derna.

Media professionals continued to report receiving death threats either in person, via text message or on their social media pages, while in Libya or after having fled abroad. For instance, a media professional from Tripoli was approached by a group of masked armed men in uniform in front of his home on 25 April 2015. One held a gun to his neck warning "you will be killed, if you don't stop covering clashes in Tripoli". He told UNSMIL that he had been threatened numerous times since August 2014 by armed groups supporting Libyan Dawn.

During the reporting period, UNSMIL documented the abduction and continued detention of a number of media professionals. In some cases, it was difficult to ascertain whether the motive behind the abduction was linked to the individuals' media work or to their tribal or political affiliations. Nonetheless, attacks against media professionals, regardless of the motive have had a crippling effect on freedom of the media and more broadly freedom of expression. Among cases documented by UNSMIL was the detention of a former correspondent with a Libya TV station abducted along with two relatives from 16 February 2015 to 5 March. They were held at the Birsis detention facility until 5 March, where they were reportedly subjected to torture, on suspicion of supporting the BRSC.

Women media professionals faced additional risks of sexual harassment and threats of a sexual nature; as well as criticism for their appearances. A television programme presenter had received threatening messages on her social media pages warning her to stop working for the channel, which is known for its support of Operation Dignity, and to stop appearing unveiled. On 10 February 2015, the photos of 21 women including journalists, activists and political figures were

circulated on social media pages, apparently by the "Revolutionaries' Operation Room" of Libya Dawn. They included inflammatory captions which implied that they were united in their support for Operation Dignity and that they had "un-Islamic" attire. Several of the women featured reported receiving persistent threats, and a number have since left Libya.

### 7.   Administration of justice

During the reporting period, the justice system continued to be severely hampered due to ongoing fighting and insecurity. Courts have not been functioning in Sirte, Derna and Benghazi since 2014. Although on 14 June 2015, judges and prosecutors at the Court of South Benghazi decided to reactivate the work of the Court, it is unclear whether their work had actually resumed. The Court had initially suspended its activities in February 2014, after a bomb attack put the building out of use. The Court of North Benghazi, the other court in the city, remained closed, due to fighting near the building.

Judges, prosecutors, and law enforcement officials have continued to face violent attacks and threats. The Libyan Judges Association reported the abduction of a judge at the al-Khoms Appeal Court, on 24 July, from a checkpoint near Harawa, a city under the control of a Libyan armed group pledging allegiance to ISIL. On 5 August, his body bearing gunshot wounds was brought to the morgue in Misrata. Among those still missing is a public prosecutor from the South Court of Benghazi Abdel Nasser al-Jarushi.[15] A military prosecutor also remains detained apparently without charge by the General Intelligence in the eastern city of Marj allied to Operation Dignity, after being taken into custody on 25 October and spending some four days held by armed groups in Tukra.

On 22 July, in an incident illustrating the breakdown of law and order in Libya, two officials from the Department of Combatting Irregular Migration in police uniform were stopped at a checkpoint by an armed group from Warshafana and taken to its base in al-Maya. One of the abducted men, Director of the Surman detention facility Colonel Ibrahim Almakhzomy, reported beatings including with rifle butts and insults. He claimed that the assailants expressed their opposition to the presence of police in their area and sought to exchange them for Warshafana detainees. Their car and other personal property were confiscated. They were freed the next day.

The judiciary has also been affected by the political polarization and struggle for control of government institutions. On 20 May, the General National Congress issued decision no. 50-2015 appointing Judge Mohamed Al-Gamudi Al-Hafi as President of the Supreme Court, after the incumbent president decided to retire.

---

[15] See section on *Abduction, detention, torture* for further information

Due to the collapse of the criminal justice system in parts of the country, victims have little avenue to seek protection and remedy amidst total impunity. Even in those rare cases where police reports had been filed, little action was taken to open prompt, thorough, effective, impartial, and independent investigations and to bring perpetrators to justice. To the best knowledge of UNSMIL, no perpetrator belonging to an armed group has been convicted since 2011.

