IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

MUNA AL-SUYID, et al.,            :
                                  :
        Plaintiffs,               :
                                  :
v.                                :        Civil Action No.:  1:20-cv-170
                                  :
KHALIFA HIFTER,                   :
                                  :
        Defendant.                :
_____ :

## NON-CONFIDENTIAL MEMORANDUM IN SUPPORT OF MOTION TO SEAL PORTIONS OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Khalifa Hifter ("Defendant"), by counsel, pursuant to Local Rule of Court 5(C) of the Local Civil Rules for the United States District Court for the Eastern District of Virginia, respectfully requests an Order sealing Exhibit A, Exhibit B, Exhibit D and Exhibit E to Defendant's Memorandum of Law in Support of his Motion for Summary Judgment, and any references therein.

**I.    Items to be Sealed and Necessity for Sealing**

1.      Defendant seeks to seal Exhibit A, Exhibit B, Exhibit D and Exhibit E to Defendant's Memorandum of Law in Support of his Motion for Summary Judgment.

2.      Exhibit A is Defendant's deposition transcript dated November 6, 2022, which was previously sealed on May 3, 2023, by United States Magistrate Judge John F. Anderson.

3.      Exhibit B is Plaintiff Abdalla Al-Krshiny's deposition transcript dated November 4, 2021, marked "Confidential."

4.      Exhibit D is the Appointment of Khalifa Hifter as Field Marshal by the Libyan House of Representatives.

5.      Exhibit E is Defendant's deposition transcript dated June 26, 2023.

6.      The deposition transcript excerpts include sensitive and confidential information. In Exhibit A and E, Defendant was questioned about and testified regarding information involving military records, information relating to an ongoing conflict in Libya, his role as a military official of the Libyan Arab Armed Forces, and individuals who are not a party of this case.  In addition, Exhibit D is confidential legislative records in Libya.

7.      This case has been of high political interest both in the United States and in Libya. During and after the Defendant's testimony, news outlets in the United States and Libya have extensively covered this matter.

8.      On May 6, 2022, this Court issued a Protective Order due to the sensitive and confidential nature of this case.  The Protective Order specifically states deposition transcripts are "confidential material" and that "[b]efore any Confidential Material may be disclosed to any person in Paragraph 3(b)(v), each person must state under oath in a written document in the form of Exhibit 'A.'"  Protective Order, *al-Suyid* ECF No. 198, at p. 5.

9.      On October 7, 2022, the U.S. District Judge stated that she "expect[s] that deposition transcript [of Hifter] to be under seal.  It's not to be discussed."  Tr., Oct. 7, 2022, a*l-Suyid* ECF No. 234 at 9:17-19.

10.     The Defendant proposes that the excerpts of the deposition transcripts remain permanently sealed.

## II.      References to Governing Case Law

11.     The Court has the inherent power to seal materials submitted to it.  *See United States v. Wuagneux*, 683 F.2d 1343, 1351 (11th Cir. 1982); *State of Arizona v. Maypenny*, 672 F.2d 761, 765 (9th Cir. 1982); *Times Mirror Company v. United States*, 873 F.2d 1210 (9th Cir. 1989);

2

*See also Shea v. Gabriel*, 520 F.2d 879 (1st Cir. 1975); *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980); *In re Braughton*, 520 F.2d 765, 766 (9th Cir. 1975). "The trial court has supervisory power over its own records and may, in its discretion, seal documents if the public's right of access is outweighed by competing interests." *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984). Parties seeking to file a pleading under seal, "must provide a compelling reason for doing so and demonstrate that the request to seal [the document] is narrowly tailored to serve that reason." *See HD Media Co., LLC v. United States DOJ (In re Nat'l Opiate Litig.)*, 927 F.3d 919, 939 (6th Cir. 2019)(quoting *Shane Grp.*, 825 F.3d at 305).

12.     Here, there are compelling reasons for the excerpts of the deposition testimony to be permanently sealed in its entirety. Defendant's deposition transcript contains sensitive and confidential information that if disclosed to the public could be prejudicial to not only the defendant, but to the other parties and nonparties alike. Public disclosure of the Defendant's deposition transcripts could significantly impact the Defendant's rights to a fair trial. The disclosure of the Defendant's deposition transcripts could also cause an unnecessary risk to Defendant's safety and the safety of individuals not a party to these cases given the ongoing propaganda and misinformation.

