# EXHIBIT A

Khalifa Hifter
CONFIDENTIAL
11/6/2022
Case 1:20-cv-00170-LMB-JFA   Document 330   Filed 11/14/25   Page 2 of 57 PageID# 3818
ATTORNEYS' EYES ONLY
Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

- - - - - - - - - - - - - - - X

ALI ABDALLA HAMZA, et al.,        :

    Plaintiffs,                 :   Case No.

      v.                      :   1:20-cv-01038

KHALIFA HIFTER,                   :   (LMB/JFA)

    Defendant.                  :

- - - - - - - - - - - - - - - X

Sunday, November 6, 2022

CONFIDENTIAL

ATTORNEYS' EYES ONLY

Interpreted Videotaped Teleconference

Deposition, Volume I, of KHALIFA HIFTER, a Defendant

herein, called for examination by counsel for

Plaintiffs in the above-entitled matter, pursuant to

notice, the witness being duly sworn via the

interpreter by Rebecca L. Stonerock, a Notary Public

in and for the Commonwealth of Virginia, taken

remotely for the offices of Mark S. Zaid, P.C., 1250

Connecticut Avenue NW, Suite 700, Washington, DC, at

8:15 a.m., Sunday, November 6, 2022, and the

proceedings being taken down by Stenotype by Rebecca

L. Stonerock, RPR, and transcribed under her

direction.

foremost looking for the interests of our people.

And of course it's a very long and complicated story.  It's very hard to summarize and present it in a simplified or condensed manner.

Q.    Thank you.  That was very helpful.

What I would ask of you when you answer some questions, to pause after a brief period of time so that the translator can translate everything.  You gave her a lot of information, which was good, and she did a great job, but we want to make sure she can translate everything that you say and that we say to you.  Okay?

A.    Thank you.

Q.    (Not translated)  And, sir, I saw that you were speaking to someone in the room.  Who was in the room with you?

A.    Basam was present in the room.

A.    (In English)  Yes.

Q.    Okay.  Is Basam still in the room?

A.    He already left.  I'm currently alone.

Q.    Okay.  Thank you.  So when -- when did you move to the United States?  What year?

TP One

Case 1:20-cv-00170-LMB-JFA    Document 330    Filed 11/14/25    Page 5 of 57 PageID#
                    ATTORNEYS EYES ONLY
                    3821

A.    1990.

Q.    And you were granted U.S. citizenship, correct?

A.    (In English)  Yes.

A.    Yes.

Q.    And do you still have United States citizenship?

A.    (In English)  Yes.

A.    Yes.  I am presenting myself as a future president of Libya.  Some conditions were imposed on myself asking me to renounce my U.S. citizenship, but I refused to do so and I'm still refusing that.  I believe that the Libyan people have the right to go through a democratic process while choosing their president and anybody should be able to run for presidency without any conditions.

A lot of opposing groups, specifically the Muslim Brotherhoods, are leading the opposition trying to instigate people against me.  I can mention a few names of the leadership of this group.  One of them is Esam Omeish.  He lives currently in DC. Another one is Emad Muntaseer.  They are leading

Khalifa Hifter
CONFIDENTIAL
11/6/2022
Case 1:20-cv-00170-LMB-JFA    Document 330    Filed 11/14/25    Page 6 of 57 PageID#
ATTORNEYS' EYES ONLY
3822
Page 39

I signed this document.

Q.    When was the last time you were in the United States?

A.    Eleventh of March, 2011.

A.    (In English) Yes.

Q.    And in your Declaration you indicate that you have a number of properties in Virginia.

Do you still own them?

A.    I do not have any of such properties.  I only own my own house, which was an apartment, a condo, and a farm in an area that I don't remember where it's located.  There is no such thing as buildings or 17-something.  All these things that are mentioned are not true.

And -- excuse me, addition.  And I don't see any connection between this and the case.

Q.    But you still own that residence here in Virginia; is that true?

A.    Of course.  But this has no connection to the case.  I'm surprised by the question.

Q.    And so do you vote in any U.S. elections?

A.    I never participated, never attended any



event related to elections to vote.  I do not attend

during the election times.  It's just a coincidence

that I've never been present.

            MR. ZAID:  And the videographer can take

that exhibit down for now, please.  Thank you.

BY MR. ZAID:

        Q.    Sir, what is your current relationship to

the Libyan National Army?

        A.    I am the commander in chief of the Libyan

Armed Forces.

        Q.    And is that the same as the LNA, or Libyan

National Army?  Is it the same term?

        A.    (In English)  The same.  The same.  The

same.  But --

        A.    Yes, it is the same.  During the beginning

of the formation of those forces it was named the

LNA, the Libyan National Army.  Afterwards it has

been named the Libyan Arabic Armed Forces.

        Q.    And I understand that in 2015 was when you

were first appointed as the Commander in Chief, or

Field Marshal, of then the LNA.  Is that correct?

            MR. COX:  Objection, foundation.

**TP One**

Khalifa Hifter
CONFIDENTIAL
11/6/2022
Case 1:20-cv-00170-LMB-JFA    Document 330   Filed 11/14/25    Page 8 of 57 PageID#
ATTORNEYS EYES ONLY
3824
Page 78

not know their identity, their names.  I think you can agree that it's not possible for a commander to know the names of all of their subordinates and soldiers and officers.

Q.    Sir, if you become aware of an allegation of war crimes against your soldiers, airmen or subordinates, what steps would -- do you take personally?

A.    As I mentioned, this will be dealt with by the jurisdiction of the attorney general, the military attorney general.  They have the authority and they have the qualifications to investigate in the matter, but it's not something that is in my authority.

MR. ZAID:  Videographer, you can take the photo down, please.  Thank you.

BY MR. ZAID:

Q.    And, sir, what was or is Operation Dignity, D-I-G-N-I-T-Y?

A.    This is a movement that we have performed in the year of 2014.  It was a big movement of coalition and coordination from citizens who gathered



in front of my residency asking me to come and help

stand -- stand against the criminal operations, as I

mentioned, of the different militias groups, Al Qaeda

and ISIS and the fighting Islamic movement.  And I

want to show you some pictures right now on the

screen, if you're able to see them.

MR. GILL:  Bob?  Bob?

MR. COX:  Yes.

MR. GILL:  This is Faisal.  The other

plaintiff's counsel, Mark and them, just got an error

message.  They lost audio.  So if we could just wait

for one second for them to reconnect.  I still have

it, but they -- they lost it.

MR. COX:  Sure.  Could the translator or

interpreter please translate that for the Field

Marshal.

