IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MUNA AL-SUYID, et al.,                )
                                       )
          Plaintiffs,                  )
                                       )
     v.                                )          1:20-cv-170 (LMB/JFA)
                                       )
KHALIFA HIFTER,                        )
                                       )
          Defendant.                   )

MEMORANDUM OPINION

This civil action arose from a period of armed conflict in Libya in which warring militia groups attempted to gain control of the country's central government. Plaintiffs Ibrahim al-Krshiny ("Ibrahim"), Abdalla al-Krshiny ("Abdalla"), Ahmad al-Krshiny ("Ahmad"), and Mahmud al-Krshiny ("Mahmud") are citizens and residents of Libya who have asserted claims pursuant to the Torture Victim Protection Act ("TVPA") against defendant Khalifa Hifter ("Hifter"), the Field Marshal of the Libyan National Army ("LNA"). Specifically, plaintiffs allege that Hifter used his leadership role within the LNA to authorize the torture of plaintiffs and the indiscriminate killings of their family members in the fall of 2014. Hifter has filed a Motion for Summary Judgment ("Motion"), which the Court granted after oral argument. This Memorandum Opinion expands upon the oral ruling that granted Hifter's Motion.

I.

The TVPA was added to the Alien Tort Statute in 1991 "to authorize a federal statutory cause of action on behalf of victims or their representatives for acts of torture or extrajudicial killings."[1] Fisher v. Great Socialist People's Libyan Arab Jamahiriya, 541 F. Supp. 2d 46, 54

---

[1] The Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73, is codified at the note following the Alien Tort Statute, 28 U.S.C. § 1350.

(D.D.C. 2008). "The purpose of the statute, as stated by both the House and Senate reports, is to unambiguously provide a federal cause of action against the perpetrators of such abuse, as well as to extend a civil remedy to U.S. citizens who may have been tortured abroad." Doe v. Qi, 349 F. Supp. 2d 1258, 1279 (N.D. Cal. 2004). Section 2(a) provides:

> (a) **Liability.** An individual who, under actual or apparent authority, or color of law, of any foreign nation—
>
>> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
>>
>> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

This provision creates two categories of claims. Section 2(a)(1) creates a cause of action for individuals who themselves are subjected to torture. Section 2(a)(2) creates a cause of action for the legal representatives of individuals who have been subjected to an extrajudicial killing, or for any person who may be the claimant in a wrongful death action on behalf of a victim of an extrajudicial killing.

## II.

On February 18, 2020, plaintiffs Ibrahim, Abdalla, Ahmad, and Mahmud—along with plaintiff Muna al-Suyid ("Muna"), whose claims have since been dismissed—filed this civil action against defendant Hifter.[2] [Dkt. No. 1]. Each plaintiff asserted a claim under TVPA § 2(a)(1), alleging that Hifter's forces subjected them to torture. Id. ¶¶ 9–11. Plaintiffs Muna and Ibrahim also asserted claims under TVPA § 2(a)(2), which were premised on the alleged extrajudicial killings of their family members. Id. ¶¶ 9–10.

Relevant here, the Complaint alleges that on October 17, 2014, Hifter's forces "attacked

---

[2] The original Complaint also named defendants Khalid Hifter and Saddam Hifter, but they were dismissed from this civil action on September 29, 2020. [Dkt. No. 52].

the al-Krshiny family home in Benghazi," at which time the "home was taken under fire by the LNA, and a gunfight ensued." Id. ¶¶ 34, 36. Ibrahim was subsequently taken prisoner by Hifter's forces; falsely accused of being a member of the Islamic State; detained at the LNA's barracks; and subjected to multiple forms of torture, including being stripped, bound, and beaten with fists, pipes, cables, a broom handle, and a plastic hose. Id. ¶¶ 37–40. The Complaint also claims that Ibrahim was "forced to stand in water and be painfully electrocuted, for five minutes at a time, for approximately seven and a half hours" and that he was "blindfolded, driven into a forest, and told to walk forward and not look back until he reached a road in the distance." Id. ¶¶ 41–42. As for plaintiffs Abdalla, Ahmad, and Mahmud, the Complaint alleges that they were detained, brought in a truck to an LNA camp, and wounded after LNA forces opened fire on the truck. Id. ¶ 45.