On 28 July, the Tripoli Court of Assize issued its verdict in the trial against 37 senior Qadhafi regime officials on charges linked to crimes committed during the 2011 conflict. Saif al-Islam Qadhafi, former intelligence chief Abdullah al-Senussi[16], the last prime minister of the Qadhafi regime, al-Baghdadi al-Mahmudi and six other defendants were sentenced to death by firing squad. Eight others received sentences of life imprisonment. The remainder of those convicted were sentenced to between five and 12 year prison terms. UNSMIL has expressed serious concerns that proceedings fell short of international fair trial standards. The right to adequate defense was not upheld; complaints of torture by a number of defendants were not investigated; and prosecution relied solely on the case file as evidence, without presenting witnesses or documents in open court[17].

Following the verdict, protests and other unrest broke out in a number of Libyan cities from where the defendants hailed or had tribal links. In Sirte, at least three protesters were injured when fighters from the Libyan armed group pledging allegiance to ISIL broke-up a demonstration against the verdict in the Abou Hadi neighbourhood, using live ammunition. The protesters were apparently also armed.

On 28 July, Libyan media reported that the House of Representatives had passed a general Amnesty Law, without consultation with relevant stakeholders or the public, granting immunity from prosecution for crimes, committed since the adoption on a similar amnesty law in 2012. Certain categories of crimes, including rape and sexual assault, homicide based on identity, abduction, torture, corruption and *hudud crimes*[18] are excluded. Nonetheless, UNSMIL is concerned that the law may lead to further entrenchment of impunity, as not all crimes under international law are excluded from the amnesty. [19]

---

[16] In 2011, the International Criminal Court issued arrest warrants and requested the transfer of Abdullah al-Senussi and Saif al-Islam Qadhafi to The Hague. The Libyan authorities challenged the admissibility of the cases. On 21 May 2014, the Appeals Chamber confirmed that the case of Mr. Qadhafi was admissible before the Court. In contrast, in July 2014, the Appeals Chamber decided that Abdullah al-Senussi's case was inadmissible before the Court. On 10 December 2014, the Pre-Trial Chamber found that Libya had failed to surrender Mr. Qadhafi to the Court, and referred the matter to the United Nations Security Council.

[17] See UNSMIL, *Concerns about Verdict in Trial of Qadhafi-era Officials*, 28 July available at
https://unsmil.unmissions.org/Default.aspx?ctl=Details&tabid=3543&mid=6187&ItemID=2099165
[18] Under Islamic law, *hudud* crimes include theft, robbery, adultery, fornication and *hiraba,* which is a criminal conduct consisting in terrorizing civilians. As per *sharia law,* the sentences foreseen are either the death penalty or corporal punishments, which would be in violation of international human rights standards.

[19] Under United Nations policy, based on international law, amnesties are not permitted if : 1) they prevent the prosecution of individuals criminally responsible for the commission of war crimes, crimes against humanity, genocide and gross violations of

Thousands of 2011 conflict-related detainees remained behind bars. The vast majority were not brought to court and had no opportunity to challenge the legality of their detention since 2011. To the best knowledge of UNSMIL, none of the 2014-2015 conflict-related detainees in the west have appeared in front of prosecutions or courts. In the east, a small number have reportedly been questioned by military prosecutors, with concerns over delays, the use of "confessions" extracted under torture prior to their referral to the prosecution, and limited access to lawyers of their choice.

During the reporting period, Libyan prisons under the oversight of the Judicial Police of the Ministry of Justice suffered from the lack of trained personnel to address the needs of inmates with chronic or contagious diseases, poor information management particularly of medical data, and severe shortages of medical supplies particularly medicine and supplies for infectious diseases (HIV, hepatitis, and tuberculosis). The problem was aggravated by the decision of the Tripoli-based Ministry of Justice to reduce the number of contracted medical staff members seconded from the Ministry of Health to work in prisons, due to budgetary constraints. Available resources required to maintain an adequate level of personal and general hygiene varied between facilities, and in some prisons were not distributed in a systematic manner.