13.     At the hearing on October 7, 2022, Judge Brinkema directed that if the deposition transcript were to be filed with the Court that it "be under seal." Tr., Oct. 7, 2022, *al-Suyid* ECF No. 234 at 9:17-19.

14.     Furthermore, the Court should adhere to its Protective Order previously issued in these cases. The Plaintiffs, the Defendant, and this Court, have determined that there are significant materials and information that should be designated as "confidential." This deposition was specifically deemed "confidential material," without objections from all parties.

### III.   Period of Time the Defendant Seeks to Have the Deposition Transcript Under Seal

15.    The Defendant proposes that the documents remain permanently sealed.

WHEREFORE, the Defendant respectfully requests that an order be entered allowing excerpts of his deposition transcript in Exhibit A, Exhibit B, Exhibit D and Exhibit E to Defendant's Memorandum of Law in Support of his Motion for Summary Judgment, ad any references therein be placed under seal.

Dated:   November 4, 2025                        Respectfully submitted,

KHALIFA HIFTER

By Counsel

_/s/ Robert H. Cox_
Robert H. Cox (VSB No.: 33118)
Whiteford, Taylor & Preston L.L.P.
3190 Fairview Park Drive, Suite 800
Falls Church, Virgini 22042
Telephone: (703) 573-1037
Facsimile: (703) 280-8941
Email: rcox@whitefordlaw.com

## **CERTIFICATE OF SERVICE**

I certify that on November 4, 2025, a copy of the foregoing was filed with the Clerk of the

Court using the Court's CM/ECF system, which will send a copy to all counsel of record.


_/s/ Robert H. Cox_
Robert H. Cox (VSB No.: 33118)

*4914-2499-7751 v.1*

# **<u>EXHIBIT A</u>** – Nov. 6, 2022, Deposition Transcript filed under seal pursuant to Protective Order entered May 6, 2022

# **EXHIBIT B** – Filed under seal pursuant to Protective Order entered May 6, 2022

# EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

Civil Action No. 1:20-cv-00170(LMB/JFA)


MUNA AL-SUYID,

          Plaintiff,

     -vs-

KHALIFA HIFTER,

     Defendant.

_____/



Deposition of ABDALLA AL-KRSHINY

Wednesday, November 3, 2021 - 2:16 p.m.







Reported by:

Erica Field, FPR

Job No.: 3543

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 27

                    A. AL-KRISHNY

1

2      event of that year as described, beginning

3      May of that year, because of the announcement

4      of Hifter's exit, the security situation in

5      Benghazi was very chaotic.  Different kinds

6      of arms were spreading heavily in the

7      streets.  We as shop owners and business

8      owners were trying to protect our properties

9      and our money and our families.

10             So at that point, everybody was

11     trying to secure some -- their hands on any

12     kind of weapon, and we honestly had those two

13     rifles.  We did have them to protect our

14     families.  We never used them outside the

15     house.  We never carried them before, but we

16     felt the pressure and the need to have them

17     and to obtain them for our own protection.

18     BY MS. MCKASSON:

19         Q.    Did you use those rifles on

20     October 17, 2014?

21         A.    We used them, but I didn't know

22     how to use them properly, and maybe we did

23     use them to shoot one or two bullets, and

24     that gave the impression to the other side

25     that we were heavily armed or were using

# **EXHIBIT D** – Filed under seal pursuant to Protective Order entered May 6, 2022

# **EXHIBIT E** – June 26, 2023, Deposition Transcript filed under seal pursuant to Protective Order entered May 6, 2022

# EXHIBIT F



# EXHIBIT G

Plaintiffs further respond that at Gaddafi's death, there were between 20 and 25 million pieces of weapons in Libya. Under the circumstances in Libya, each Libyan could have owned at least three pieces of weapons. As a result of the 2011 Revolution, the state security system collapsed since its only mission was to serve Muammer Gaddafi's interest. Police force was lacking. Many Libyans were obligated to and did obtain arms to defend themselves and their properties. The plaintiffs' families were not an exception to the rest of Libyan families. They owned weapons to defend their lives and properties.

**Interrogatory No. 12:**

Identify and describe in detail how and to what extent members of the al-Krshiny family were involved in the gunfight at the al-Krshiny family home, state with particularity the basis for Plaintiffs' contention, who was involved, what their involvement was, and what happened.