THE WITNESS:  Yes, okay.  I have all the

documents and I'm -- I want them to be able to review

them.  We are ready.

MR. GILL:  Thank you.

Mark, can you hear us?

THE VIDEOGRAPHER:  Want to go off record,



record.)

BY MR. ZAID:

Q.    And who -- what is reflected in these photographs, sir?

A.    As you can see, it's the killing of people, slaughtering of individuals.  Another slaughtering case.

Q.    And where is the location of the photos?

A.    In my city of Benghazi.  So we got out for those people.

Q.    And so what was the military goal of Operation Dignity?

A.    To get rid of those criminals that are killing people.  People who have a conscience, they have the conscience moving when they witness such actions performed against innocent people.

THE WITNESS:  Thank you.

BY MR. ZAID:

Q.    And did Operation Dignity involve activities in the town or city of Ganfouda, G-A-N-F-O-U-D-A?

A.    Yes.  Operation Dignity got rid -- it got

Khalifa Hifter        CONFIDENTIAL        11/6/2022
Case 1:20-cv-00170-LMB-JFA    Document 330   Filed 11/14/25    Page 11 of 57 PageID#   Page 111
ATTORNEYS EYES ONLY
3827

this is a sensitive question.  And I don't see any

basis -- while I can understand lots of objections to

questions that I ask at times, when I ask, "What did

you refer to," I don't understand what basis that

could be.

           MR. COX:  I didn't -- Mark, I didn't

object to "What did you refer to."  You asked

whether -- in a prior question what he meant by

Ganfouda is a small problem.  I wrote down in my

notes that he said Ganfouda is a small area, not a

small problem.  So that was the basis for my

objection.

           MR. ZAID:  I don't -- I don't think that

that's what he said, which I'm not saying you didn't

hear it that way, but he said there was a small

problem, as I understood it.  That's what I heard.

There was a small problem, and I said, "By what small

problem, what" -- "By saying 'small problem,' what

did you refer to," which he then answered.

           And he can answer obviously however he

wants.  We just want his factual basis.  But I would

ask if you just maybe perhaps listen a little bit



more carefully, because I think some of this could be

perceived as signaling and we obviously don't want to

go down that road for any of us.

       MR. COX: No, Mark, I'm not signaling

anything. That's why I'm not stating the basis for

my objection. I'm showing you on video right now my

notes where I wrote "small area." So if it was my

mistake in writing it down, it's my mistake. I'm not

trying to coach the witness. I'm making objections.

       MR. ZAID: Mistakes happen. I just wanted

to say that. I get it. All right. We can move on.

BY MR. ZAID:

     Q. General, I understand that in October --

on October 26, 2017, there were the bodies of 36 men

found close to Al-Abyar, A-B-Y-A-R, which is

apparently 50 kilometers east of Benghazi.

       Do you have any knowledge of that

discovery?

       MR. COX: Objection to form.

       THE WITNESS: I'm not -- I'm not sure. At

that time, it wasn't a rare thing to happen. And

it's been a long time. And to find in rural areas 36

Case 1:20-cv-00170-LMB-JFA    Document 330    Filed 11/14/25    Page 13 of 57 PageID# 3829
ATTORNEYS' EYES ONLY

A.    Correct.  That was the highest rank.  But I wasn't appointed.  It was an old rank that I was serving at for the previous 25 years approximately. I traveled to the United States and I spent 24 years approximately in the U.S.  When the revolution started in Libya, I returned to Libya and I came back to fight terrorists, and that's what happened.

I came -- I returned back to Libya to fight terrorists.  Previously there has been a conflict between myself and President Gaddafi.  When I came back, I also participated in the removal of Muammar Gaddafi.  After the end of the revolution, I focused on fighting terrorists.

Q.    Okay.  I want to -- I want to stay just with October/November of 2014 for these next questions.  Okay?

A.    The -- efforts started in 2014 were based on volunteering initiatives.  We unified our efforts to fight terrorism in our country.  And after our success in those efforts, I believe we -- we succeeded.  And now Libyans are free of those forces and those militias groups.

Q.    Okay.

A.    I prefer all -- all of the questions to be directed at the period starting from the 3rd of May, 2015 as that was the date when I was officially assuming my -- my position with the military.  And before that, there was no need to ask any questions because it's kind of a gap in that period.

Q.    I can understand that, Field Marshal, but the facts in our case, in the Al-Suyid case, pertain to October/November of 2014.  So I have to ask you questions about that period.

A.    I don't know anybody -- who are -- who are all those plaintiffs with the name Al-Suyid?  I have no information about them.  Who are they?  Nobody in Libya has that name, Al-Suyid.

Q.    Okay.  So that's fine.  If you would answer my questions, Field Marshal, we'll get done quicker.

A.    (In English)  Okay.

Q.    If you don't know someone, that's fine. You can just tell me that.

A.    (In English)  Okay.



Khalifa Hifter
CONFIDENTIAL
11/6/2022
Case 1:20-cv-00170-LMB-JFA    Document 330    Filed 11/14/25    Page 15 of 57 PageID#
ATTORNEYS EYES ONLY
3831
Page 155

Q.    Did you hold any positions in any Libyan government entity in October/November of 2014?

A.    No, I was not holding any -- any jobs when I returned from the U.S. to Libya.  At that time, I was taking a break.

Q.    How many men were under your control in October/November of 2014?  Your command I should say.

A.    As I mentioned, officially I was appointed to that military position in 2015.  Before that, they were all unofficial preparations, so I cannot say that there were any -- officially anybody under my -- under my rank, under my position.

Starting 2015, we started the forming of our military forces.

Q.    So did the Libyan National Army not exist in 2014?

A.    Correct.  Correct.

Q.    But you testified that you were the highest ranking officer in the military in October 2014.  What did the military consist of at that time?

A.    The formation and the efforts in forming the official army started in 2014, but nothing was

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA


ABDALLA AL-KRSHINY,           §
MUSTAFA AL-SUYID, ALI         §
AL-KRSHINY, IBRAHIM           §
AL-SUYID, IBRAHIM             §
AL-KRSHINY, MAHMUD            §
AL-KRSHINY, ABDEL SALAM       §
AL-SUYID, AHMAD               §
AL-KRSHINY, KHALID            §
AL-SUYID, MUNA AL-SUYID,      §
AND MUSTAFA AL-KRSHINY,       §
                              §   CASE NO. 1:20-cv-00170
            Plaintiffs,       §
                              §
VS.                           §
                              §
KHALIFA HIFTER, KHALID        §
HIFTER, AND SADDAM            §
HIFTER,                       §
                              §
            Defendants.       §



                    CONFIDENTIAL


        Remote Deposition of AHMAD AL-KRSHINY

      Thursday, November 4, 2021 - 2:21 p.m. EST




Reported by:

JANICE McMORAN, CSR, RDR, CRR, TCRR

Job No.: 3544

A.   I was located outside the house, on the street.

Q.   And did someone tell you that the women and children were going to be allowed to leave safely?

A.   Yes.  Some of the neighbors approached us and told us that they will allow -- they heard that the group will allow the women and children to leave safely.