On April 12, 2024, the Court entered an Order granting in part defendant's original Motion for Summary Judgment, finding a lack of personal jurisdiction over Hifter. [Dkt. No. 296] at 2. The Fourth Circuit reversed, holding that "the district court erred in granting summary judgment to Hifter based on lack of personal jurisdiction because Hifter waived any such defense by failing to raise it in his pre-answer motions to dismiss." al-Suyid v. Hifter, 139 F.4th 368, 373 (4th Cir. 2025). The Fourth Circuit remanded the action "without considering the alternative grounds for affirmance that Hifter offer[ed]." Id. at 374–75. On September 5, 2025, this Court held a status conference to set deadlines for summary judgment briefing. [Dkt. No. 320].

On November 4, 2025, Hifter timely filed a renewed Motion for Summary Judgment, which contained several arguments, including that plaintiffs lacked sufficient evidence to demonstrate that Hifter was acting under color of law; that Hifter was not properly served; that he was entitled to head-of-state immunity; that plaintiffs failed to exhaust the remedies available to them in Libya; and that there was insufficient evidence of command responsibility to support

3

liability. [Dkt. No. 329] at 13–30. On November 7, 2025, the Court scheduled oral argument on Hifter's Motion for January 9, 2026. [Dkt. No. 327]. Plaintiffs subsequently filed an opposition to the Motion, [Dkt. No. 331], and Hifter filed a reply, [Dkt. No. 332]. Importantly, in Section F of his reply brief, Hifter argued for the first time that there was no evidence in the record showing that plaintiffs were subjected to torture within the meaning of the TVPA. Id. at 17–18. Although a claim under § 2(a)(1) cannot proceed without evidence of torture, plaintiffs did not seek leave to file a surreply to respond to Hifter's contention.

On January 8, 2026, one day before the January 9, 2026 oral argument, the Court entered an Order dismissing without prejudice Muna's § 2(a)(1) and § 2(a)(2) claims and Ibrahim's § 2(a)(2) claim. [Dkt. No. 333] at 8. The Order explained that both Muna and Ibrahim lacked standing to sue under § 2(a)(2) because there was insufficient evidence in the record to establish that they were the legal representatives of their deceased family members or that they could have qualified as claimants in a wrongful death action under Virginia state law. Id. at 5. The Order also explained that there was absolutely no evidence in the record—or allegations in the Complaint—indicating that Muna had been subjected to torture. Id. at 4. Finally, the Order made clear that the Court would hear oral argument as scheduled on January 9, 2026 "on defendant's Motion for Summary Judgment as it relates to the claims and plaintiffs remaining in this civil action—namely, the individual claims under TVPA § 2(a)(1) brought by Ibrahim al-Krshiny, Abdalla al-Krshiny, Ahmad al-Krshiny, and Mahmud al-Krshiny." Id. at 8.

On January 9, 2026, the Court held oral argument, but plaintiffs' counsel did not appear. [Dkt. No. 334]. By an Order dated January 12, 2026, the Court stated:

> As discussed on the record with defense counsel, the Court is concerned that there is insufficient evidence in the record demonstrating that the four remaining plaintiffs were victims of torture that can be attributed to defendant Khalifa Hifter. Their counsel's failure to appear and failure to seek leave to file a surreply to respond to Section F of defendant's reply brief—which argued that there is no

4

evidence in the record showing that any of the remaining plaintiffs were actually tortured, [Dkt. No. 332] at 17–18—has left these core issues unaddressed.

[Dkt. No. 335] at 1. Accordingly, the Court ordered plaintiffs to "show cause by Friday, January 16, 2026 that there is sufficient evidence in this civil action to create a material dispute as to whether any remaining plaintiff was actually the victim of torture and as to whether that torture can be attributed to defendant Hifter." Id. at 2.

On January 16, 2026, plaintiffs filed a three-page response, which contained a two-paragraph argument section baldly asserting that Hifter's forces subjected plaintiffs to torture:

> Multiple exhibits included in this submission provide evidence which shows the Plaintiffs were subjected to torture. Exhibits 2, 6, 9, 11, 12, 16, 23–29. In Exhibit 2, Abdalla al Krshiny described that the al Krshiny home was attacked by gunfire on October 17, 2014, and he and his brothers were under fire, at which point they had to surrender to individuals identified as the 21st Battalion. They were then taken to a military barracks. They were then shot at while inside a box where he and his brothers were further injured or killed. He explained that he was then held captive for 23 to 25 days. Exhibits 6, 9, 11, 12, 16, and 23–29 support the above facts. Thus, the plaintiffs were subjected to torture.
>
> Further, Exhibits 1, 3-5, 7, 8, 10, 13–15, and 17–22 show that these acts of torture can be attributed to Defendant Hifter. Notably, as seen in Exhibit 17, Defendant admits that his group started Operation Dignity, and that its goal was to kill criminals and terrorists. Further, Hifter confirmed in Exhibit 21 that Bukamada, who the al Krshiny plaintiffs said they met while being captive in the exhibits above, was part of the LNA leadership. Most importantly, Hifter admitted in Exhibit 19 and 22 that he was in command of all individuals volunteering for [sic] Libyan National Army during the Operation Dignity and that the Neighborhood Youths were collaborating with the LNA. Further, Hifter agreed that in October 2014, he was the highest position in the LNA. Exh. 18. Thus, there is sufficient evidence to show that the attack and capture of the al Krshiny plaintiffs was attributable to Defendant Hifter.

[Dkt. No. 336] at 2–3. Attached to plaintiffs' response were 370 pages of exhibits, including excerpts of transcripts from the depositions of Abdalla, Ahmad, Mamhud, and Hifter; plaintiffs' interrogatory responses; photos of what plaintiffs claim to be the al-Krshiny home in Libya; and medical records purporting to belong to Ibrahim. Importantly, plaintiffs' response did not attach any excerpts of the transcript of Ibrahim's deposition which, according to Hifter, was cut short

5

because Ibrahim refused to answer questions about whom he had spoken to regarding this litigation.[3] [Dkt. No. 339] at 3 n.7. Hifter filed an opposition, arguing that plaintiffs' evidence of injuries and detention did not establish torture under the TVPA. Id. at 6–9. Plaintiffs did not file a reply. On February 20, 2026, the Court held a second hearing on Hifter's Motion, and after hearing arguments from both parties, the Court granted defendant's Motion. [Dkt. No. 345].

III.

As a threshold matter, plaintiffs' three-page response to the Court's January 12, 2026 Order was insufficient. First, plaintiffs did not provide the Court with specific citations to the relevant information contained in each exhibit. Instead, plaintiffs merely provided citations such as "Exhibits 2, 6, 9, 11, 12, 16, 23–29," which is remarkably deficient given that those exhibits spanned across 187 pages. "By failing to cite any specific, relevant facts in the supplemental evidentiary materials, [plaintiffs] effectively left to the [undersigned] the unenviable task of poring over the [370] pages of attached exhibits in search of bits of evidence that could preclude summary judgment." Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc., 33 F.3d 390, 395–96 (4th Cir. 1994). Moreover, as Hifter correctly points out, [Dkt. No. 339] at 3–4, plaintiffs' response cited evidence related to only one plaintiff, Abdalla, and did not identify which evidence supported the claims that Ahmad, Mahmud, and Ibrahim were tortured. Absent references to specific evidence in the record and proper analysis linking that evidence to each individual plaintiff remaining in this action, the Court was left only to speculate as to plaintiffs' torture claims and how plaintiffs would have used the evidence to support their claims that they were subjected to torture by Hifter's forces. It is not the Court's job to assume the role of

---

[3] During the February 20, 2026 hearing on Hifter's renewed Motion for Summary Judgment, the Court explained that Ibrahim's refusal to answer questions during his deposition was problematic given an overarching concern that plaintiffs were pursuing litigation against Hifter solely for political purposes.

plaintiffs' advocate and comb through voluminous exhibits to piece together plaintiffs' claims. Simply put, "even assuming arguendo" that the Court "had some duty to consider the . . . exhibits, it would have remained well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate." Cray Commc'ns, Inc., 33 F.3d at 396.