### 8.      Conclusion and recommendations

The overall situation in Libya remains highly volatile due to continued fighting across different parts of the country. All parties to the conflict appear to be committing violations of international humanitarian law including those that may amount to war crimes such as violence to life and person, including murder and torture of civilians and those *hors de combat*; outrages upon personal dignity and the taking of hostages; and destroying or seizing property of an adversary. They have also committed acts that may amount to collective punishment directed against groups based on their identity or actual or perceived political affiliation. All parties have carried out military operations that appeared to violate the principles of distinction and proportionality, and the obligation to take precautions to protect civilians and civilian objects from the effects of hostilities and violence. All parties also appear to be committing gross violations or abuses of international human rights law including torture, enforced disappearance, and unlawful killings.

---

human rights including extrajudicial, summary or arbitrary executions, torture and enforced disappearances; 2) they interfere with victims' rights to an effective remedy including reparations; 3) if they obstruct the victims' and society's right to truth. See publication entitled "Rule-of-law tools for post-conflict states, amnesties", for more information at http://www.ohchr.org/Documents/Publications/Amnesties_en.pdf

UNSMIL/OHCHR urge all those with effective control on the ground to:

- Cease all armed hostilities, and support the UNSMIL-facilitated political talks aimed at reaching an agreement on a framework for a transition towards a State based on democracy, respect for human rights and the rule of law.

- Immediately cease and give orders to cease all violations of international law, in particular all acts that may amount to war crimes, including murder; mutilation; torture and other ill-treatment; indiscriminate and disproportionate attacks; arbitrary deprivation of liberty; enforced disappearances; abductions; hostage-taking; collective punishment; and destruction of property. Immediately cease all violations and abuses of international human rights law including torture and other ill treatment, and extrajudicial killings.

- Promptly, thoroughly, and effectively investigate and take all measures within their power to ensure that all those responsible for violations of international human rights and humanitarian law, and abuses of human rights, are held accountable, in accordance with international law and standards, regardless of political or other affiliation.

- In the conduct of hostilities, respect the principles of distinction, proportionality and precautions in attack. Ensure that commanders take all possible measures to avoid and at the very least minimize loss of civilian lives and prevent civilian injuries and damage to civilian objects.

- Prohibit attacks against, respect, and protect civilian hospitals, medical units and medical personnel. Protection shall not cease unless they are used to commit hostile acts, outside their humanitarian function. Protection may, however, cease only after a warning has been given, setting, whenever appropriate, a reasonable time-limit, and after such warning has remained unheeded.

- Declare publicly that acts amounting to violations and abuses of international human rights law and international humanitarian law will not be tolerated. All armed groups must remove from active duty those among their members suspected of having committed such acts.

- Immediately release all those detained illegally and arbitrarily such as those detained without referral to judicial authorities as per Libyan legislation and international human rights law, and those who have served their sentences; or hand them over to an independent and impartial justice system to face criminal charges in proceedings which meet international fair trial standards. Immediately and unconditionally release all hostages and others detained solely on account of their family links, opinions, political affiliation, tribal origin or for purposes of prisoner exchanges.

- Pending release or transfer to the justice system, ensure that all those detained are treated humanely and strictly enforce the absolute prohibition of torture and effectively protect detainees from other ill-treatment. Families should be immediately informed of the fate and whereabouts of those detained and allowed to visit them.

- Take action to stop attacks on human rights defenders, humanitarian workers and journalists, and undertake urgent measures to protect them. All parties should unequivocally publicly condemn such attacks.

- Take action to stop the torture or other ill-treatment of those deprived of their liberty, including migrants, asylum-seekers and refugees; find alternatives to detention for those vulnerable groups and those in need of international protection; and facilitate release and voluntary repatriation of detained migrants.

- Promote and support local efforts, such as those initiated by communities from Misrata and Tawergha, to engage in discussions on mechanisms to enable the voluntary, safe and dignified return of all IDPs to their homes. In the meantime ensure safe and free humanitarian access to IDPs, and protect IDP shelters from attack.