**Response to Interrogatory No. 12:**

Subject to and without waiving any objections, under which documents may be withheld in whole or in part, Plaintiffs provide the following additional information:

During the October 17, 2014 attacks, the al-Krshiny family acted in self-defense. They were forced to defend themselves and their property. After coming under attack, members of the al-Krshiny family returned fire by using rifles. Al-Krshinys owned rifles for self-defense and the protection of their businesses and properties. Plaintiffs further refer to their supplemental response to Interrogatory 8 regarding Plaintiffs' ownership of weapons.

Dated: July 28, 2021

<div style="margin-left:50%">

Respectfully Submitted,
**WIGGIN AND DANA LLP**

*/s/ Kevin T. Carroll*
Kevin T. Carroll (VSB#95292)
Joseph G. Grasso (*pro hac vice*)

</div>

# EXHIBIT H

United
Nations

EN ∨

☰  **Meetings Coverage and Press Releases**

Meetings Coverage
Security Council

**7644TH MEETING (AM)**

**SC/12282**
**15 March 2016**

# Adopting Resolution 2273 (2016), Security Council Extends Mandate of United Nations Support Mission in Libya until 15 June

The Security Council today decided to extend until 15 June 2016 the mandate of the United Nations Support Mission in Libya (UNSMIL), under the leadership of the Special Representative of the Secretary-General, and in full accordance with the principles of national ownership.

Unanimously adopting resolution 2273 (2016), the 15-member Council recognized the need for UNSMIL to re-establish its presence in Libya and make the necessary security arrangements to that effect.

Also by the text, the Council requested that the Secretary-General report within 60 days following consultations with the national authorities on recommendations for UNSMIL's support to the subsequent phases of Libya's transition process, and for the Mission's own security arrangements.

The meeting began at 10:04 a.m. and ended at 10:08 a.m.

Resolution

The full text of resolution 2273 (2016) reads as follows:

"*The Security Council*,

"*Recalling* its resolution 1970 (2011) and all its subsequent resolutions on Libya,

"*Reaffirming* its strong commitment to the sovereignty, independence, territorial integrity and national unity of Libya,

"Taking note of the report of the Secretary-General on the United Nations Support Mission in Libya (UNSMIL) (S/2016/182),

"*Expressing* its support for the ongoing efforts of UNSMIL and the Special Representative of the Secretary-General to facilitate a Libyan-led political solution to the challenges facing Libya,

"*Recalling* resolution 2259 (2015) which endorses the Rome Communiqué of 13 December 2015 to support the Government of National Accord as the sole legitimate Government of Libya, that should be based in the capital Tripoli,

"*Reiterating* its support for the full implementation of the Libyan Political Agreement of Skhirat, Morocco signed on 17 December 2015 to form a Government of National Accord consisting of the Presidency Council and Cabinet supported by the other institutions of State including the House of Representatives and State Council, and *welcoming* the endorsement in principle of the Libyan Political Agreement by the House of Representatives on 25 January 2016,

"*Recognizing* the importance of continued inclusiveness and *strongly encouraging* all parties in Libya to be part of and engage constructively in good faith with the Agreement,

"*Encouraging* the Government of National Accord to finalize interim security arrangements for stabilizing Libya as a critical step towards tackling Libya's political, security, humanitarian, economic and institutional challenges and to combat the rising threat of terrorism,

"*Reiterating* its request that all Member States fully support the efforts of the Special Representative of the Secretary-General and work with the Libyan authorities and UNSMIL to develop a coordinated package of support to build the capacity of the Government of National Accord, in line with Libyan priorities and in response to requests for assistance, and *further reiterating* its call upon all parties to cooperate fully with the activities of UNSMIL, including taking necessary steps to ensure the security and unhindered movement for the UN and associated personnel,

"*Recognizing* in the current circumstances, the need for a short extension of the mandate of UNSMIL, to enable the Mission to continue to assist the Presidency Council in further work in establishing the Government of National Accord, that should be based in the capital Tripoli, and implementing the Libyan Political Agreement,

"*Recalling* its determination in resolution 2213 (2015) that the situation in Libya continues to constitute a threat to international peace and security,

1.  *Decides* to extend until 15 June 2016 the mandate of UNSMIL, as set out in paragraph 12 of resolution 2238 (2015), under the leadership of the Special Representative of the Secretary-General, in full accordance with the principles of national ownership, and *recognizes* the need for UNSMIL to re-establish its presence in Libya, and the need to make the necessary security arrangements to this effect;

"2.  *Requests* the Secretary-General to report within 60 days following consultations with the Libyan authorities on recommendations for UNSMIL's support to the subsequent phases of the Libyan transition process and UNSMIL's security arrangements;

"3.  *Decides* to remain actively seized of the matter."