Q.   Were any of your neighbors' homes under attack, or was it only your home?

A.   No, the direct attack was on our building, on our house.

Q.   Earlier you mentioned that four to five individuals entered your home and identified themselves as being a part of Brigade Number 21.  What kind of clothes were they wearing?

A.   They were wearing military uniforms.  Some of them were wearing a T-shirt with a military uniform pants.  Some were wearing a full uniform.  I don't remember exactly the details.

Q.   Did you recognize any sort of military insignia on the military clothing that you saw?

A.   The military uniform became widespread in Libya after the revolution.  It's not that

significant to understand that any special signs or any special other attributes on that uniform.  It's pretty common to see somebody wearing it in Libya.

Q.   When you say "military uniform," are you describing Army fatigues?

A.   Yes.  I'm not sure if it was the Army uniform fatigue or it was something else.  As I mentioned, a lot of people are wearing military uniforms at the moment.  It was a green camouflage color.

Q.   Okay.  When you were describing that in, you know, the last few years a lot of people in Libya are wearing military uniforms, are you describing the green camouflage that people may wear?

A.   Yes.

Q.   Is it your understanding that just because someone may wear that green camouflage that you were just describing, they may not be a part of an official military?

A.   Yes.  But those individuals identified themselves as members of the 21st Brigade that is fighting under the leadership of Hifter and fighting under the Karamah or Dignity project.

Q.   What is the basis for your contention that

# EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

Civil Action No. 1:20-cv-00170(LMB/JFA)


MUNA AL-SUYID,

        Plaintiff,

    -vs-

KHALIFA HIFTER,

        Defendant.

_____/



        Deposition of ABDALLA AL-KRSHINY

    Wednesday, November 3, 2021 - 2:16 p.m.



Reported by:

Erica Field, FPR

Job No.: 3543

A. AL-KRISHNY

event of that year as described, beginning

May of that year, because of the announcement

of Hifter's exit, the security situation in

Benghazi was very chaotic.  Different kinds

of arms were spreading heavily in the

streets.  We as shop owners and business

owners were trying to protect our properties

and our money and our families.

So at that point, everybody was

trying to secure some -- their hands on any

kind of weapon, and we honestly had those two

rifles.  We did have them to protect our

families.  We never used them outside the

house.  We never carried them before, but we

felt the pressure and the need to have them

and to obtain them for our own protection.

BY MS. MCKASSON:

Q.    Did you use those rifles on

October 17, 2014?

A.    We used them, but I didn't know

how to use them properly, and maybe we did

use them to shoot one or two bullets, and

that gave the impression to the other side

that we were heavily armed or were using

# EXHIBIT D

القائد الأعلى للجيش الليبي

رقم 20 ﻟ.م لسنة 2015م

## بشأن ترقية ضابط وتعيين قائد عام للجيش الليبي

القائد الأعلى للجيش الليبي

بعد الاطلاع :-

- على الإعلان الدستوري المؤقت الصادر في 3/ أغسطس/2011م وتعديلاته.
- وعلى القانون رقم (10) لسنة 2014م في شأن إنتخاب مجلس النواب في المرحلة الإنتقالية.

- وعلى القانون رقم (40) لسنة 1974م بشأن الخدمة في الجيش الليبي وتعديلاته.
- وعلى القانون رقم (43) لسنة 1974م بإصدار قانون تقاعد العسكريين وتعديلاته.
- وعلى القانون رقم (5) لسنة 1978م بتعديل بعض أحكام القوانين العسكرية.
- وعلى القانون رقم (11) لسنة 2012م بتقرير بعض الأحكام في شأن صلاحيات المستويات القيادية بالجيش الليبي المعدل بالقانون رقم ( 1 ) لسنة 2015م بشأن استحداث منصب القائد العام.

- وعلى قرار مجلس النواب رقم (20) لسنة 2014مفي شأن تفويض مكتب رئاسة مجلس النواب باختصاصات القائد الأعلى للجيش الليبي.

## صدر القرار الآتي

المادة الأولى

يرقى الرقم / 519 / لواء /خليفة بالقاسم حفتر إلى رئاسة فريق بالجيش الليبي.

المادة الثانية

يعين الفريق / خليفة بالقاسم حفتر قائداً عاماً للجيش الليبي ويتولى كافة الاختصاصات المنصوص عليها في التشريعات النافذة.

المادة الثالثة

يعمل بأحكام هذا القرار من تاريخ صدوره ويلغى كل حكم يخالفه وعلى كل فيما يخصه تنفيذه.



القائد الأعلى للقوات المسلحة

05 .......
03 .02 .....

CONFIDENTIAL

KH_000055

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

- - - - - - - - - - - - - - - - X

ALI ABDALLA HAMZA, et al.,          :

    Plaintiffs,                       :    Case No.

        v.                            :    1:20-cv-01038

KHALIFA HIFTER,                     :    (LMB/JFA)

    Defendant.                        :

- - - - - - - - - - - - - - - - X

Monday, June 26, 2023

CONFIDENTIAL

ATTORNEYS' EYES ONLY

PURSUANT TO THE PROTECTIVE ORDER

Interpreted Videotaped Teleconference

Deposition, Volume II, of KHALIFA HIFTER, a Defendant

herein, called for examination by counsel for

Plaintiffs in the above-entitled matter, pursuant to

notice, the witness being duly resworn via the

interpreter by Rebecca L. Stonerock, a Notary Public

in and for the Commonwealth of Virginia, taken

remotely for the offices of Faisal Gill, Gill Law

CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO THE PROTECTIVE ORDER

Firm, 1717 Pennsylvania Avenue, NW, Suite 1025, Washington, DC, at 3:01 p.m., Monday, June 26, 2023, and the proceedings being taken down by Stenotype by Rebecca L. Stonerock, RPR, and transcribed under her direction.

Khalifa Hifter (Vol. II)
CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO THE PROTECTIVE ORDER
6/26/2023
Page 209
Case 1:20-cv-00170-LMB-JFA   Document 330   Filed 11/14/25   Page 28 of 57 PageID# 3844

Does that mean that either the chief of staff or the supreme commander are above you?