Additionally, several of plaintiffs' exhibits are inadmissible. See Fed. R. Civ. P. 56(c)(2). For example, the purported photos of the al-Krshiny home, [Dkt. No. 336-24], are inadmissible because they have not been verified or authenticated by sworn testimony. See Mbugua v. Carlin, No. 1:23-cv-4842, 2025 WL 1703620, at *2 n.2 (D.S.C. June 18, 2025). The documents which plaintiffs have labeled as the "[m]edical records of Ibrahim al Krshiny," [Dkt. No. 336] at 2, are inadmissible because many of the records do not relate to Ibrahim. Rather, the records include a death certificate for an individual named Mostafa Mohamed Ibrahim, [Dkt. No. 336-25] at 11–12; a forensic report regarding the death of an individual named Ali Mohamed Mohamed Al-Karshini, id. at 13; a death certificate for an individual named Mostafa Mohamed Al-Karshini, id. at 18; and a discharge sheet for an individual named Ahmed Mohamed Ibrahim Al-Karshini, who is identified on the form as female, id. at 14. Plaintiffs' interrogatory responses, [Dkt. Nos. 336-23, 336-26, 336-27, 336-28], are inadmissible because they are not sworn and have not even been signed by plaintiffs. See Wood v. Credit One Bank, 277 F. Supp. 3d 821, 831 (E.D. Va. 2017). Finally, plaintiffs cannot rely upon the allegations in the unverified Complaint, [Dkt. No. 336-29], because "[a]llegations contained in a complaint are not evidence, and cannot defeat a motion for summary judgment." Cambridge Capital Grp. v. Pill, 20 Fed. Appx. 121, 124–25 (4th Cir. 2001). For all these reasons, exhibits 23–29, [Dkt. Nos. 336-23–29], are inadmissible.

IV.

Turning to the merits, the Court must determine if the admissible evidence in the record creates a "genuine dispute" as to whether any one or all of the plaintiffs were subjected to

7

torture. Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovants'] position will be insufficient" to overcome a motion for summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### A.

The TVPA contains a "rigorous" definition of torture. Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002). Specifically, § 3(b)(1) defines torture as:

> Any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions) . . . is intentionally inflicted on that individual for such purposes as obtaining from that individual or third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

This definition contains a "severity requirement" that is "crucial to ensuring that the conduct proscribed by . . . the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotates and invokes." Price, 294 F.3d at 92. Torture "does not automatically result whenever individuals in official custody are subjected even to direct physical assault." Id. at 93. Rather, the term is "usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electronic currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." Id. at 92–93 (quoting S. Exec. Rep. No. 101-30, at 14 (1990)). "The critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim. The more intense, lasting, or heinous the agony, the more likely it is

to be torture." Id. at 93; see, e.g., Nikbin v. Islamic Republic of Iran, 517 F. Supp. 2d 416, 425 (D.D.C. 2007) (concluding that "striking [the plaintiff] repeatedly on the soles of his feet with an electric cable, hanging [him] upside down from the ceiling during an interrogation session, and assaulting [him] with a coke bottle prior to his departure from Iran" were acts of torture).

B.

In their response to the Court's January 12, 2026 Order, plaintiffs' brief describes the alleged torture to which plaintiffs were exposed. First, all four plaintiffs claim that they were subjected to torture when "the al Krshiny home was attacked by gunfire on October 17, 2014." [Dkt. No. 336] at 2. According to Abdalla's and Mahmud's deposition testimony, a gunfight ensued at their family home, and several individuals "burned the cars that were parked in front of the house," burned "the shops in front of the house," and fired bullets at the house. Deposition Transcript of Abdalla al-Krshiny, Nov. 3, 2021, at 25:20–26:11 (hereinafter "Abdalla Dep. Tr."); see Deposition Transcript of Mahmud al-Krshiny, Nov. 4, 2021, at 24:21–25 (hereinafter "Mahmud Dep. Tr.") ("I heard shooting. I heard gunfire sound. And there was something resembling like a shell exploding on the balcony in my house."). During the gunfight, Mahmud's leg was injured. Mahmud Dep. Tr. at 24:24–25. Both Abdalla and Ahmad responded to the attack using rifles and by firing several rounds of ammunition. Abdalla Dep. Tr. at 27:19–25; Deposition Transcript of Ahmad al-Krshiny, Nov. 4, 2021, at 27:16–19 (hereinafter "Ahmad Dep. Tr.").

Second, in their brief, plaintiffs allege they were subjected to torture when they were "taken to a military barracks" and "shot at while inside a box," [Dkt. No. 336] at 2; however, the evidence submitted by plaintiffs does not support the claim that they were shot at while in a box. Instead, Abdalla and Mahmud described during their depositions that after the gunfight they were "captured" and taken to an LNA camp. Abdalla Dep. Tr. at 28:14–17; see Mahmud Dep.