！ **For information media. Not an official record.**

# EXHIBIT I

## DECLARATION OF FATHI YOUNIS TOOMI

I, Fathi Younis Toomi, affirm and declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. The statements set out below are based on my personal knowledge and experience.

2. I am a citizen of Libya and have resided and worked in Tripoli, Libya for most of my life, although I currently reside and work in Benghazi, Libya.

3. I received a bachelor's degree in law at Naser University in Tripoli, Libya in 1992.

4. I received a diploma in accounting from the National Institute of Administrative and Financial Sciences in Tripoli in 2001.

5. I currently serve as a Legal Adviser to the Prime Minister of the Libyan Government in Benghazi, Libya as well as a Legal Adviser to the Minister of Planning and Finance of the Libyan Government in Benghazi, Libya.

6. From 1992 to the present, I have served in several legal positions within the Libyan Government, including as a litigator in the Department of State Litigation (roughly equivalent to the U.S. Office of the Solicitor General) from 1993 to 1997. A true and correct copy of my resume is attached to my declaration.

7. Despite some disruptions in judicial operations, the Courts in Libya have been operating as normal for much of the time between 2014- and the present date.

8. Courts in Benghazi were operating during (1) all of 2018, (2) all of 2019 except from April to June, (3) all of 2020 except from April to June, (4) all of 2021 except from April to June, (4) all of 2022, (5) all of 2023, and (6) all of 2024 to date.

1

9. Courts in Tripoli were operating during (1) January to May and November to December in 2014, (2) all of 2015, (3) all of 2016, (4) all of 2017, (5) all of 2018, (6) all of 2019 except from January to March, (7) all of 2021 except from September to December, (8) all of 2022, (9) all of 2023, and (10) all of 2024 to date.

10. I have attached to my declaration a chart that accurately summarizes the availability of judicial proceedings in Libya during the time period from 2014 to date.

11. The Libyan legal system is civil in nature rather than common law based. The codified laws prior to 1969 in Libya are modelled closely on those of Egypt and, consequently, the Napoleonic Codes of France in addition to the principles of the Islamic Shari'a ("Shari'a").

12. Since the overthrow of the Gaddafi regime in 2011, the primary source of law in Libya has been the Constitutional Declaration of the National Transitional Council (the "Constitutional Declaration"), which states that the foundation for all law in Libya is the Shari'a. The Constitutional Declaration is intended to be a transitional document; the permanent constitution is currently still in the drafting phase.

13. As a general rule, the sources of law in Libya for civil matters follow the following hierarchy:

    a. legislation;

    b. principles of Shari'a Law;

    c. prevailing custom; and

    d. principles of natural law and principles of justice.

14. The Libyan courts are divided into civil courts, criminal courts, and administrative courts. All matters are heard before judges; there are no jury trials in Libya.

2

15. Civil proceedings in Libya are initiated in the civil Court of First Instance or the Partial Court. Decisions of the Partial Court are automatically appealable to the Court of First Instance, and decisions of the Court of First Instance are automatically appealable to the Court of Appeal. Appeals can be based on both the facts and the law of a case. An appeal involves a rehearing of the matter and new evidence may be adduced.  Any judgment of the Court of Appeal is subject to a further appeal to the Supreme Court; however, such an appeal is only heard on matters of law and with the permission of the Supreme Court.

16. The judicial system in Libya is inquisitorial in nature and judges have wide powers to investigate and establish the facts and then apply the law to these facts. Judges may be assisted by court appointed experts whenever a court needs to consider technical matters such as accountancy, banking, engineering, etc. Cases before the lower bench of the Court of First Instance are generally determined before a single judge, whereas matters before the Court of Appeal will be heard by a panel of three judges.

17. Article 166 of the Civil Code, which governs civil liability, states that: "Every fault which causes injury to another imposes an obligation to make reparation upon the person by whom it is committed." The elements required under Article 166 to establish liability and obtain reparations are fault, causation, and injury.

18. Under Libyan law, damages are awarded to compensate for an injury.  The damages awarded must be commensurate with the losses suffered (i.e. damages cannot exceed the amount of loss). Under Article 224 of the Civil Code, the judge will fix the amount of damages if not otherwise fixed by contract or by law. Damages will include profits lost by the claimant, to the extent that such lost profits are a normal result of the injury.