A.    Yes.   The highest rank is the supreme commander Aguila Saleh.

Q.    Is that a civilian position or is that a military position?

A.    Civilian.

Q.    So you are the highest ranking military officer?

A.    Yes.

Q.    In 2014 were you the highest ranking military officer?

A.    During that time -- during that time we did not have an army.

Q.    When did you become the highest ranking military officer?

A.    Okay.   2015.

Q.    And you said the person right below you is the chief of staff?

A.    That's correct.

Q.    Underneath that, how is the LNA organized? Are there combatant commanders or other generals

Case 1:20-cv-00170-LMB-JFA    Document 330    Filed 11/14/25    Page 29 of 57 PageID# 3845
PURSUANT TO THE PROTECTIVE ORDER

Q.    What was the military objective of Operation Dignity?

A.    Yes, of course.  Operation Dignity was launched to get rid of the criminals, the killers who were attacking our people, the Libyan people in their houses, in their villages, in their towns.  It was a form of a people's revolution actually that lasted between 2014 and 2015.  Civilians, citizens came to my house and pledged me to save them, to support them, saving the country from the bloodshed, from the attacks on women and children.  And of course we responded.  We went out there.

It was actually a mix of civilians, armed forces, veterans, young people, seniors.  And it was a difficult time, difficult stage in our country.  We were fighting against ISIS and against the Islamic forces who, in fact, don't have anything, any -- any relation to Islam or any connection to Islam.

I believe it was a good operation.  As you know, also, during that time the American ambassador was killed by those savages, the extremists.  They killed him.  And we in Libya consider all of the



Case 1:20-cv-00170-LMB-JFA    Document 330    Filed 11/14/25    Page 30 of 57 PageID# 3846
PURSUANT TO THE PROTECTIVE ORDER

A.    There were no forces in that area at that time.  They were all withdrawn.

Q.    When did you -- when did the LNA withdraw from Tripoli?

A.    (In English)  Nineteen.

A.    2019.

Q.    Right.  I'm asking on April 2019.  Were the forces there in April 2019?

A.    I do remember that the forces were withdrawing in 2019.  I do not have details of the exact date.  I don't remember.

Q.    In the -- in the attacks on Tripoli, did your forces ever bomb any hospitals?

A.    Not at all.

Q.    How do you --

A.    Because it is forbidden to hit hospitals. It was not allowed.  I wasn't aware of any orders that were issued to hit or attack any hospitals.  On the contrary, any order that contained civilians were out of limits and we -- we provided also regulations regarding not touching any areas where civilians might be seeking refuge.



not our army.  It is our army doctrine that doesn't allow this to happen.  And I mentioned that in my previous answers when you were asking me about it.

Q.    I understand army doctrine, but sometimes soldiers don't follow orders.  Are you saying that your soldiers always followed every order and never committed any bombings of civilian areas and hospitals?

A.    That is correct.  This will be of the concern of the prosecutor general to open a proper investigation, to follow up with all the information pertaining this matter.  We never heard of any hospitals being attacked or bombed.  If it had happened, we would have heard of it.  There were many militias spreading in that area surrounding Tripoli.  I did not hear of any hospital attacks specifically.  In Tripoli maybe some issues were related to attacks committed by those militias, but not by our army.

Q.    So are you saying the soldiers in your army, LNA, always follow your orders?

A.    Those individuals, they can commit mistakes.  But for -- for that we have laws and



CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO THE PROTECTIVE ORDER
3848

the king that was previously ruling the country, and I was friends with Gaddafi, but later on we had a disagreement and eventually he paid for it.

And before that I was -- I was going to the Alhurra.  It's a radio station that's located in Virginia.  I was calling to the Libyan people to bring down the Gaddafi regime, and within two weeks people started asking me to come back to Libya, so I went there and I participated in the movement to remove the Gaddafi regime.  And after my participation in this revolution I just stayed home and I was just resting at home.

I never committed a crime in my life.  I never committed war crimes, although we participated in wars.  These are my beliefs, these are my -- my statements.  This is how I was raised within my family.  It doesn't allow me to commit any sort of any crime.

Q.    Field Marshal, have you ever ordered the torture of any prisoners while in the custody of LNA?

A.    Never.

Q.    Do you know of any prisoners -- do you



CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO THE PROTECTIVE ORDER

Case 1:20-cv-00170-LMB-JFA    Document 330    Filed 11/14/25    Page 33 of 57 PageID# 3849

know of any prisoners that were tortured while in custody?

A.    Never.  I'm honest in my statements.  And as I mentioned, I do respect this Court, I respect the law, and I hope that the questions will be suitable for this situation.

Q.    (Not translated)  So I'm just trying -- so is the answer no, then, you have not -- you're not aware of any prisoners that were tortured while in LNA custody?

A.    (In English)  Never.

Q.    Okay.  Thank you.  I want to ask -- try to ask one last question.  Hopefully I can just get a yes-or-no answer.  Again, back to my question of FBI/law enforcement, have you been contacted by them about war crimes?  If you haven't, it's a no.  If you have, it's a yes.

A.    No.  No, a thousand no.

Q.    (Not translated)  Okay.  That is all I have.  Thank you so much for participating.

A.    Thank you.  Yes.  I just want to thank everyone, thank you for all the legal counsels, thank

# EXHIBIT F



# EXHIBIT G

Plaintiffs further respond that at Gaddafi's death, there were between 20 and 25 million pieces of weapons in Libya. Under the circumstances in Libya, each Libyan could have owned at least three pieces of weapons. As a result of the 2011 Revolution, the state security system collapsed since its only mission was to serve Muammer Gaddafi's interest. Police force was lacking. Many Libyans were obligated to and did obtain arms to defend themselves and their properties. The plaintiffs' families were not an exception to the rest of Libyan families. They owned weapons to defend their lives and properties.

**Interrogatory No. 12:**

Identify and describe in detail how and to what extent members of the al-Krshiny family were involved in the gunfight at the al-Krshiny family home, state with particularity the basis for Plaintiffs' contention, who was involved, what their involvement was, and what happened.

**Response to Interrogatory No. 12:**

Subject to and without waiving any objections, under which documents may be withheld in whole or in part, Plaintiffs provide the following additional information:

During the October 17, 2014 attacks, the al-Krshiny family acted in self-defense. They were forced to defend themselves and their property. After coming under attack, members of the al-Krshiny family returned fire by using rifles. Al-Krshinys owned rifles for self-defense and the protection of their businesses and properties.  Plaintiffs further refer to their supplemental response to Interrogatory 8 regarding Plaintiffs' ownership of weapons.