9

Tr. at 27:12–14. While they were being transported to the camp, an individual opened the door of the enclosed truck, "closed the door shortly afterwards," and then "started shooting." Ahmad Dep. Tr. at 29:13–20. Mahmud was "injured again in his leg," Abdalla "was lightly injured," and Ahmad "received a very heavy wound in [his] leg." Id. at 29:13–23. It is unclear from the record whether Ibrahim was in the truck at that time. After the incident, Mahmud received antibiotics and a bandage, and Ahmad was "transferred to the Benghazi Medical Center for treatment." Mahmud Dep. Tr. at 47:12–16; Ahmad Dep. Tr. at 41:19–23.

Finally, although plaintiffs' brief alleges that Abdalla was tortured when he was "held captive for 23 to 25 days," [Dkt. No. 336] at 2, his deposition testimony consists solely of the following description of his time in captivity:

> We suffered for approximately 23 days in that camp, and it was true hell because the position of that camp, it was right in the fire zone, day and night hear firing and shooting and missiles flying by. They would give us one bottle of water to share. It was a very difficult situation. I remember that camp, Camp 21, is positioned in the neighborhood that's called the Tabaleen or the beginning of the area called Gayunes.
>
> . . .
>
> [A]pproximately ten days into our captivity in Camp 21, one night a person entered our cell, and he was wearing a headlight and pointing it at us, as well as a gun, and he started interrogating us and asking us questions that we didn't know what he was talking about. We didn't have any answers. What I understood is that they were trying to arrange some sort of prisoners or war prisoners exchange, but I didn't know any details about that.

Abdalla Dep. Tr. 34:2–35:8.[4] Abdalla also testified during his deposition that he did not sustain any injuries while at the camp, id. at 35:18–21, and that he received treatment and antibiotics from the Red Crescent while he was being held captive for the injuries he sustained as a result of being shot at while inside the truck, id. at 33:3–9. Aside from those statements, there is no

---

[4] Although Abdalla's deposition testimony suggests that he was held in captivity with other individuals, it is unclear from the record who those individuals were.

evidence in the record as to the conditions of confinement, whether Abdalla received food during his captivity, or whether he was ever beaten or threatened with death.

C.

Based on the evidence before the Court—although it is clear that plaintiffs were subjected to the horrors of armed conflict and suffered injuries as a result of that conflict—no reasonable jury could find that plaintiffs were subjected to torture. As an initial matter, the only allegations in the Complaint that describe conduct that would constitute torture are the allegations that Ibrahim was stripped, bound, beaten, and "forced to stand in water and be painfully electrocuted, for five minutes at a time, for approximately seven and a half hours." [Dkt. No. 1] at ¶¶ 37–41. Those allegations, if proven, would demonstrate that Ibrahim was tortured, see Chowdhury v. Worldtel Bangladesh Holding, Ltd., 746 F.3d 42, 52 (2d Cir. 2014); however, there is no evidence in the record that corroborates those claims. Rather, Ibrahim's deposition has not been included in the summary judgment record, and the only evidence in the record relating to Ibrahim's injuries is a medical report from April 2015 which documents that he lost his eye due to a gunshot, [Dkt. No. 336-25] at 16; however, it is unclear when, and under what conditions, that injury occurred, and that injury alone would not qualify as evidence of torture.

After having engaged in extensive discovery, plaintiffs' allegations of torture reduce to the following: All four plaintiffs allege they were shot at during the gunfight at the al-Krshiny home and while being transported in a truck to the LNA camp, and Abdalla alleges that he was held in captivity for 23 to 25 days. [Dkt. No. 336] at 2. None of these incidents qualify as torture. For one, being shot at—even "in the course of [an] abduction"—"in and of itself[] does

11

not suggest torture." Fritz v. Islamic Republic of Iran, 320 F. Supp. 3d 48, 81 (D.D.C. 2018).[5]

Rather, several cases suggest that TVPA plaintiffs must establish that they were subjected to

"cruel" and "heinous" conduct beyond being shot at. Price, 294 F.3d at 93; see Boniface v.