19. In Civil Appeal No. 835/55, 02/12/2010 [unpublished], the claimant filed a claim against the Libyan State security apparatus alleging that he was arrested and imprisoned (effectively by extrajudicial abduction and detention) without a warrant from the public prosecution or the judiciary. The Supreme Court found that the alleged acts were unlawful. It held that law enforcement duties must be conducted in accordance with the regulations and procedures set out by the law, otherwise the conduct is invalid, and the perpetrator will be liable. The Supreme Court found that the officers violated the procedures of arrest and detention and therefore were liable.  The Supreme Court further ruled that the independence of a government body does not equate to unfettered authority; rather, the government body is subject to the authority and supervision of the State.

20. In Civil Appeal No. 195/56, 26/05/2011 [unpublished], the claimants brought claims for compensation for the years they spent in prison and the torture and abuse they suffered during that time. The Supreme Court held that this was a violation of the human right to freedom and dignity rendering the treatment of the claimants in prison a criminal offence. The Supreme Court stated that compensation arising from this conduct would be decided pursuant to the rules governing liability arising out of harmful acts, a determination within the jurisdiction of the Court of First Instance.

21. In Civil Appeal No. 217/56, 14/01/2013, the Supreme Court stated that damages include moral damages which compensate damage to the person's dignity, emotions, or status.

22. In Paragraph 9 of the *Hamza* Complaint, Plaintiffs allege that they are "unable to exhaust any remedies in Libya because there is no functioning or effective justice system to

4

adjudicate their claims." This statement is inaccurate. As of 2022, all Libyan Courts have been functional, and criminal and civil suits may be filed.

23. In Paragraph 47 of the *Hamza* Complaint, Plaintiffs allege that they "do not have the ability to seek a legal remedy or appropriate civil relief in Libya." This statement is inaccurate. Article 166 of the Civil Code, which governs civil liability, allows Plaintiffs to seek a civil remedy for alleged torts in Libya.

24. In Paragraph 209 of the *Hamza* Complaint, Plaintiffs allege they "are unable to exhaust adequate remedies in Libya where the conduct giving rise to the claim occurred given the on-going hostilities and dysfunctional judicial systems and any such attempts would be futile or otherwise create risk of reprisal." This statement is inaccurate. Plaintiffs may seek legal remedies in Libya on the alleged civil torts.

25. In Paragraph 8 of the *al-Suyid* Complaint, Plaintiffs allege that they "cannot seek justice in Libya, which is largely controlled by the Defendants and their cohorts." This statement is inaccurate. Defendant is not in control of the judicial system in Tripoli, and Plaintiffs may bring forward a civil claim against Defendant.

26. In Paragraph 51 of the *al-Suyid* Complaint, Plaintiffs allege that "[t]his is not an environment in which Plaintiffs may practically or safely pursue justice in a Libyan court, seeking personal damages against the field marshal of the LNA who controls the government in much of Libya, including Plaintiffs' home jurisdiction. Their relief can come only in U.S. federal courts." This statement is inaccurate. The Libyan Courts have been fully functional as of 2022. Prior to 2022, the Courts were functional with periodic pauses in activity due to COVID-19 and ongoing conflicts.

27. The Plaintiffs' claims in the underlying actions pending in the Eastern District of Virginia: *al-Suyid, et.al v. Hifter* (1:20-cv-170), *Elzagally, et. al v. Hifter* (1:19-cv-853), and *Hamza, et. al v. Hifter* (1:20-cv-1038) may be brought forward in Libya under Article 166 of the Civil Code.

28. Exemplary (punitive) damages are not available under Libyan Law.

29. I confirm that I understand my duty to the Court and have complied with and will continue to comply with it.

30. I confirm that I have made clear which facts and matters in this report are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true.

31. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.

I declare under the penalties of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Signed on this 23rd day of February, 2024.