Dated: July 28, 2021

Respectfully Submitted,
**WIGGIN AND DANA LLP**

_/s/ Kevin T. Carroll_
Kevin T. Carroll (VSB#95292)
Joseph G. Grasso (*pro hac vice*)

15

# EXHIBIT H

**United Nations**

EN ⌄

☰  **Meetings Coverage and Press Releases**

Meetings Coverage
Security Council

---

**7644TH MEETING (AM)**

**SC/12282**

**15 March 2016**

## Adopting Resolution 2273 (2016), Security Council Extends Mandate of United Nations Support Mission in Libya until 15 June

The Security Council today decided to extend until 15 June 2016 the mandate of the United Nations Support Mission in Libya (UNSMIL), under the leadership of the Special Representative of the Secretary-General, and in full accordance with the principles of national ownership.

Unanimously adopting resolution 2273 (2016), the 15-member Council recognized the need for UNSMIL to re-establish its presence in Libya and make the necessary security arrangements to that effect.

Also by the text, the Council requested that the Secretary-General report within 60 days following consultations with the national authorities on recommendations for UNSMIL's support to the subsequent phases of Libya's transition process, and for the Mission's own security arrangements.

The meeting began at 10:04 a.m. and ended at 10:08 a.m.

Resolution

The full text of resolution 2273 (2016) reads as follows:

"*The Security Council*,

"*Recalling* its resolution 1970 (2011) and all its subsequent resolutions on Libya,

"*Reaffirming* its strong commitment to the sovereignty, independence, territorial integrity and national unity of Libya,

"*Taking note* of the report of the Secretary-General on the United Nations Support Mission in Libya (UNSMIL) (S/2016/182),

"*Expressing* its support for the ongoing efforts of UNSMIL and the Special Representative of the Secretary-General to facilitate a Libyan-led political solution to the challenges facing Libya,

"*Recalling* resolution 2259 (2015) which endorses the Rome Communiqué of 13 December 2015 to support the Government of National Accord as the sole legitimate Government of Libya, that should be based in the capital Tripoli,

"*Reiterating* its support for the full implementation of the Libyan Political Agreement of Skhirat, Morocco signed on 17 December 2015 to form a Government of National Accord consisting of the Presidency Council and Cabinet supported by the other institutions of State including the House of Representatives and State Council, and *welcoming* the endorsement in principle of the Libyan Political Agreement by the House of Representatives on 25 January 2016,

"*Recognizing* the importance of continued inclusiveness and *strongly encouraging* all parties in Libya to be part of and engage constructively in good faith with the Agreement,

"*Encouraging* the Government of National Accord to finalize interim security arrangements for stabilizing Libya as a critical step towards tackling Libya's political, security, humanitarian, economic and institutional challenges and to combat the rising threat of terrorism,

"*Reiterating* its request that all Member States fully support the efforts of the Special Representative of the Secretary-General and work with the Libyan authorities and UNSMIL to develop a coordinated package of support to build the capacity of the Government of National Accord, in line with Libyan priorities and in response to requests for assistance, and *further reiterating* its call upon all parties to cooperate fully with the activities of UNSMIL, including taking necessary steps to ensure the security and unhindered movement for the UN and associated personnel,

"*Recognizing* in the current circumstances, the need for a short extension of the mandate of UNSMIL, to enable the Mission to continue to assist the Presidency Council in further work in establishing the Government of National Accord, that should be based in the capital Tripoli, and implementing the Libyan Political Agreement,

"*Recalling* its determination in resolution 2213 (2015) that the situation in Libya continues to constitute a threat to international peace and security,

"1.   *Decides* to extend until 15 June 2016 the mandate of UNSMIL, as set out in paragraph 12 of resolution 2238 (2015), under the leadership of the Special Representative of the Secretary-General, in full accordance with the principles of national ownership, and *recognizes* the need for UNSMIL to re-establish its presence in Libya, and the need to make the necessary security arrangements to this effect;

"2.   *Requests* the Secretary-General to report within 60 days following consultations with the Libyan authorities on recommendations for UNSMIL's support to the subsequent phases of the Libyan transition process and UNSMIL's security arrangements;

"3.   *Decides* to remain actively seized of the matter."

!   **For information media. Not an official record.**

# EXHIBIT I

**DECLARATION OF FATHI YOUNIS TOOMI**

I, Fathi Younis Toomi, affirm and declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. The statements set out below are based on my personal knowledge and experience.

2. I am a citizen of Libya and have resided and worked in Tripoli, Libya for most of my life, although I currently reside and work in Benghazi, Libya.

3. I received a bachelor's degree in law at Naser University in Tripoli, Libya in 1992.

4. I received a diploma in accounting from the National Institute of Administrative and Financial Sciences in Tripoli in 2001.

5. I currently serve as a Legal Adviser to the Prime Minister of the Libyan Government in Benghazi, Libya as well as a Legal Adviser to the Minister of Planning and Finance of the Libyan Government in Benghazi, Libya.

6. From 1992 to the present, I have served in several legal positions within the Libyan Government, including as a litigator in the Department of State Litigation (roughly equivalent to the U.S. Office of the Solicitor General) from 1993 to 1997. A true and correct copy of my resume is attached to my declaration.

7. Despite some disruptions in judicial operations, the Courts in Libya have been operating as normal for much of the time between 2014- and the present date.

8. Courts in Benghazi were operating during (1) all of 2018, (2) all of 2019 except from April to June, (3) all of 2020 except from April to June, (4) all of 2021 except from April to June, (4) all of 2022, (5) all of 2023, and (6) all of 2024 to date.

1

9.  Courts in Tripoli were operating during (1) January to May and November to December in 2014, (2) all of 2015, (3) all of 2016, (4) all of 2017, (5) all of 2018, (6) all of 2019 except from January to March, (7) all of 2021 except from September to December, (8) all of 2022, (9) all of 2023, and (10) all of 2024 to date.

10. I have attached to my declaration a chart that accurately summarizes the availability of judicial proceedings in Libya during the time period from 2014 to date.

11. The Libyan legal system is civil in nature rather than common law based. The codified laws prior to 1969 in Libya are modelled closely on those of Egypt and, consequently, the Napoleonic Codes of France in addition to the principles of the Islamic Shari'a ("Shari'a").

12. Since the overthrow of the Gaddafi regime in 2011, the primary source of law in Libya has been the Constitutional Declaration of the National Transitional Council (the "Constitutional Declaration"), which states that the foundation for all law in Libya is the Shari'a. The Constitutional Declaration is intended to be a transitional document; the permanent constitution is currently still in the drafting phase.