Viliena, 338 F. Supp. 3d 50, 69 (D. Mass. 2018) ("Taken together, the combination of severe

beatings by multiple individuals at once, threats of imminent death, and gunshot wounds causing

painful, permanent injuries [were] sufficient to allege torture under the TVPA."); Jara v. Nunez,

No. 6:13-cv-1426, 2014 WL 12623015, at *3 (M.D. Fla. June 30, 2014) (finding that a plaintiff

was tortured where the defendants "brutally beat" the plaintiff and then played "Russian

Roulette" with him and "eventually shot him in the head"). Here, there is no evidence in the

record indicating that during the gunfight and while they were being transported to the camp any

plaintiff was subjected to anything more than gunfire, which is not enough to qualify as torture.

All that Abdalla alleges about having been held captive is that he heard gunfire and

missiles, he was given "one bottle of water to share," he was asked questions one night, and he

received treatment and antibiotics for his injuries. Abdalla Dep. Tr. at 33:3–35:21. This

evidence does not create a genuine issue of material fact as to whether Abdalla was tortured.

Two cases support this conclusion. First, in Price, two Americans were allegedly kept in a

"political prison" for 105 days and subjected to "deplorable conditions while incarcerated,

including urine-soaked mattresses, a cramped cell with substandard plumbing that they were

forced to share with seven other inmates, a lack of medical care, and inadequate food." 294 F.3d

at 86. They were also allegedly kicked, clubbed, beaten, and verbally and mentally abused. Id.

In reviewing the complaint, the D.C. Circuit stated that "the facts pleaded do not reasonably

support a finding that the physical abuse allegedly inflicted by Libya evinced the degree of

---

[5] Although Fritz involved the Foreign Sovereign Immunities Act, that statute incorporates the TVPA's definition of torture. 28 U.S.C. § 1605A(h)(7).

12

cruelty necessary to reach a level of torture." Id. at 94. Specifically, "there [was] no way to determine from the present complaint the severity of plaintiffs' alleged beatings—including their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out—in order to ensure that they satisfy the TVPA's rigorous definition of torture." Id. at 93.

Second, in Simpson v. Socialist People's Libyan Arab Jamahiriya, a cruise ship used the Port of Benghazi as a safe harbor during a severe storm, at which time Libyan authorities boarded the ship, forcibly removed a married couple, held them captive for three months, and "threatened to kill them if they tried to leave." 326 F.3d 230, 232 (D.C. Cir. 2003). When the Libyan authorities released the wife, they "held her husband incommunicado for four more months." Id. In reversing the district court's denial of Libya's motion to dismiss, the D.C. Circuit held that the wife failed to allege sufficient facts to demonstrate she had been subjected to torture. Id. at 234. The court explained that "[a]lthough these alleged acts certainly reflect a bent toward cruelty on the part of their perpetrators, they are not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture." Id.

Here, the admissible evidence in the record demonstrates that Abdalla was held captive for "approximately 23 days." Abdalla Dep. Tr. 34:2–3. Although he claims he was "interrogat[ed]" during "one night," there is no evidence that he was beaten or threatened, or that the interrogator used any cruel interrogation techniques. Id. 34:22–35:8. In fact, Abdalla stated during his deposition that he did not suffer any injuries while at the camp, id. 35:18–21, and that he was permitted to receive treatment and antibiotics from the Red Crescent for injuries he previously sustained, id. at 33:3–9. These facts do not establish that he was subjected to torture because both Price and Simpson rejected the notion that being held captive constitutes torture where the perpetrator's conduct neither rose "to such a level of depravity [nor] caused [the

13

victim] intense pain and suffering." Price, 294 F.3d at 94. Moreover, both Price and Simpson were decided at the motion-to-dismiss stage when the courts accepted the allegations as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Here, even after extensive discovery, no plaintiff has come forward with any evidence supporting their claims that they were subjected to "extreme, deliberate and unusually cruel practice[s]." Price, 294 F.3d at 92 (citation omitted). In fact, Abdalla's testimony that he was permitted to access the Red Crescent and take antibiotics during his time in captivity demonstrates that the perpetrators did not intend to inflict upon him "intense, lasting, [and] heinous . . . agony." Id. at 93.

V.

Because no reasonable jury could find on this record that any plaintiff was subjected to torture, defendant Khalifa Hifter's renewed Motion for Summary Judgment, [Dkt. No. 321], has been granted.[6]

The Clerk is directed to forward a copy of this Memorandum Opinion to counsel of record.

Entered this 9 day of April, 2026.

Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge

---

[6] Because there is insufficient evidence in the record of torture, the Court need not consider the other arguments offered in support of Hifter's renewed Motion for Summary Judgment.