Signed (electronically) and executed in accord with 10 CFR 2.304(d) by:

Fathi Younis Toomi
Address: Building 102, Apt. 4
Alsouiai Alkhitouni Street
Abuhrida, Tripoli 00218 (Libya)
Phone No.: +218912149212
E-mail Address: fat2gar@gmail.com

6

# FATHI YOUNIS TOOMI

Email: fat2gar@gmail.com
Mobile No.: +218912149212

## Personal Details

Date of Birth: April 24, 1969
Gender: Male
Nationality: Libyan
Civil status: Married

## Education

Diploma in Accounting                                                          2000 – 2001
National Institute of Administrative and Financial Sciences, Tripoli

Bachelor's Degree in Law                                                       1991 – 1992
Naser University, Tripoli

## Employment

Legal Adviser to the Prime Minister                              May 2023 to Present
Libyan Government, Benghazi

Legal Adviser to the Minister of Planning and Finance         June 2022 to Present
Libyan Government, Benghazi

Legal Adviser to the Minister of Finance                        Jan 2017 to Oct 2018
Government of National Accord, Tripoli

Director, Office of Legal Affairs                                March 2013 to Dec 2019
Libya Trade Network, Tripoli

Director, Office of Legal Affairs of the Ministry of Finance    Nov 2011 to Feb 2013
Libyan Government, Tripoli

Legal Adviser to the General People's Committee for Finance    July 2010 to Oct 2011
Libyan Arab Jamahiriya, Tripoli

Assistant Controller of the Libyan Mission to the United Nations   Feb 2006 to June 2010
United Nations, New York

Legal Adviser to the General People's Committee for Finance    Dec 1997 to Jan 2006
Libyan Arab Jamahiriya, Tripoli

Staff Attorney, Department of State Litigation                  Jan 1993 to Dec 1997
Libyan Arab Jamahiriya, Tripoli

Legal Adviser, Advisory and Legislative Department             Oct 1992 to Dec 1992
Libyan Arab Jamahiriya, Tripoli

**Memberships and Other Activities**

- Member of Supervisory Board – Libyan Iron and Steel Company
- Member of the drafting committee for the Libyan E-commerce Transactions Law and the implementing regulations for the Labor Relations Act and the Local Government Act, among others.
- Member of the Ministry of Finance committee charged with supervising the execution of civil judgments against the Libyan State.
- Member of several investigative and audit committees and disciplinary boards charged with the investigation of financial and administrative offenses.
- Member of several committees charged with overseeing the closure of Libyan embassies and consulates abroad.
- Lecturer on financial and administrative legislation, training courses for members of the National Accounting Office.
- Member of the Committee on Administrative and Financial Matters (Fifth Committee) of the General Assembly of the United Nations in New York.

## Status of Judicial Operations in Major Libyan Cities (2014-2024)

| Year | Tripoli | Benghazi | Sabha | Misrata | Zawiya | Notes |
|------|---------|----------|-------|---------|--------|-------|
| 2014 | Operating Jan to May and Nov to Dec | Operating Jan to Oct; suspended Nov to Dec | Operating all year | Operating all year | Operating all year | • Conflict in Tripoli erupted in June, leading to a temporary suspension of judicial operations from June to November 2014. <br> • Conflict in Benghazi caused a suspension of judicial operations from late 2014 until 2017. |
| 2015 | Operating all year | Suspended all year | Operating all year | Operating all year | Operating all year | • Conflict in Benghazi continued to disrupt judicial operations. |
| 2016 | Operating all year | Suspended all year | Operating all year | Operating all year | Operating all year | • Conflict in Benghazi continued to disrupt judicial operations. |
| 2017 | Operating all year | Suspended all year | Operating all year | Operating all year | Operating all year | • Conflict in Benghazi continued to disrupt judicial operations. |
| 2018 | Operating all year | Operating all year | Operating all year | Operating all year | Operating all year | • Situation normal all year. |
| 2019 | Suspended from Jan to Mar | Suspended from Apr to Jun | Suspended from Apr to Jun | Operating all year | Operating all year | • Conflict across Libya disrupted judicial operations in Tripoli, Benghazi and Misrata from mid-2019 to late 2021. |
| 2020 | Suspended all year | Suspended from Apr to Jun | Suspended from Apr to Jun | Suspended from Apr to Jun | Suspended from Apr to Jun | • COVID-19 pandemic disrupted judicial operations between April and June; all cities affected. <br> • Judicial operations in Tripoli suspended all year. |
| 2021 | Suspended from Sep to Dec | Suspended from Apr to Jun | Suspended from Apr to Jun | Operating all year | Operating all year | • Conflict across Libya disrupted judicial operations in Tripoli, Benghazi and Misrata at various times during 2021. |
| 2022 to 2024 | Operating normally | Operating normally | Operating normally | Operating normally | Operating normally | • Situation normal throughout 2022, 2023 and 2024 to date. |