13. As a general rule, the sources of law in Libya for civil matters follow the following hierarchy:

   a.  legislation;

   b.  principles of Shari'a Law;

   c.  prevailing custom; and

   d.  principles of natural law and principles of justice.

14. The Libyan courts are divided into civil courts, criminal courts, and administrative courts. All matters are heard before judges; there are no jury trials in Libya.

2

15. Civil proceedings in Libya are initiated in the civil Court of First Instance or the Partial Court. Decisions of the Partial Court are automatically appealable to the Court of First Instance, and decisions of the Court of First Instance are automatically appealable to the Court of Appeal. Appeals can be based on both the facts and the law of a case. An appeal involves a rehearing of the matter and new evidence may be adduced. Any judgment of the Court of Appeal is subject to a further appeal to the Supreme Court; however, such an appeal is only heard on matters of law and with the permission of the Supreme Court.

16. The judicial system in Libya is inquisitorial in nature and judges have wide powers to investigate and establish the facts and then apply the law to these facts. Judges may be assisted by court appointed experts whenever a court needs to consider technical matters such as accountancy, banking, engineering, etc. Cases before the lower bench of the Court of First Instance are generally determined before a single judge, whereas matters before the Court of Appeal will be heard by a panel of three judges.

17. Article 166 of the Civil Code, which governs civil liability, states that: "Every fault which causes injury to another imposes an obligation to make reparation upon the person by whom it is committed." The elements required under Article 166 to establish liability and obtain reparations are fault, causation, and injury.

18. Under Libyan law, damages are awarded to compensate for an injury. The damages awarded must be commensurate with the losses suffered (i.e. damages cannot exceed the amount of loss). Under Article 224 of the Civil Code, the judge will fix the amount of damages if not otherwise fixed by contract or by law. Damages will include profits lost by the claimant, to the extent that such lost profits are a normal result of the injury.

3

19. In Civil Appeal No. 835/55, 02/12/2010 [unpublished], the claimant filed a claim against the Libyan State security apparatus alleging that he was arrested and imprisoned (effectively by extrajudicial abduction and detention) without a warrant from the public prosecution or the judiciary. The Supreme Court found that the alleged acts were unlawful. It held that law enforcement duties must be conducted in accordance with the regulations and procedures set out by the law, otherwise the conduct is invalid, and the perpetrator will be liable. The Supreme Court found that the officers violated the procedures of arrest and detention and therefore were liable.  The Supreme Court further ruled that the independence of a government body does not equate to unfettered authority; rather, the government body is subject to the authority and supervision of the State.

20. In Civil Appeal No. 195/56, 26/05/2011 [unpublished], the claimants brought claims for compensation for the years they spent in prison and the torture and abuse they suffered during that time. The Supreme Court held that this was a violation of the human right to freedom and dignity rendering the treatment of the claimants in prison a criminal offence. The Supreme Court stated that compensation arising from this conduct would be decided pursuant to the rules governing liability arising out of harmful acts, a determination within the jurisdiction of the Court of First Instance.

21. In Civil Appeal No. 217/56, 14/01/2013, the Supreme Court stated that damages include moral damages which compensate damage to the person's dignity, emotions, or status.

22. In Paragraph 9 of the *Hamza* Complaint, Plaintiffs allege that they are "unable to exhaust any remedies in Libya because there is no functioning or effective justice system to

4

adjudicate their claims." This statement is inaccurate. As of 2022, all Libyan Courts have been functional, and criminal and civil suits may be filed.

23. In Paragraph 47 of the *Hamza* Complaint, Plaintiffs allege that they "do not have the ability to seek a legal remedy or appropriate civil relief in Libya." This statement is inaccurate. Article 166 of the Civil Code, which governs civil liability, allows Plaintiffs to seek a civil remedy for alleged torts in Libya.

24. In Paragraph 209 of the *Hamza* Complaint, Plaintiffs allege they "are unable to exhaust adequate remedies in Libya where the conduct giving rise to the claim occurred given the on-going hostilities and dysfunctional judicial systems and any such attempts would be futile or otherwise create risk of reprisal." This statement is inaccurate. Plaintiffs may seek legal remedies in Libya on the alleged civil torts.

25. In Paragraph 8 of the *al-Suyid* Complaint, Plaintiffs allege that they "cannot seek justice in Libya, which is largely controlled by the Defendants and their cohorts." This statement is inaccurate. Defendant is not in control of the judicial system in Tripoli, and Plaintiffs may bring forward a civil claim against Defendant.

26. In Paragraph 51 of the *al-Suyid* Complaint, Plaintiffs allege that "[t]his is not an environment in which Plaintiffs may practically or safely pursue justice in a Libyan court, seeking personal damages against the field marshal of the LNA who controls the government in much of Libya, including Plaintiffs' home jurisdiction. Their relief can come only in U.S. federal courts." This statement is inaccurate. The Libyan Courts have been fully functional as of 2022. Prior to 2022, the Courts were functional with periodic pauses in activity due to COVID-19 and ongoing conflicts.

5

27. The Plaintiffs' claims in the underlying actions pending in the Eastern District of Virginia: *al-Suyid, et.al v. Hifter* (1:20-cv-170), *Elzagally, et. al v. Hifter* (1:19-cv-853), and *Hamza, et. al v. Hifter* (1:20-cv-1038) may be brought forward in Libya under Article 166 of the Civil Code.

28. Exemplary (punitive) damages are not available under Libyan Law.

29. I confirm that I understand my duty to the Court and have complied with and will continue to comply with it.

30. I confirm that I have made clear which facts and matters in this report are within my own knowledge and which are not. Those that are within my own knowledge I confirm to be true.

31. The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.

I declare under the penalties of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Signed on this 23rd day of February, 2024.