# EXHIBIT J

**Description of Documents Related to Exhaustion of Remedies in Libya**

**al-Suyid et al v. Hifter et al**

### SUYID - 000003 - 000032:
**Document No. 1: Complaint No. 1 Filed with the Attorney General's Office dated November 19, 2014**

Copies of documents from the Office of the Attorney General (OAG) of Libya show a public prosecutor's appointment to be in charge of the complaint against Hifter and others. The case was filed by a lawyer acting on behalf of six clients petitioning the OAG to issue arrest warrants against four individuals, among them Khalifa Belgasem Hifter, and the Speaker and members of the Parliament, to start criminal proceedings against them for the crimes committed in Benghazi in October 2014.

Moahmed Al-Krshiny, Ibahim's brother (the Plaintiff) is one of those who filed this complaint on behalf of his family.

The first page of the document is the appointment of a prosecutor by the office of the Attorney General dated November 27, 2014.

Other than interrogating the complainants by the public prosecutor, the OAG took no measures to progress the case.

### SUYID - 000013 - 000132:
**Document No. 2: Investigation Interview Questions with Complainants by Public Prosecutor December 11, 2014**

After filling Complaint No. 1, the Public Prosecutor interviewed those who filed the complaint. The file contains a complaint filed by 56 complainants at the Public Prosecutor's Office in Tripoli and Zliten. The first affidavit was in Zliten (a Libyan city) on December 11, 2014, and the last (starts on page 89) was made in Zliten on February 12, 2015. The document is 100 pages long.

Mohamed Al-Krshiny, Ibahim's brother (the Plaintiff), was questioned by the Public Prosecutor.

### SUYID - 000133 - 000139:
**Document No. 3 Complaint No. 2 filed July 17, 2016**

Complaint No. 2 was filed with the Office of the General Attorney of Libya by 56 complainants on July 17, 2016. Number one on the list of petitioners is Muna al-Suyid. The complaint petitioned the Office of the General Attorney of Libya to investigate the attacks on the lives and properties of the petitioners in Benghazi, allegedly committed by Col. Mahdi al-Barghathi and

eight others, in October 2014. All nine named individuals were field commanders under the leadership of Khalifa Belgasem Hifter.

A full copy of the complaint was published on a pro-Hifter Facebook account on August 6, 2016. The post threatened retributions against the complainants and their relatives in Benghazi.

**SUYID - 000140:**

**Document No. 4 Complaint No. 2 filed August 7, 2016**

Ms. Muna al-Suyid filed a complaint with the Office of the Attorney General of Libya on August 7, 2016, petitioning the OGA to start an investigation into the leaking of the Complaint No. 2 (July 17, 2016), which exposed the names of the complainants, thus endangering their relatives and themselves.

**SUYID - 000141 - 000146:**

**Document No. 5 Copy of Facebook Threats August 6, 2016**

A copy of a post published by a pro-Hifter account on Facebook showing images of the complaint filed by Ms. Muna al-Suyid.  The post on Facebook warns those who filed the complaint against al-Zahawi and al-Bargathi. It should be noted that the post was shared 78 times and received 781 likes after 8 hours of its posting.

# EXHIBIT K



### Libyan Leader faces terrorist-supporter smear campaign in US courts

October 7, 2025

By John Rossomando

The Muslim Brotherhood's campaign of lawfare and disinformation against Libyan Field Marshal Khalifa Haftar (often spelled "Hifter") persists unabated. In April 2024, a lower court ruled that U.S. courts lacked jurisdiction over Haftar, who leads the Libyan National Army (LNA) — Libya's most powerful military faction. However, the plaintiffs appealed, and the Fourth Circuit Court of Appeals accepted the case in June 2024. This ongoing legal battle represents a continuation of the Islamist movement's broader perception war against him.

Libya's Muslim Brotherhood has vilified Haftar for years, labeling him a "war criminal," an enemy of democracy, a "coup leader," and a successor to Moammar Gaddafi. These accusations intensified with Haftar's 2014 military campaign against them. The post-Gaddafi political settlement imposed a Feb. 7, 2014 expiration date on the General National Congress's term, which the Islamist-controlled body ignored. This blatant disregard for the rule of law prompted Haftar to launch Operation Dignity in May 2014, aimed at dismantling Islamist militias.

Pro-Brotherhood outlets, such as Qatar's Al Jazeera, Middle East Eye, and Middle East Monitor, have amplified narratives maligning Haftar. These stories have seeped into mainstream Western media, including The Washington Post and The New York Times, entrenching the Brotherhood's framing.