Signed (electronically) and executed in accord with 10 CFR 2.304(d) by:

Fathi Younis Toomi

Address: Building 102, Apt. 4
Alsouiai Alkhitouni Street
Abuhrida, Tripoli 00218 (Libya)
Phone No.: +218912149212
E-mail Address: fat2gar@gmail.com

6

# FATHI YOUNIS TOOMI

Email: fat2gar@gmail.com
Mobile No.: +218912149212

## Personal Details

Date of Birth: April 24, 1969
Gender: Male
Nationality: Libyan
Civil status: Married

## Education

| | |
|---|---|
| **Diploma in Accounting** | 2000 – 2001 |
| National Institute of Administrative and Financial Sciences, Tripoli | |
| **Bachelor's Degree in Law** | 1991 – 1992 |
| Naser University, Tripoli | |

## Employment

| | |
|---|---|
| **Legal Adviser to the Prime Minister** | May 2023 to Present |
| Libyan Government, Benghazi | |
| **Legal Adviser to the Minister of Planning and Finance** | June 2022 to Present |
| Libyan Government, Benghazi | |
| **Legal Adviser to the Minister of Finance** | Jan 2017 to Oct 2018 |
| Government of National Accord, Tripoli | |
| **Director, Office of Legal Affairs** | March 2013 to Dec 2019 |
| Libya Trade Network, Tripoli | |
| **Director, Office of Legal Affairs of the Ministry of Finance** | Nov 2011 to Feb 2013 |
| Libyan Government, Tripoli | |
| **Legal Adviser to the General People's Committee for Finance** | July 2010 to Oct 2011 |
| Libyan Arab Jamahiriya, Tripoli | |
| **Assistant Controller of the Libyan Mission to the United Nations** | Feb 2006 to June 2010 |
| United Nations, New York | |
| **Legal Adviser to the General People's Committee for Finance** | Dec 1997 to Jan 2006 |
| Libyan Arab Jamahiriya, Tripoli | |
| **Staff Attorney, Department of State Litigation** | Jan 1993 to Dec 1997 |
| Libyan Arab Jamahiriya, Tripoli | |
| **Legal Adviser, Advisory and Legislative Department** | Oct 1992 to Dec 1992 |
| Libyan Arab Jamahiriya, Tripoli | |

## Memberships and Other Activities

- Member of Supervisory Board – Libyan Iron and Steel Company
- Member of the drafting committee for the Libyan E-commerce Transactions Law and the implementing regulations for the Labor Relations Act and the Local Government Act, among others.
- Member of the Ministry of Finance committee charged with supervising the execution of civil judgments against the Libyan State.
- Member of several investigative and audit committees and disciplinary boards charged with the investigation of financial and administrative offenses.
- Member of several committees charged with overseeing the closure of Libyan embassies and consulates abroad.
- Lecturer on financial and administrative legislation, training courses for members of the National Accounting Office.
- Member of the Committee on Administrative and Financial Matters (Fifth Committee) of the General Assembly of the United Nations in New York.

## Status of Judicial Operations in Major Libyan Cities (2014-2024)

| Year | Tripoli | Benghazi | Sabha | Misrata | Zawiya | Notes |
|---|---|---|---|---|---|---|
| 2014 | Operating Jan to May and Nov to Dec | Operating Jan to Oct; suspended Nov to Dec | Operating all year | Operating all year | Operating all year | • Conflict in Tripoli erupted in June, leading to a temporary suspension of judicial operations from June to November 2014.<br>• Conflict in Benghazi caused a suspension of judicial operations from late 2014 until 2017. |
| 2015 | Operating all year | Suspended all year | Operating all year | Operating all year | Operating all year | • Conflict in Benghazi continued to disrupt judicial operations. |
| 2016 | Operating all year | Suspended all year | Operating all year | Operating all year | Operating all year | • Conflict in Benghazi continued to disrupt judicial operations. |
| 2017 | Operating all year | Suspended all year | Operating all year | Operating all year | Operating all year | • Conflict in Benghazi continued to disrupt judicial operations. |
| 2018 | Operating all year | Operating all year | Operating all year | Operating all year | Operating all year | • Situation normal all year. |
| 2019 | Suspended from Jan to Mar | Suspended from Apr to Jun | Suspended from Apr to Jun | Operating all year | Operating all year | • Conflict across Libya disrupted judicial operations in Tripoli, Benghazi and Misrata from mid-2019 to late 2021. |
| 2020 | Suspended all year | Suspended from Apr to Jun | Suspended from Apr to Jun | Suspended from Apr to Jun | Suspended from Apr to Jun | • COVID-19 pandemic disrupted judicial operations between April and June; all cities affected.<br>• Judicial operations in Tripoli suspended all year. |
| 2021 | Suspended from Sep to Dec | Suspended from Apr to Jun | Suspended from Apr to Jun | Operating all year | Operating all year | • Conflict across Libya disrupted judicial operations in Tripoli, Benghazi and Misrata at various times during 2021. |
| 2022 to 2024 | Operating normally | Operating normally | Operating normally | Operating normally | Operating normally | • Situation normal throughout 2022, 2023 and 2024 to date. |

# EXHIBIT J

**Description of Documents Related to Exhaustion of Remedies in Libya**

**al-Suyid et al v. Hifter et al**

**SUYID - 000003 - 000032:**

**Document No. 1: Complaint No. 1 Filed with the Attorney General's Office dated November 19, 2014**

Copies of documents from the Office of the Attorney General (OAG) of Libya show a public prosecutor's appointment to be in charge of the complaint against Hifter and others. The case was filed by a lawyer acting on behalf of six clients petitioning the OAG to issue arrest warrants against four individuals, among them Khalifa Belgasem Hifter, and the Speaker and members of the Parliament, to start criminal proceedings against them for the crimes committed in Benghazi in October 2014.

Moahmed Al-Krshiny, Ibahim's brother (the Plaintiff) is one of those who filed this complaint on behalf of his family.

The first page of the document is the appointment of a prosecutor by the office of the Attorney General dated November 27, 2014.

Other than interrogating the complainants by the public prosecutor, the OAG took no measures to progress the case.

**SUYID - 000013 - 000132:**

**Document No. 2: Investigation Interview Questions with Complainants by Public Prosecutor December 11, 2014**

After filling Complaint No. 1, the Public Prosecutor interviewed those who filed the complaint. The file contains a complaint filed by 56 complainants at the Public Prosecutor's Office in Tripoli and Zliten. The first affidavit was in Zliten (a Libyan city) on December 11, 2014, and the last (starts on page 89) was made in Zliten on February 12, 2015. The document is 100 pages long.

Mohamed Al-Krshiny, Ibahim's brother (the Plaintiff), was questioned by the Public Prosecutor.

**SUYID - 000133 - 000139:**

**Document No. 3 Complaint No. 2 filed July 17, 2016**

Complaint No. 2 was filed with the Office of the General Attorney of Libya by 56 complainants on July 17, 2016. Number one on the list of petitioners is Muna al-Suyid. The complaint petitioned the Office of the General Attorney of Libya to investigate the attacks on the lives and properties of the petitioners in Benghazi, allegedly committed by Col. Mahdi al-Barghathi and

eight others, in October 2014. All nine named individuals were field commanders under the leadership of Khalifa Belgasem Hifter.