The Brotherhood's American affiliates, particularly the Libyan American Alliance (LAA) led by Virginia surgeon Esam Omeish, have sought to leverage U.S. government power through a series of lawsuits. The LAA initiated litigation shortly after Haftar's 2019 conversation with President Donald Trump, with the apparent goal of halting Haftar's offensive against Tripoli. The group collaborated with attorney Faisal Gill, who has past associations with the American Muslim Council (AMC), a Muslim Brotherhood front group.

The plaintiffs' current counsel, Asim Ghafoor, has his own troubling history. He served as spokesman for Care International, linked to the 1993 World Trade Center bombing and the 1998 U.S. embassy bombings in Kenya and Tanzania. Ghafoor also represented the Global Relief Foundation (GRF), an Islamic charity shut down in 2002 for ties to Osama bin Laden, al-Qaeda, and other terrorist networks.

Social media activity from some plaintiffs reveals ideological biases and attempts to conceal their relatives' affiliations with al-Qaeda fighters killed in combat with the LNA. Others failed to prove in court that their family members were killed by the LNA, given the chaos of war and shelling by militias loyal to the rival Government of National Accord (GNA).



This case exemplifies "malicious prosecution" — litigation driven by ill will, revenge, bias, or ulterior motives.

Consider the current plaintiffs: Muna al-Suyid and her co-plaintiffs Abdalla al-Krshiny, Ahmad al-Krshiny, Mahmud al-Krshiny, and Ibrahim al-Krshiny (also transliterated as al-Karshini).  An X account attributed to al-Suyid by Libyan journalist Mohammed Al-Shaafi shows explicit support for the al-Qaeda-linked Benghazi Revolutionaries Shura Council and Libya's Brotherhood — and al-Qaeda-linked Grand Mufti Sadiq al-Ghariani.  This positions al-Suyid as a pro-Brotherhood, pro-al-Qaeda partisan with a clear grudge against Haftar rather than an impartial victim.

In her book *Benghazi: Know Thy Enemy: A Cold Case Investigation*, CIA targeter Sarah Adams details how al-Suyid's father, Abdel Salam al-Suyid, led an assassination team in Benghazi's Bouhdima neighborhood for the al-Qaeda-linked group Ansar al-Sharia.  Adams reports that Benghazi residents informed her that al-Suyid's family members were killed by enraged neighbors, not the LNA. Similarly, the al-Krshiny relatives were al-Qaeda combatants targeted in operations against Haftar's forces.

The Brotherhood- and Qatari-controlled International Union of Muslim Scholars (IUMS), which supported al-Qaeda jihadists during the 2011 uprising against Gaddafi, accused Haftar in 2014 of leading a "coup" against the illegally seated government.  It urged Libyans to resist him and condemned his efforts to "cleanse Libya of the Brotherhood."  Haftar's actions were, in fact, responses to the Brotherhood's illegal activities: hijacking the state after losing the July 2012 elections and backing terrorist militias that plunged Libya into anarchy.  Al-Qaeda in the Islamic Maghreb (AQIM) echoed this, denouncing Haftar's campaign as a "war on Islam" — a common jihadist recruitment tactic.

It branded him a "traitor" and called on Libyan tribes to disavow him.  This rhetoric has been imported to the U.S. by the Libyan Brotherhood's American allies.  Omeish, labeled a "terrorist" by Libya's House of Representatives for his Brotherhood activities, maintains close ties to Libyan Brotherhood figures like State Council chairman Khalid al-Mishri.  In 2016, Omeish portrayed Haftar as another Gaddafi bent on restoring military rule and endorsed the al-Qaeda-linked Mujahideen Shura Council of Derna, glossing over its extremist ties by calling it a group of "moderate" Islamists.  Beyond his Libyan connections, Omeish has strong ties to the U.S. Democrat party.

In essence, Haftar faces a siege from individuals with deep ties to the Muslim Brotherhood and al-Qaeda, all because he seeks to dismantle their destructive influence in Libya.  The accusations lack substantive merit, rooted instead in the biases of terrorist sympathizers who ravaged the country after Gaddafi's fall.  These claims should be dismissed as the baseless lawfare they are.

https://www.americanthinker.com/blog/2025/10/libyan_leader_faces_terrorist_supporter_smear_campaign_in_us_courts.html