A full copy of the complaint was published on a pro-Hifter Facebook account on August 6, 2016. The post threatened retributions against the complainants and their relatives in Benghazi.

**SUYID - 000140:**

**Document No. 4 Complaint No. 2 filed August 7, 2016**

Ms. Muna al-Suyid filed a complaint with the Office of the Attorney General of Libya on August 7, 2016, petitioning the OGA to start an investigation into the leaking of the Complaint No. 2 (July 17, 2016), which exposed the names of the complainants, thus endangering their relatives and themselves.

**SUYID - 000141 - 000146:**

**Document No. 5 Copy of Facebook Threats August 6, 2016**

A copy of a post published by a pro-Hifter account on Facebook showing images of the complaint filed by Ms. Muna al-Suyid.  The post on Facebook warns those who filed the complaint against al-Zahawi and al-Bargathi. It should be noted that the post was shared 78 times and received 781 likes after 8 hours of its posting.

# EXHIBIT K



## Libyan Leader faces terrorist-supporter smear campaign in US courts

**October 7, 2025**

**By John Rossomando**

The Muslim Brotherhood's campaign of lawfare and disinformation against Libyan Field Marshal Khalifa Haftar (often spelled "Hifter") persists unabated.  In April 2024, a lower court ruled that U.S. courts lacked jurisdiction over Haftar, who leads the Libyan National Army (LNA) — Libya's most powerful military faction.  However, the plaintiffs appealed, and the Fourth Circuit Court of Appeals accepted the case in June 2024.  This ongoing legal battle represents a continuation of the Islamist movement's broader perception war against him.

Libya's Muslim Brotherhood has vilified Haftar for years, labeling him a "war criminal," an enemy of democracy, a "coup leader," and a successor to Moammar Gaddafi.  These accusations intensified with Haftar's 2014 military campaign against them.  The post-Gaddafi political settlement imposed a Feb. 7, 2014 expiration date on the General National Congress's term, which the Islamist-controlled body ignored.  This blatant disregard for the rule of law prompted Haftar to launch Operation Dignity in May 2014, aimed at dismantling Islamist militias.

Pro-Brotherhood outlets, such as Qatar's Al Jazeera, Middle East Eye, and Middle East Monitor, have amplified narratives maligning Haftar.  These stories have seeped into mainstream Western media, including The Washington Post and The New York Times, entrenching the Brotherhood's framing.

The Brotherhood's American affiliates, particularly the Libyan American Alliance (LAA) led by Virginia surgeon Esam Omeish, have sought to leverage U.S. government power through a series of lawsuits.  The LAA initiated litigation shortly after Haftar's 2019 conversation with President Donald Trump, with the apparent goal of halting Haftar's offensive against Tripoli.  The group collaborated with attorney Faisal Gill, who has past associations with the American Muslim Council (AMC), a Muslim Brotherhood front group.

The plaintiffs' current counsel, Asim Ghafoor, has his own troubling history.  He served as spokesman for Care International, linked to the 1993 World Trade Center bombing and the 1998 U.S. embassy bombings in Kenya and Tanzania.  Ghafoor also represented the Global Relief Foundation (GRF), an Islamic charity shut down in 2002 for ties to Osama bin Laden, al-Qaeda, and other terrorist networks.

Social media activity from some plaintiffs reveals ideological biases and attempts to conceal their relatives' affiliations with al-Qaeda fighters killed in combat with the LNA.  Others failed to prove in court that their family members were killed by the LNA, given the chaos of war and shelling by militias loyal to the rival Government of National Accord (GNA).



This case exemplifies "malicious prosecution" — litigation driven by ill will, revenge, bias, or ulterior motives.

Consider the current plaintiffs: Muna al-Suyid and her co-plaintiffs Abdalla al-Krshiny, Ahmad al-Krshiny, Mahmud al-Krshiny, and Ibrahim al-Krshiny (also transliterated as al-Karshini). An X account attributed to al-Suyid by Libyan journalist Mohammed Al-Shaafi shows explicit support for the al-Qaeda-linked Benghazi Revolutionaries Shura Council and Libya's Brotherhood — and al-Qaeda-linked Grand Mufti Sadiq al-Ghariani. This positions al-Suyid as a pro-Brotherhood, pro-al-Qaeda partisan with a clear grudge against Haftar rather than an impartial victim.

In her book *Benghazi: Know Thy Enemy: A Cold Case Investigation*, CIA targeter Sarah Adams details how al-Suyid's father, Abdel Salam al-Suyid, led an assassination team in Benghazi's Bouhdima neighborhood for the al-Qaeda-linked group Ansar al-Sharia. Adams reports that Benghazi residents informed her that al-Suyid's family members were killed by enraged neighbors, not the LNA. Similarly, the al-Krshiny relatives were al-Qaeda combatants targeted in operations against Haftar's forces.

The Brotherhood- and Qatari-controlled International Union of Muslim Scholars (IUMS), which supported al-Qaeda jihadists during the 2011 uprising against Gaddafi, accused Haftar in 2014 of leading a "coup" against the illegally seated government. It urged Libyans to resist him and condemned his efforts to "cleanse Libya of the Brotherhood." Haftar's actions were, in fact, responses to the Brotherhood's illegal activities: hijacking the state after losing the July 2012 elections and backing terrorist militias that plunged Libya into anarchy. Al-Qaeda in the Islamic Maghreb (AQIM) echoed this, denouncing Haftar's campaign as a "war on Islam" — a common jihadist recruitment tactic.
It branded him a "traitor" and called on Libyan tribes to disavow him. This rhetoric has been imported to the U.S. by the Libyan Brotherhood's American allies. Omeish, labeled a "terrorist" by Libya's House of Representatives for his Brotherhood activities, maintains close ties to Libyan Brotherhood figures like State Council chairman Khalid al-Mishri. In 2016, Omeish portrayed Haftar as another Gaddafi bent on restoring military rule and endorsed the al-Qaeda-linked Mujahideen Shura Council of Derna, glossing over its extremist ties by calling it a group of "moderate" Islamists. Beyond his Libyan connections, Omeish has strong ties to the U.S. Democrat party.

In essence, Haftar faces a siege from individuals with deep ties to the Muslim Brotherhood and al-Qaeda, all because he seeks to dismantle their destructive influence in Libya. The accusations lack substantive merit, rooted instead in the biases of terrorist sympathizers who ravaged the country after Gaddafi's fall. These claims should be dismissed as the baseless lawfare they are.

https://www.americanthinker.com/blog/2025/10/libyan_leader_faces_terrorist_supporter_smear_campaign_in_us_courts.html